UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                    :
ELIZABETH KENNEDY,                                  :      Case No.
                                                    :
                              Plaintiff,            :
                                                    :      **<u>COMPLAINT</u>**
              -against-                             :
                                                    :
ROBERT BASIL, THE BASIL LAW GROUP                   :
P.C., ARTIFECT LLC, WFT REALTY LLC,                 :
WFT FASHION LLC                                     :
                                                    :
                              Defendants.           :
                                                    :
---------------------------------------------------------------x

       Plaintiff Elizabeth Kennedy ("Kennedy") alleges for her complaint against Defendants, to the best of her knowledge, information and belief, formed after an inquiry reasonable under the circumstances:

<u>JURISDICTION AND VENUE</u>

       1.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121, 28 U.S.C § 1331, 28 U.S.C. § 1338, 28 U.S.C. § 2201, and has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

       2.     This Court has personal jurisdiction over Defendants because they are located and transact business in New York concerning acts, transactions and circumstances relating to the claims alleged herein, and causing harm and tortious injury to Kennedy in New York.

       3.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 for the same reasons that personal jurisdiction over Defendants in New York is proper and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

4.       Plaintiff Elizabeth Kennedy ("Kennedy" or "Plaintiff") resides in Manhattan.

5.       Defendant Robert J. Basil ("Basil") is an attorney licensed to practice law in New York with offices in Manhattan.

6.       Defendant The Basil Law Group, P.C. (the "Basil Law Firm") is a law firm with offices in Manhattan.

7.       Defendant Artifect LLC ("Artifect") is a New York company with offices in Manhattan.

8.       Defendant WFT Realty LLC ("WFT") is a New York company with offices in Manhattan.

9.       Defendant WFT Fashion LLC ("WFT Fashion") is a New York company with offices in Manhattan.

10.      Defendants JOHN and JANE DOEs #1 through #99 are persons and entities, the names of which are presently unknown to Plaintiff, who participated in the wrongful conduct alleged in this Complaint.

## STATEMENT OF FACTS

11.      In 2003, Kennedy graduated from Parsons School of Design with a BFA degree in fashion design.

12.      After graduation, Kennedy gained recognition in the fashion industry for her dress and gown designs, quickly rising to senior roles at prestigious fashion houses, such as Donna Karan, J. Mendel, Max Mara and Isaac Mizrahi Couture.

13.      At age 22, Kennedy became the head designer for Isaac Mizrahi where she designed runway collections and custom couture for clients worldwide. At Donna Karan,

Kennedy played an integral part in the launch of Donna Karan Atelier and was responsible for creating one-of-a-kind gowns and dresses for the red carpet.

14.     In 2007, Kennedy started her own fashion company called Elizabeth Kennedy, LLC (the "Company"). Kennedy was the sole owner and Creative Director of the Company when it was formed.

15.     In 2011, Kennedy created her own website, www.ElizabethKennedy.com, that displays a logo throughout the website titled "Elizabeth Kennedy" which uses a stylized form with a distinctive lettering style. Kennedy used the same logo for tags and labels placed on all of her products from 2011 to present, as shown below:



16.     In May 2012, Kennedy wanted to add a partner to help with her growing company. Kennedy contacted her colleague and friend, Jayne Harkness ("Harkness"), who she worked with at Isaac Mizrahi. Harkness agreed to join the Company as a member and entered into an Operating Agreement with Kennedy where Kennedy and Harkness each held a 50% interest in the Company.

17.     Kennedy hired an attorney to draft an operating agreement for the Company (the "Operating Agreement"). Kennedy instructed the attorney to include a provision in the Operating Agreement that ensured Kennedy could continue to use her name in the event she was no long a member of the Company. Section 2.2 of the Operating Agreement provides:

Name. The name of the Company is '**ELIZABETH KENNEDY, LLC**.' All business conducted in the State of New York shall be conducted under such name. All business of the Company shall be conducted under that name or under any other name, but in any case, only to the extent permitted by applicable law. The Company shall hold all of its property in the name of the Company and not in the name of any Member. If at any time **ELIZABETH KENNEDY** is no longer a Member of the Company, then, upon her demand or the demand of her estate/legal representative, the Company shall change its name from '**ELIZABETH KENNEDY, LLC'** to a name which is not confusingly similar thereto. In addition, upon her demand or the demand of her estate/legal representative, the Company shall execute any documentation necessary for **ELIZABETH KENNEDY** or her estate/legal representative to use the name '**ELIZABETH KENNEDY, LLC.**'

18.     Kennedy did not want restrictions on her pursuing other business opportunities, whether they were unrelated or in direct competition with the Company's interests. Section 2.9(b) of the Operating Agreement provides:

The parties hereto expressly agree that any Member may at any time engage in and possess interests in other business ventures of any and every nature and description, independently or with others, including, but not limited to, engaging in activities which parallel or compete with the business of the Company, and neither the Company nor any other Member shall by virtue of this Agreement have any right, title or interest in or to such independent activities or to the income or profits derived therefrom.

19.     In August 2012, Kennedy began designing custom dresses and gowns for Bergdorf Goodman, a luxury goods department store located in Manhattan.

20.     In December 2014, Kennedy, through the Company, applied for two trademark registrations of Kennedy's personal name, "Elizabeth Kennedy", with the United States Patent and Trademark Office ("USPTO"). The Company submitted the logo used on Kennedy's website, dresses and gowns as the trademark specimen. Kennedy hired a lawyer for the application, paying all related legal and application fees out of her own pocket.

21.     On September 14, 2015, the "Elizabeth Kennedy" trademarks were registered with the USPTO, Registration Nos. 4811444 and 4811445 (the "KENNEDY marks").

22.     From August 2012 to July 2015, Kennedy sold approximately $600,000 worth of goods using the KENNEDY marks first created by Kennedy in 2011.

23.     In the same time period, Kennedy's clientele expanded beyond Bergdorf Goodman to celebrities, including Mariah Carey, Molly Sims and Sharon Osbourne.

24.     In 2015, Kennedy wanted to expand distribution and was looking for new investors.

25.     In June 2015, Kennedy and Harkness met with Defendant Basil for the purpose of raising funds for the Company.

26.     At the meeting, Basil represented himself as attorney and part owner of Defendant Artifect, a company that claims "to strategically support fashion brands across in-house talent needs, brand building tactics and investment prospects." After hearing about the Company Kennedy built, Basil wanted to invest.

27.     On July 19, 2015, Basil prepared an amendment to the Operating Agreement (the "First Amendment") signed by Basil (on behalf of Artifect), Kennedy and Harkness.

28.     The First Amendment memorialized a new ownership structure in which Artifect received a 35% interest in the Company. Kennedy's interest increased from 50% to 51% and Harkness' interest was reduced from 50% to 14%. In exchange, the Company received a $250,000 line of credit from Artifect that was personally guaranteed by Basil.

29.     The Artifect line of credit was secured by the Company's assets and revenues. All monies withdrawn from the line of credit were charged monthly to the Company at a 6% interest rate for the first $150,000 drawn and 3% interest rate for the next $100,000 drawn. The outstanding balance was to be paid in full to Artifect by January 1, 2021.

30.     All withdrawals from the Artifect line of credit were managed by Basil through a bank account he controlled, and all interest payments were automatically deducted from the bank account on a monthly basis.

31.     The First Amendment also appointed Basil and his law firm, Defendant Basil Law Firm, as General Counsel of the Company. Basil hired his personal accountant, Edward Colville ("Colville"), to manage the Company's financials.

32.     As of July 19, 2015, Basil was the Company's attorney, and through Artifect, part owner and financier of the Company.

33.     Basil did not instruct Kennedy to seek the advice of independent legal counsel regarding his conflicting positions as the attorney for the Company who negotiated a loan transaction where Basil's company, Artifect, received interest payments on the credit line and full repayment of the principal borrowed while also receiving a 35% ownership interest in the Company. In addition, Basil did not provide Kennedy with terms of the Artifect $250,000 line of credit and did not obtain Kennedy's written consent on Basil's conflicts.

34.     In December 2015, the Company was gearing up for its first fashion show. Fashion shows are attended by buyers from around the world who purchase clothes worn by runway models to sell in their stores and are critical to the growth and survival of a high-end fashion company.

35.     At the same time the Company was preparing for the fashion show, it was experiencing a cash shortage. In response, Basil decided to unilaterally freeze the Company's bank account, including the balance of the Artifect $250,000 line of credit, effectively prohibiting the Company from participating in the fashion show.

36.     As a result, Kennedy was forced to cover Company expenses out of her own pocket and personally raised $80,000 in family loans to continue to fund the Company. After Kennedy injected the $80,000 into the Company, Basil unfroze the Company's bank accounts and the Artifect line of credit.

37.     On January 16, 2016, Basil, through his wholly owned company, WFT, provided the Company with a $100,000 line of credit at a 6% interest rate to be paid out in monthly payments. In April 2016, WFT also provided the Company with a $210,000 line of credit at a 5% interest rate to be paid out in monthly payments.

38.     Acting as a part owner, lender and attorney to the Company, Basil was obligated to advise Kennedy of his conflicting interests and to instruct her to seek the advice of independent counsel on the WFT lines of credit, to provide Kennedy with the terms of the line of credit and to obtain Kennedy's written consent on Basil's conflicts. Basil did none of those things.

39.     On February 10, 2016, Kennedy had her first fashion show in Manhattan at the Four Seasons Restaurant (now "The Grill"). The Company hired a public relations consultant, a sales consultant and hired models to wear Kennedy's dresses.

40.     The fashion show was a success. Companies in attendance placed orders for dresses and gowns, but no payment was to arrive until August 2016.

41.     In need of immediate funds, on April 12, 2016, Basil prepared a second amendment to the Operating Agreement (the "Second Amendment") signed by Basil (on behalf of Artifect and WFT), Kennedy and Harkness.

42.     The Second Amendment memorialized a new ownership structure in which Basil's other company, WFT, received a 20% interest in the Company and Artifect's 35%

interest remained unchanged. Kennedy's interest was reduced from 51% to 43% and Harkness's interest was reduced further from 14% to 2%. In exchange, the Company received an interest free $500,000 line of credit from WFT. The prior lines of credit issued by Artifect ($250,000) and WFT ($210,000) were fully exhausted.

43.     The WFT $500,000 line of credit was secured by the Company's assets and revenues. The outstanding balance on the new WFT line of credit and prior lines of credit issued by WFT and Artifect were to be all be fully paid by January 1, 2021.

44.     As the Company's attorney, investor and lender, Basil was required to advise Kennedy to seek the advice of independent counsel regarding the WFT $500,000 line of credit that gave Basil's company, WFT, a 20% interest in the Company for money the Company was obligated to fully repay. Basil was also required to provide Kennedy with the terms of the line of credit agreement and to obtain Kennedy's written consent on Basil's conflicts. Basil did none of those things.

45.     Basil also amended § 2.9 of the Operating Agreement which originally permitted Kennedy to engage in business ventures in direct competition with the Company. The amendment states:

> Elizabeth Kennedy agrees not to undertake or be involved in any business that competes with EKLLC during her membership in EKLLC, and also for 90 days after the termination of her membership, for any reason. Specifically excepted from this restriction are (a) Elizabeth Kennedy's continued work for Adeam (or its affiliates), and (b) the performance of any other work by Elizabeth Kennedy that does not involve Elizabeth Kennedy's contribution to design or sales for items marketed at similar price points and containing similar aesthetics as the items marketed by EKLLC during her membership.

46.     Basil told Kennedy the non-compete provision did not affect Kennedy's "right to control the use of [her] own name" and referred to the KENNEDY marks as "your [i.e., Kennedy's] trademark."

47.     Basil's statements gave Kennedy reassurance that the Second Amendment did not prohibit Kennedy from continuing to use her name and that Kennedy was the owner of the KENNEDY marks and would retain ownership of those marks in the event Kennedy was no longer a member of the Company.

48.     Based on his conflicting positions, Basil was obligated to instruct Kennedy to seek the advice of independent counsel on the legal implications of the non-compete and obtain Kennedy's written consent concerning Basil's conflicts. Basil did none of those things.

49.     Between April 2016 and September 2016, sales continued to increase, but the Company was burdened with interest payments owed on the prior lines of credit issued by Artifect and WFT. The Company once again needed to raise additional capital.

50.     Kennedy advised Basil and Colville, who had no experience in the fashion industry, to look into factor financing.

51.     A "factor" is a financial intermediary that purchases receivables from a company. A factor is a funding source that agrees to pay the company the value of the invoice less a discount for commission and fees. Factor arrangements are common in the fashion industry.

52.     Basil showed no interest in a factor arrangement and wanted to be relied on as the only financial source.

53.     Kennedy also introduced Basil to a potential investor who wanted to invest up to $300,000 in the Company. Basil showed no interest in taking on the new investor.

54.     In September 2016, in lieu of a factor arrangement, Basil promised to fund up to $1,000,000 in additional capital if the Company was unable to secure new financing. The Company did not secure additional financing, but Basil still refused to contribute funds.

55.     Instead, Basil convinced a client of his law firm, Noah Bank, to provide the Company with a $500,000 line of credit. Although Basil and WFT guaranteed repayment of monies drawn from the credit line, the line of credit was also secured by the Company's assets.

56.     After closing the Noah Bank loan, Basil prohibited any draws on the loan claiming that the Company he was managing may have provided Noah Bank with false financial information to secure the bank loan.

57.     Immediately after assuming the Noah Bank loan, the Company was again in financial disarray. Bills were not paid on time and the Company was late on collecting its receivables. Kennedy pleaded with Basil to hire a financial officer with actual experience managing financial books and records. Basil agreed to a new hire.

58.     In October 2016, the Company hired Shan Reddy ("Reddy") as its Chief Operating Officer to reorganize the Company's financials and operations.

59.     On October 23, 2016, Basil prepared a third amendment to the Operating Agreement (the "Third Amendment") signed by Basil (on behalf of Artifect and WFT), Kennedy and Harkness.

60.     The Third Amendment memorialized yet another revised ownership structure that further diluted Kennedy's interest and gave Basil, through his affiliated companies, a 71% interest in the Company.

61.     WFT's interest in the Company increased from 20% to 54% and Artifect's interest decreased from 35% to 17%. Kennedy's interest was reduced from 43% to 27% and Harkness's remained at 2%. In exchange, the Company received a $435,500 loan from WFT at 10% per annum and the $500,000 line of credit from Noah Bank. Basil withdrew the prior restraint he placed on the Noah Bank loan.

62.    The Third Amendment waived all repayments rights or interest payments on "any loans, advances, equity contributions or other contributions" to the Company, except for interest payments and repayments of the Noah Bank line of credit. This waiver also extinguished the rights Kennedy had to recover monies she personally loaned to the Company.

63.    The Third Amendment further consolidated Basil's power and authority over the Company by:

    a.    Appointing WFT as the sole managing member who was "solely responsible for the day-to-day operation of EKLLC, including the hiring and firing of all employees, as well as the sole determiner of their compensation";

    b.    Ensuring Basil was the "sole determiner" of additional financing by requiring a majority vote of the Company's members (*i.e.*, WFT) for all "debt transactions"; and

    c.    Changing the location of the Company's office to Basil's law office location.

64.    As a majority owner, lender, attorney, and now managing member responsible for the Company's operations, Basil was obligated to advise Kennedy on his multiple roles and to seek advice from independent counsel regarding Basil's conflicts. Basil was also required to obtain Kennedy's written consent on his conflicts. Basil did none of those things.

65.    Basil also amended the prior non-compete in the Second Amendment by extending the non-compete period from 90 days to 180 days. In consideration for this change, WFT promised to adequately compensate Kennedy, stating:

> In consideration, the managing member will work with Elizabeth Kennedy to develop an acceptable compensation and incentive arrangement to reward her fairly for this contribution.

WFT never provided Kennedy with "an acceptable compensation and incentive arrangement." Indeed, Kennedy was forced to borrow money in order to continue working for Basil and the Company.

66.     Basil was acutely aware of his power over Kennedy to have her sign any document he put in front of her. Days before Kennedy signed the Third Amendment, Basil wrote an email to Kennedy, stating:

> I know you would accept whatever I propose because you understand that I am not trying to take undue advantage, and that if you say 'no' the company dies…I do not want to go forward with a gun to everyone's head, but I need compensation for the financial risks and contributions I would be making.

In response, Kennedy confirmed Basil's statement:

> As you said, I will sign whatever agreement that everyone feels comfortable with.

67.     On November 3, 2016, Kennedy signed the Third Amendment.

68.     Throughout 2017, the Company faced additional capital shortfalls due to Basil's refusal to consider alternative finance arrangements either through factors or third-party financing.

69.     In mid-2017, Basil again froze the Company's bank accounts and withheld corporate funds, only to then unfreeze the accounts to cover payroll.

70.     Basil's solution to the Company's persistent money problems was to have all members relinquish 1% of their ownership interests in the Company and offer 1% membership interests to new investors at no less than $50,000 per 1% piece, thereby placing the value of the Company at no less than $5,000,000.

71.     The $5,000,000 valuation was more than double Basil's valuation just months prior when he negotiated a 71% equity position in the Company for Basil's continued consumption of equity.

72.     In April 2017, Basil memorialized a new ownership structure in a fourth amendment to the Operating Agreement (the "Fourth Amendment").  Kennedy, Harkness and

Basil (on behalf of Artifect and WFT) eventually signed the Fourth Amendment in November 2017.

73.    WFT's interest in the Company decreased from 54% to 51.84% and Artifect's interest decreased from 17% to 16.32%.

74.    Kennedy's interest was reduced again from 27% to 25.95% and Harkeness' was reduced from 2% to 1.92%. The members contributed a total of 4% to the Company's treasury that Basil valued at $200,000.

75.    One percent of the Company was sold to Kennedy's parents for $50,000 and another 1% was sold to one of Basil's colleagues for $50,000.

76.    On November 16, 2017, Reddy requested an emergency meeting concerning the Company's finances. Reddy stated he had not been paid in 8 months and had deferred his compensation based on his understanding that Basil was looking for additional funding to keep the Company afloat. Reddy also confirmed the Company had failed to pay its rent in months, had not withheld the right amount of taxes and was behind on paying bills. Notwithstanding the Company's poor management and financial problems, Reddy also stated the Company had tripled its sales in 2017 from the year prior.

77.    On same day, Kennedy warned Basil if the Company did not raise desperately needed money to pay its bills, cover payroll and taxes and finish the collection for the next fashion season, the Company would be forced into bankruptcy. Kennedy once again pleaded with Basil to consider a factor arrangement. This time Basil relented and agreed to factor financing.

78.    Kennedy continued production of the fashion collection based on Basil's promise to agree to a factor arrangement. Kennedy also relayed the news of factor financing to the

Company's unpaid vendors, hoping to alleviate their concerns about the Company's ability to pay its bills. Without Basil's promise to enter into a factor arrangement, Kennedy would have ceased all production on the fashion collection and would have not communicated with the Company's vendors.

79.     The Company lined up a factor company who agreed to fund the Company. All the necessary paperwork was prepared for Kennedy's and Basil's signatures.

80.     At the 11th hour, Basil reneged on his promise to a factor arrangement claiming it made more economic sense for Basil himself to loan the Company money through his various shells companies (i.e., WFT and Artifect). Basil claimed he could easily fund the Company "without fear of ending up living in a box in the Walmart parking lot if it all went bad."

81.     Basil promised Kennedy and other members that he, not a factor company, would provide necessary funds to keep the Company afloat. This was a lie.

82.     Instead of providing funds, Basil complained to Kennedy that his investment in the Company was "lost, never to return." Later that day, Basil backtracked and stated he had confidence "in the great brand [Kennedy] created." A few days later, Basil reversed again holding the Company hostage by refusing to cover payroll.

83.     On December 8, 2017, Basil asked Colville whether WFT and Artifect could convert WFT and Artifect's equity (now at 68%) to debt. Basil raised this question to purportedly accommodate Kennedy's concern that Basil had too much equity in the Company and it was discouraging new investors. Basil then told Kennedy she was "not personally liable" for any of the Company's debt. Basil, as he would later declare, had no intention of converting his equity to debt.

84.     On December 19, 2017, Kennedy and other members again asked Basil to consider factor financing, bring in new investors and convert some of Basil's equity to debt to avoid bankruptcy.

85.     Basil ignored these requests and declared that WFT was resigning as the Company's managing member due to WFT's "conflicts of interest regarding the close-down." Thus, after 2.5 years as the Company's attorney, majority owner, lender and managing member, the only conflict Basil raised was his disagreement over a possible dissolution due to the Company's inability to pay its debts.

86.     In response, Kennedy sought to fill the void and assume the role as managing member of the Company and offered to assume the Company's debt. Basil rejected Kennedy's proposal.

87.     In fear of losing his grip, Basil claimed the Company had not paid its payroll taxes and all members would face civil and criminal liability for "tax fraud" if the taxes were not paid. This was a lie. Basil had already paid the taxes through WFT's bank account.

88.     In late December 2017, Basil claimed Noah Bank owned all of the Company's assets, including the KENNEDY marks, and that the Noah Bank loan was in default and had to be repaid by the Company. As a solution, Basil proposed that his client, the Company, confess judgment to his other client, Noah Bank.

89.     Basil did not advise any Company member, including Kennedy, to seek advice from independent counsel on whether to confess judgment to Basil's other client (Noah Bank), nor did Basil obtain written consent from Kennedy on his conflicts of interest by simultaneously representing two clients (the Company and Noah Bank) with competing interests.

90.     On January 2, 2018, Kennedy informed Basil and other Company members that the Company was cancelling its spring dress and gown production due to cash flow issues. The Company was unable to purchase fabric or get the production sewn on time.

91.     On January 12, 2018, Basil proposed to dissolve the Company by selling all Company assets, including the KENNEDY marks, as well as reappoint himself, through Artifect, as managing member of the Company. Basil also proposed to sue Kennedy personally and have the Company appoint him as "litigation counsel".

92.     On January 18, 2018, Kennedy advised the Company that she was resigning as the Creative Director of Company because she had not been paid her salary in months and the Company was damaging her reputation and brand. Kennedy again proposed to dissolve the Company. In response, Basil threatened to auction off the KENNEDY marks.

93.     Two days later, on January 20, 2018, Basil advised all Company members, including Kennedy, to turn over all money they received from the Company for the past two years (2016-2018) to Artifect. Basil further threatened to sue anyone who breached a duty to the Company.

94.     Basil then sent an email to Kennedy, stating "Still want to fight me?" after being put on notice that Kennedy had retained counsel due to Basil's continued harassment and litigation threats. Basil tried to persuade Harkness to convince Kennedy to fire her recently hired attorney who was finally questioning Basil's actions.

95.     Although proposing just a week prior to dissolve the Company, on January 21, 2018, Basil sent an email to Kennedy's lawyer advising him that Artifect and WFT were against dissolution. Basil also rejected Kennedy's resignation from her position as Creative Director of the Company and wanted a more restrictive covenant in place to prevent Kennedy from working

in the fashion industry. Basil threatened to use "all of the company's assets, including the company's trademark…solely for the benefit of the company and its creditors."

96.     On the same day, Basil sent an email to Kennedy suggesting she embezzled money from the Company by using the Company's credit card for her personal use. Basil made this statement without any evidence.

97.     As a result of Basil's persistent and calculated mismanagement of the Company and its affairs, Kennedy was forced to declare insolvency as defined in subsection (c) in Article I of the Operating Agreement. Pursuant to § 12.1(b) of the Operating Agreement, Kennedy ceased to be a member of the Company on January 22, 2018.

98.     On January 24, 2018, Kennedy, through her counsel, demanded that the Company (i) immediately change its name from "Elizabeth Kennedy, LLC" and (ii) assign the KENNEDY marks to Kennedy so that she may use the name "Elizabeth Kennedy, LLC" without contraindicating the KENNEDY marks.

99.     On January 29, 2018, Basil changed the name of the company from "Elizabeth Kennedy, LLC" to "WFT Fashion LLC". However, Basil refused to assign the KENNEDY marks to Kennedy.

100.     After Kennedy's withdrawal from the Company, Basil engaged in a smear campaign against Kennedy.

101.     Basil contacted vendors of the Company falsely claiming Kennedy misrepresented the Company's financial status and ability to repay its debts. Basil falsely told vendors that the Company had no money to pay their bills and the "only true source of funds for unsecured creditors resides in claims against [Kennedy's] financial and legal advisors, who may

have been complicit in [Kennedy's] extensions of credit knowing that the amounts owed would never be paid."

102.    In addition, Basil sent an email to the Company's former employees, falsely stating they had each been a "victim of serial misrepresentations concerning the status of the company…[and Artifect and WFT] had no part in those misrepresentations…."

103.    Basil also falsely stated Kennedy "voluntarily and strategically (for herself, not the company)…" withdrew as a member of the Company.

**FIRST CLAIM FOR RELIEF**
**BREACH OF CONTRACT AGAINST ALL DEFENDANTS**

104.    Kennedy repeats and alleges the allegations in paragraphs 1 through 103.

105.    The Operating Agreement constitutes a valid and binding contract.

106.    Defendants breached the Operating Agreement by failing to "execute any documentation necessary for **ELIZABETH KENNEDY** or her estate/legal representative to use the name "**ELIZABETH KENNEDY, LLC**."

107.    Kennedy demanded Defendants assign her the KENNEDY marks. Defendants refused, claiming ownership over the marks notwithstanding Defendants' prior representations that Kennedy is the owner of the KENNEDY marks.

108.    Moreover, at the time of Kennedy's withdrawal from the Company on January 22, 2018, Kennedy held a 25.95% interest in the Company. Based on Defendants' minimum $5,000,000 valuation of the Company, the value of Kennedy's membership interest is at least $1,300,000.

109.    Section 509 of the New York Limited Liability Company Law ("NYLLCL") provides:

Except as provided in this chapter, upon withdrawal as a member of the limited liability company, any withdrawing member is entitled to receive any distribution to which he or she is entitled under the operating agreement and, if not otherwise provided in the operating agreement, he or she is entitled to receive, within a reasonable time after withdrawal, the fair value of his or her membership interest in the limited liability company as of the date of withdrawal based upon his or her right to share in distributions from the limited liability company.

110.   Having withdrawn from the Company in accordance with the Operating Agreement and NYLLCL § 509, Kennedy is entitled to be paid the fair value of her membership interest.

111.   Defendants have not paid Kennedy the value of her membership interest.

112.   As a result of Defendants' breach of the Operating Agreement, Kennedy has suffered damages in both a personal and professional capacity.

113.   Kennedy is entitled an injunction or other equitable relief to prevent Defendants from (i) attempting to sell the KENNEDY marks or (ii) producing and/or distributing unapproved products using the KENNEDY marks.

114.   In addition, Kennedy is entitled to a money judgment for contract damages in an amount no less than $1,300,000 plus prejudgment interest.

## SECOND CLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTY AGAINST BASIL AND THE BASIL LAW FIRM

115.   Kennedy repeats and alleges the allegations in paragraphs 1 through 114.

116.   Basil and the Basil Law Firm were the Company's lawyers and owed the Company and its members fiduciary duties of care and loyalty.

117.   Basil and the Basil Law Firm violated their fiduciary duties by acting as the Company's attorneys, while also being the majority owner, lender and managing member responsible for the Company's business operations.

19

118.     Basil and the Basil Law Firm failed to advise the Company's members, including Kennedy, of their conflicting interests and positions in the Company.

119.     Basil and the Basil Law Firm failed to instruct the Company's members, including Kennedy, to seek advice from independent counsel regarding Basil and the Basil Law Firm's conflicts.

120.     Basil and the Basil Law Firm failed to obtain written consent concerning their conflicts.

121.     As a result, Kennedy has suffered damages of at least $1,300,000 plus prejudgment interest.

**THIRD CLAIM FOR RELIEF**
**MALPRACTICE AGAINST BASIL AND THE BASIL LAW FIRM**

122.     Kennedy repeats and alleges the allegations in paragraphs 1 through 121.

123.     Basil and the Basil Law Firm were the Company's lawyers and owed the Company and its members duties of care and loyalty.

124.     Basil and the Basil Law Firm routinely transacted multiple equity acquisitions and other corporate actions while representing the Company, Basil and the Basil Law Firm's strawmen members (i.e., WFT and Artifect) and Noah Bank while also advising members of the Company on the same transactions with no mention of conflict and intentionally seeking to discourage Kennedy from engaging independent counsel.

125.     Consequently, Kennedy was coerced into relinquishing substantial amounts of equity in the Company, was wrongfully induced into entering numerous transactions that unjustly favored the Basil Law Firm and Robert Basil, and was wrongfully induced into entering agreements that served the interest of the Basil Law Firm and Robert Basil to the detriment of the Company.

126.     As a result, Kennedy has suffered damages of at least $1,300,000 plus prejudgment interest.

## FOURTH CLAIM FOR RELIEF
## BREACH OF FIDUCIARY DUTY AGAINST WFT AND ARTIFECT

127.     Kennedy repeats and alleges the allegations in paragraphs 1 through 126.

128.     WFT and Artifect were managing members of the Company during the relevant time period.

129.     WFT and Artifect owed Kennedy fiduciary duties of care and loyalty.

130.     WFT and Artifect were solely responsible for the day-to-day operations of the Company.

131.     WFT and Artifect violated the fiduciary duties owed to Kennedy through the systematic consumption of the Company that once belonged to its creative force, Kennedy, through self-dealing, manipulation and threats, as described in detail above.

132.     As a result, Kennedy has suffered damages of at least $1,300,000 plus prejudgment interest.

## FIFTH CLAIM FOR RELIEF
## FRAUD AGAINST ALL DEFENDANTS

133.     Kennedy repeats and alleges the allegations in paragraphs 1 through 132.

134.     Defendants made false and material statements to Kennedy as the managing members and attorneys of the Company described with particularity above.

135.     Defendants knew that these statements were false and made them with the intent to deceive Kennedy.

136.     Kennedy justifiably relied on Defendants' statements in continuing her employment with, and membership in, the Company.

137.    As a result, Kennedy has suffered damages of at least $1,300,000, together with punitive damages, plus prejudgment interest.

## SIXTH CLAIM FOR RELIEF
### ACCOUNTING AGAINST ALL DEFENDANTS

138.    Kennedy repeats and alleges the allegations in paragraphs 1 through 137.

139.    In breach of the fiduciary duties owed to Kennedy, Defendants have misappropriated corporate assets and funds for their own benefit.

140.    As a result, Kennedy is entitled to an accounting to determine the value of the misappropriated funds, and upon said accounting, to pay Kennedy the value so determined believed to be no less than $1,300,000 plus prejudgment interest.

141.    Kennedy has no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF
### DECLARATORY JUDGMENT OF OWNERSHIP
### OF TRADEMARKS AGAINST ALL DEFENDANTS

142.    Kennedy repeats and alleges the allegations in paragraphs 1 through 141.

143.    A case or controversy exists between Kennedy and Defendants concerning ownership of the KENNEDY marks.

144.    The KENNEDY marks are inherently distinctive. They are presented in a stylized form with a distinctive lettering style.

145.    The KENNEDY marks have also acquired a secondary meaning as a result of (i) Kennedy's use of the logo on a wide variety of gowns and dresses since at least 2011; (ii) the extensive marketing and advertising of products bearing the KENNEDY marks; and (iii) the fame the logo has achieved as a result.

22

146.    Defendants claim that Kennedy is not the rightful owner of the KENNEDY marks notwithstanding Defendants' prior representations that Kennedy is the owner of the KENNEDY marks.

147.    Kennedy was the first to use the KENNEDY marks in the sale of dresses and gowns and is the owner of the marks.

148.    The operating agreement of the Company, which was drafted by Defendants, explicitly states that Kennedy shall be able to use her name subsequent to the termination of her membership with the Company, and that all documents necessary to effect such usage shall be executed in her favor.

149.    Such documents include the assignment of the KENNEDY marks.

150.    Accordingly, Kennedy is entitled to a declaratory judgment that she is the rightful owner of the KENNEDY marks and that Defendants are not allowed to challenge Kennedy's ownership of the KENNEDY marks.

**EIGHTH CLAIM FOR RELIEF**
**TRADEMARK INFRINGEMENT UNDER**
**15 U.S.C. § 1114 AGAINST ALL DEFENDANTS**

151.    Kennedy repeats and alleges the allegations in paragraphs 1 through 150.

152.    Kennedy owns all right, title and interest in and to the KENNEDY marks.

153.    Defendants have used or intend to use in commerce, without Kennedy's permission, the KENNEDY marks in a manner that is likely to cause confusion mistake or deception with respect to Kennedy's KENNEDY marks, and is likely to cause confusion or mistake and to deceive purchasers as to the affiliation, connection, approval, sponsorship or association of Kennedy and/or her goods, services and commercial activities, on the one hand, with these Defendants and/or their respective goods, services or commercial activities, on the other hand.

154.    Defendants have advised Kennedy that they intend to use the KENNEDY marks "solely for the benefit of the company and its creditors." Defendants have also advised Kennedy that they are attempting to sell the KENNEDY marks.

155.    Defendants intend on using and/or selling the KENNEDY marks notwithstanding Defendants' prior representations that Kennedy is the owner of the KENNEDY marks and Kennedy's demands for the assignment of the KENNEDY marks.

156.    Defendants' acts constitute infringement of the KENNEDY marks under 15 U.S.C. § 1114.

157.    As a direct and proximate result of Defendants' wrongful acts, Kennedy has suffered and continues to suffer and/or is likely to suffer damage to her trademarks, business reputation and goodwill. Defendants will continue to use, unless restrained, the KENNEDY marks or marks confusingly similar thereto and will cause irreparable damage to Kennedy. Kennedy has no adequate remedy at law and is entitled to an injunction restraining Defendants, their respective officers, agents, and employees, and all persons acting in concert with Defendants, from engaging in further acts of infringement.

158.    Kennedy is further entitled to recover from Defendants the actual damages that she has sustained and/or is likely to sustain as a result of Defendants' wrongful acts.

159.    Kennedy is further entitled to recover from Defendants the gains, profits and advantages that Defendants have obtained as a result of their wrongful acts.

160.    Because of the willful nature of Defendants' wrongful acts, Kennedy is entitled to an award of exemplary damages under the common law, and treble damages and increased profits under 15 U.S.C. § 1117.

## NINTH CLAIM FOR RELIEF
## FEDERAL UNFAIR COMPETITION UNDER
## 15 U.S.C. § 1125(A) AGAINST ALL DEFENDANTS

161.    Kennedy repeats and alleges the allegations in paragraphs 1 through 160.

162.    Kennedy owns all right, title and interest in and to the KENNEDY marks.

163.    Defendants have used or intend to use in commerce marks that are substantially similar to the KENNEDY marks on unauthorized merchandise.

164.    Defendants' unlawful acts in appropriating rights in the KENNEDY marks are and were intended to capitalize on Kennedy's goodwill for Defendants' own pecuniary gain.

165.    Defendants' unauthorized use of the KENNEDY marks have caused and are likely to cause confusion as to the source of Defendants' products, all to the detriment of Kennedy.

166.    Defendants' conduct as alleged herein, including their unauthorized use of the KENNEDY marks on merchandise, constitutes a false designation of origin as such conduct is likely to cause confusion and/or to deceive users and consumers as to the origin, sponsorship, affiliation, connection and/or association of Kennedy with Defendants' goods and/or services.

167.    Defendants' products bearing the KENNEDY marks are calculated and intended to deceive and are likely to deceive consumers into believing that they are Kennedy's products and/or Kennedy is associated with the merchandise.

168.    Defendants have chosen to present the KENNEDY marks in the similar font, color and style that Kennedy depicts on similar merchandise.

169.    Defendants are capitalizing on and profiting from the likely consumer confusion between their infringing merchandise bearing the KENNEDY mark, on the one hand, and Kennedy's authentic merchandise bearing the KENNEDY mark, on the other hand.

170.    Kennedy has not approved or authorized Defendants' use of the KENNEDY marks.

171.    Defendants' conduct is willful and deliberate and done with the intent to unfairly commercially benefit from the goodwill associated with Kennedy and Kennedy's brand, fashion and trademarks.

172.    The foregoing acts of Defendants constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

173.    As a direct and proximate result of Defendants' wrongful acts, Kennedy has suffered and continues to suffer and/or is likely to suffer damage to her trademarks, business reputation and goodwill.  Defendants will continue to use, unless restrained, the KENNEDY marks or marks confusingly similar thereto and will cause irreparable damage to Kennedy. Kennedy has no adequate remedy at law and is entitled to an injunction restraining Defendants, their respective officers, agents, and employees, and all persons acting in concert with Defendants, from engaging in further acts of infringement.

174.    Kennedy is further entitled to recover from Defendants the actual damages that she has sustained and/or is likely to sustain as a result of Defendants' wrongful acts.

175.    Kennedy is further entitled to recover from Defendants the gains, profits and advantages that Defendants have obtained as a result of their wrongful acts.

176.    Because of the willful nature of Defendants' wrongful acts, Kennedy is entitled to an award of exemplary damages under the common law, and treble damages and increased profits under 15 U.S.C. § 1117.

**TENTH CLAIM FOR RELIEF**
**COMMON LAW UNFAIR COMPETITION AGAINST ALL DEFENDANTS**

177.    Kennedy repeats and alleges the allegations in paragraphs 1 through 176.

178.    Kennedy owns all right, title and interest in and to the KENNEDY marks.

179.    Consumers identify the KENNEDY marks exclusively with Kennedy.

180.    Kennedy has expended substantial time, resources, and effort to develop and obtain a strong reputation in the marketplace and enormous goodwill in the KENNEDY marks.

181.    Defendants have infringed the KENNEDY marks by using the KENNEDY marks without authorization. Defendants' unlawful acts are intended to capitalize on Kennedy's goodwill for Defendants' own pecuniary gain.

182.    Defendants use of the KENNEDY marks is calculated to and is likely to create confusion and to deceive and mislead consumers into believing that Defendants' products originate with or are authorized by Kennedy, and is likely to cause confusion as to the source of Defendants' products, all to the detriment of Kennedy.

183.    Defendants' acts as alleged herein constitute unfair competition and will, unless enjoined by the Court, continue to result in harm to the goodwill associated with Kennedy.

184.    Defendants committed the acts alleged herein willfully and with the intent to confuse the public and to injure Kennedy.

185.    The acts of Defendants have caused and are causing great and irreparable harm and damage to Kennedy, and unless permanently restrained and enjoined by this Court, such irreparable harm will continue.

186.    As a direct and proximate result of Defendants' actions as stated herein, Kennedy has suffered damage to the goodwill of the KENNEDY marks.

187.    As a result, Kennedy is entitled to exemplary damages as a result of Defendants' malicious actions as described above.

## ELEVENTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

188.     Kennedy repeats and alleges the allegations in paragraphs 1 through 187.

189.     Defendants have benefited from the unlawful and infringing use of the KENNEDY marks because Defendants have derived and/or will derive substantial revenue from the sale of goods and/or the rendering of services offered and/or promoted on retail websites and elsewhere.

190.     It would be against equity and good conscience to allow Defendants to retain the substantial revenue and profits they have realized and/or will realize through their unlawful use of Kennedy's intellectual property.

191.     Defendants have been unjustly enriched by their unlawful use of the KENNEDY marks.

192.     The acts of Defendants have caused and are causing great and irreparable harm and damage to Kennedy, and unless permanently restrained and enjoined by this Court, such irreparable harm will continue.

193.     As a direct and proximate result of Defendants' actions as stated herein, Kennedy has suffered damage to her reputation and damage to the goodwill of the KENNEDY marks. Further, Kennedy is entitled to exemplary damages as a result of Defendants' malicious actions as described above.

## TWELFTH CLAIM FOR RELIEF
### FEDERAL TRADEMARK DILUTION UNDER
### 15 U.S.C. § 1125 AGAINST ALL DEFENDANTS

194.     Kennedy repeats and alleges the allegations in paragraphs 1 through 193.

195.     Kennedy owns all right, title and interest in and to the KENNEDY marks.

28

196. The KENNEDY marks are famous and distinctive marks entitled to protection under 15 U.S.C. § 1125.

197. The KENNEDY marks became famous long before Defendants adopted the KENNEDY marks.

198. Defendants' use of the KENNEDY marks is likely to dilute the distinctive quality of the famous KENNEDY marks in violation of 15 U.S.C. §1125(c).

199. Defendants' acts complained of herein are likely to irreparably damage Kennedy.

200. Kennedy has no adequate remedy at law for such wrongs and injuries.

201. Kennedy is further entitled to recover from Defendants for the actual damages sustained by Kennedy as a result of Defendants' wrongful acts.

202. Kennedy is further entitled to recover from Defendants the gains, profits and advantages Defendants have obtained as a result of their wrongful acts.

203. Because of the willful nature of Defendants' actions, Kennedy is entitled to all remedies available under 15 U.S.C. §§ 1117 and 1118, including, but not limited to, treble damages.

## THIRTEENTH CLAIM FOR RELIEF
### DECEPTIVE ACTS AND PRACTICE UNDER
### NEW YORK GEN. BUS. L. § 349 AGAINST ALL DEFENDANTS

204. Kennedy repeats and alleges the allegations in paragraphs 1 through 203.

205. Kennedy owns all right, title and interest in and to the KENNEDY marks.

206. Consumers identify the KENNEDY marks exclusively with Kennedy.

207. Defendants without Kennedy's authorization or consent, and having knowledge of Kennedys' rights, have attempted to sell KENNEDY marks claiming to be the owners of such marks and have offered goods for sale to the public in direct competition with Kennedy.

208.     Upon information and belief, Defendants' use of Kennedy's name, marks and/or other intellectual property is likely to cause and is causing confusion, mistake and deception among the general purchasing public as to the origin of the Defendants' products, and is likely to deceive the public into believing that goods and/or services being offered for sale by Defendants originate from, are associated with, or are otherwise authorized by Kennedy.

209.     Defendants' deceptive acts and practices involve public sales activities of a recurring nature.

210.     The acts of Defendants have caused and are causing great and irreparable harm and damage to Kennedy, and unless permanently restrained and enjoined by this Court, such irreparable harm will continue.

## FOURTEENTH CLAIM FOR RELIEF
### TRADEMARK DILUTION UNDER NEW YORK
### GEN. BUS. L. § 360-L AGAINST ALL DEFENDANTS

211.     Kennedy repeats and alleges the allegations in paragraphs 1 through 210.

212.     Kennedy owns all right, title and interest in and to the KENNEDY marks.

213.     The KENNEDY marks are famous and distinctive marks within the meaning of New York Gen. Bus. L. § 360-1.

214.     The KENNEDY marks became famous long before Defendants adopted the KENNEDY marks.

215.     Defendants' use of the KENNEDY marks is likely to dilute the distinctive quality of the famous KENNEDY marks in violation of New York Gen. Bus. L. § 360-1.

216.     Defendants' acts complained of herein are likely to irreparably damage Kennedy.

217.     Kennedy has no adequate remedy at law for such wrongs and injuries. The damage to Kennedy includes harm to the KENNEDY marks, goodwill and reputation that money

cannot compensate. Kennedy is, therefore, entitled to a preliminary and permanent injunction enjoining Defendants' use of Kennedy famous trademarks, and/or marks substantially similar thereto, or any marks dilutive of Kennedy's famous trademarks in connection with the promotion, advertisement and sale of any goods, services or commercial activities by Defendants.

218.     Kennedy is further entitled to recover from Defendants for the actual damages sustained by Kennedy as a result of Defendants' wrongful acts.

219.     Kennedy is further entitled to recover from Defendants the gains, profits and advantages Defendants have obtained as a result of their wrongful acts.

220.     Because of the willful nature of Defendants' actions, Kennedy is entitled to all remedies available under New York General Business Law.

### FIFTEENTH CLAIM FOR RELIEF
### VIOLATION OF RIGHT OR PRIVACY AND PUBLICITY UNDER
### NEW YORK CIVIL RIGHTS LAW § 51 AGAINST ALL DEFENDANTS

221.     Kennedy repeats and alleges the allegations in paragraphs 1 through 220.

222.     Defendants have used Kennedy's name, image and likeness within the state of New York for advertising and/or for the purpose of trade.

223.     Defendants use of Kennedy's name, image and likeness has been without the authorization of Kennedy or anyone authorized by her to give such authorization.

224.     Defendants use of Kennedy's name, image and likeness has caused injury to her in an amount to be proven at trial.

225.     Defendants use of Kennedy's name, image and likeness in the manner described herein is forbidden and/or unlawful pursuant to Section 50 of New York Civil Rights Law.

226.     Kennedy therefore demands exemplary damages under Section 51 of New York Civil Rights Law.

227.     Furthermore, Section 51 of the New York Civil Rights Law provides a right to injunctive relief to restrain the unauthorized use of a person's name for purposes of advertising or trade purposes within New York State.

228.     The acts of Defendants have caused and are causing great and irreparable harm and damage to Kennedy, and unless permanently restrained and enjoined by this Court, such irreparable harm will continue.

229.     Kennedy therefore demands that Defendants be enjoined and restrained pursuant to Section 51 of the Civil Rights law of the State of New York from using Kennedy's name for advertising purposes or purposes of trade.

### SIXTEENTH CLAIM FOR RELIEF
### DEFAMATION *PER SE* AGAINST ALL DEFENDANTS

230.     Kennedy repeats and alleges the allegations in paragraphs 1 through 229.

231.     Defendants have intentionally disseminated false and injurious information to third parties by stating Kennedy (i) extended lines of credit to the Company "knowing the amounts owed would never be paid"; (ii) does not intend on contributing anything "to those who are owed money as a result of their contributions to [the] company's progress over the last three years"; (iii) "strategically (for herself, not the company)" withdrew as a member of the Company; (iv) made "misrepresentations to all of [the Company's employees]";

232.     Defendants' intentional dissemination of false and injurious information to third parties Kennedy does business with has harmed her brand and reputation in the fashion industry.

233.    Defendants disseminated the information for the purpose of gaining an economic and legal advantage by creating a false impression in the marketplace that Kennedy made misrepresentations about the Company's financial state and its ability to repay its debts.

234.    Defendants' defamation of Kennedy directly and proximately caused damages to Kennedy in an amount to be determined at trial.

235.    In addition, because Defendants acted with the malicious intent to injure Kennedy's business and reputation, Kennedy is further entitled to punitive damages in an amount to be determined at trial.

WHEREFORE, Kennedy demands judgment:

A.    On the First Claim for Relief against Defendants for an injunction or other equitable relief to prevent Defendants from (i) attempting to sell the KENNEDY marks or (ii) producing and/or distributing unapproved products using the KENNEDY marks; and (iii) damages in an amount no less than $1,300,000 plus prejudgment interest.

B.    On the Second Claim for Relief against Basil and the Basil Law Firm in the amount no less than $1,300,000 plus prejudgment interest.

C.    On the Third Claim for Relief against Basil and the Basil Law Firm in the amount no less than $1,300,000 plus prejudgment interest.

D.    On the Fourth Claim for Relief against WFT and Artifect in the amount no less than $1,300,000 plus prejudgment interest.

E.    On the Fifth Claim for Relief against all Defendants in the amount no less than $1,300,000 plus prejudgment interest.

F.    On the Sixth Claim for Relief against all Defendants for an accounting to determine the value of the funds misappropriated by Defendants, and upon said accounting, to

pay Kennedy the value so determined believed to be no less than $1,300,000 plus prejudgment interest.

        G.      On the Seventh Claim for Relief against all Defendants for a declaratory judgment that Kennedy is the rightful owner of the KENNEDY marks and that Defendants are not allowed to challenge Kennedy's ownership of the KENNEDY marks.

        H.      On the Eighth Claim for Relief against all Defendants for an award of exemplary damages under the common law, and treble damages and increased profits under 15 U.S.C. § 1117.

        I.      On the Ninth Claim for Relief against all Defendants for an award of exemplary damages under the common law, and treble damages and increased profits under 15 U.S.C. § 1117.

        J.      On the Tenth Claim for Relief against all Defendants for an award of exemplary damages as a result of Defendants' malicious actions as described above.

        K.      On the Eleventh Claim for Relief against all Defendants for an award of exemplary damages as a result of Defendants' malicious actions as described above.

        L.      On the Twelfth Claim for Relief against all Defendants for remedies available under 15 U.S.C. §§ 1117 and 1118, including, but not limited to, treble damages.

        M.      On the Thirteenth Claim for Relief against all Defendants for a permanent injunction against Defendants' use of Kennedy's name, marks and/or other intellectual property.

        N.      On the Fourteenth Claim for Relief against all Defendants for actual damages sustained by Kennedy as a result of Defendants' wrongful acts.

O.      On the Fifteenth Claim for Relief against all Defendants enjoining and restraining

Defendants pursuant to Section 51 of the Civil Rights law of the State of New York from using

Kennedy's name for advertising purposes or purposes of trade.

P.      On the Sixteenth Claim for Relief against all Defendants for defamation *per se*

with damages in amount to be determined at trial, including punitive damages.

Q.      For interest, costs and the disbursements of the action and such other relief as the

Court deems just.

## REQUEST FOR JURY TRIAL

Kennedy requests a trial by jury of all issues raised that are triable by jury.

Dated: New York, New York
       March 20, 2018

THOMPSON BUKHER LLP

By: /s/ Andrew R. Goldenberg
Andrew R. Goldenberg, Of Counsel (AG 8213)
Benjamin S. Thompson (BT2176)
75 Broad Street, Suite 2120
New York, New York 10004
Telephone: (212) 920-6050
Facsimile: (646) 924-3040

*Attorneys for Plaintiff*