UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                    :
ELIZABETH KENNEDY,                                  :        Case No. 1:18-cv-02501-ALC-KNF
                                                    :
                                    Plaintiff,      :
                                                    :
                  -against-                         :
                                                    :
ROBERT BASIL, THE BASIL LAW GROUP                   :
P.C., ARTIFECT LLC, WFT REALTY LLC,                 :
WFT FASHION LLC,                                    :
                                                    :
                                    Defendants.     :
                                                    :
-------------------------------------------------------------x

## PLAINTIFF'S LOCAL RULE 56.1 STATEMENT

Plaintiff Elizabeth Kennedy ("Plaintiff" or "Kennedy") submits this statement of facts pursuant to Local Rule 56.1 as to which Plaintiff contends there is no genuine issue to be tried:

### A.  Elizabeth Kennedy Starts Her Own Fashion Company

161.    In 2007, Plaintiff started her own fashion company called Elizabeth Kennedy, LLC (the "Company").[1]

162.    The Company designed and manufactured couture evening dresses and gowns.[2]

163.    Plaintiff was the sole owner and Creative Director of the Company when it was formed.[3]

164.    In May 2012, Plaintiff added her friend, Jayne Harkness ("Harkness"), as a member of the Company where each held a 50% interest in the Company pursuant to the terms of an operating agreement of the Company ("Operating Agreement").[4]

---

[1] The Company changed its name in January 2018 to WFT Fashion, LLC and is a named defendant in this action.
[2] Kennedy Decl., ¶ 3.
[3] *Id.*, ¶ 2.
[4] Ex. 1 at Schedule A.

165.    The Operating Agreement provides that Plaintiff shall be able to use her name subsequent to the termination of her membership with the Company, and that all documents necessary to effect such usage shall be executed in her favor.[5]

166.    From August 2012 to July 2015, the Company sold approximately $600,000 worth of goods.[6]

167.    In the same time period, the Company's clientele included, without limitation, Bergdorf Goodman and celebrities Mariah Carey, Molly Sims and Sharon Osbourne.[7]

**B.  Plaintiff Registers Trademarks Bearing Her Name – Elizabeth Kennedy**

168.    In December 2014, Plaintiff, through the Company, applied for two trademark registrations of her name, and submitted the logo used on Plaintiff's website, dresses and gowns as the trademark specimens to the USPTO.[8]

169.    Plaintiff hired a law firm for the application, paying all related legal and application fees out of her own pocket.[9]

170.    On September 14, 2015, the "Elizabeth Kennedy" trademarks were registered with the USPTO, Registration Nos. 4811444 and 4811445 (the "KENNEDY Marks").[10]

171.    The KENNEDY Marks are inherently distinctive.[11]

172.    The KENNEDY Marks are presented in a stylized form with a distinctive lettering style.[12]

173.    The KENNEDY Marks have acquired a secondary meaning as a result of (i) Plaintiff's use of the logo on a wide variety of gowns and dresses since at least 2011; (ii) the

---

[5] Compl., ¶ 148 (ECF Doc. 1); Defs. Answers, ¶ 148 (admitting allegation) (ECF Docs. 10-13).
[6] Kennedy Decl., ¶ 5.
[7] *Id.*.
[8] *Id.*, ¶ 6.
[9] *Id.*
[10] Compl., ¶ 21; Defs. Answers, ¶ 21 (admitting allegation).
[11] Compl., ¶ 144; Defs. Answers, ¶ 144 (admitting allegation).
[12] Compl., ¶ 144; Defs. Answers, ¶ 144 (admitting allegation).

extensive marketing and advertising of products bearing the KENNEDY Marks; and (iii) the fame the logo has achieved as a result.[13]

174.    The KENNEDY Marks are famous and distinctive marks entitled to protection under 15 U.S.C. § 1125 and New York Gen. Bus. L. § 360-1.[14]

### C. Basil Invests in the Company and Prepares the First Amendment to the Company's Operating Agreement

175.    In June 2015, Kennedy and Harkness met with Defendant Robert Basil ("Basil") for the purpose of raising funds for the Company.[15]

176.    Basil is a lawyer and acts as general counsel to multiple startup companies, has invested his own money in several startups and holds a degree in business and economics, an MBA and an LLM in corporate law.[16]

177.    At the June 2015 meeting, Basil represented himself as an attorney who could provide legal services to the Company and Kennedy.[17]

178.    After hearing about the Company, and its prior achievements, Basil wanted to invest.[18]

179.    Basil advised Plaintiff in the review and execution of an amendment to the Operating Agreement (the "First Amendment"), which was drafted by Basil.[19]

180.    The First Amendment provided that Basil and his law firm, Defendant The Basil Law Group, P.C. ("BL"), would provide "contract review, collection, employment, litigation, [and] IP rights" for the Company.[20]

---

[13] Compl., ¶ 145; Defs. Answers, ¶ 145 (admitting allegation).
[14] Compl., ¶¶ 196, 213; Defs. Answers, ¶¶ 196, 213 (admitting allegations).
[15] Compl., ¶ 25; Defs. Answers, ¶ 25 (admitting allegation).
[16] Ex. 2 at 34:2-13, 36:20-25, 43:14 – 44:6.
[17] Kennedy Decl., ¶ 8.
[18] *Id*.
[19] Ex. 2 at 14:12-20.
[20] Ex. 3 at § 9.

181.    At the time the First Amendment was signed, Basil stated his willingness and ability to provide any legal service to Plaintiff desired of him, writing:

> We [Basil and BL] can let you know your rights, give you advice, and, if appropriate, interface with those taking an adversarial position to EKLLC in correspondence, in conference, or in court.  It is one of several ways that we intend to contribute heavily to the success of this enterprise.[21]

182.    Basil subsequently advised the Company on many legal matters, including: (i) reviewing and approving contracts; (ii) advising on tax, insurance, corporate and employment matters; and (iii) advising in collection disputes.[22]

183.    In addition to representing the Company, Basil also provided Plaintiff with legal advice.[23]

184.    Plaintiff routinely sought out Basil's legal assistance and relied and trusted him to protect her interests in the Company.[24]

185.    The First Amendment also gave Defendant Artifect, LLC ("Artifect"), a company Basil owned and controlled, a 35% interest in the Company for a $250,000 line of credit that had to be fully repaid with interest.[25]

186.    Artifect is a company whose purpose is to service the fashion industry primarily through staffing and licensing services.[26]

187.    Artifect is wholly owned by Defendant WFT Realty, LLC ("WFT").[27]

188.    WFT is wholly owned by Basil.[28]

---

[21] Ex. 4.
[22] Ex. 5.
[23] Kennedy Decl., ¶ 16.
[24] Id.
[25] Ex. 3 at § 1.
[26] Ex. 2 at 7:20 – 8:4.
[27] Id. at 28:16 – 23.
[28] Id. at 27:25 – 28:2.

189.    As a result of the First Amendment, Kennedy's interest in the Company increased from 50% to 51% and Harkness' interest was reduced from 50% to 14%.[29]

190.    Basil did not provide Kennedy with the terms of the $250,000 line of credit and did not obtain her written consent to his various positions as the Company's attorney, owner and financier.[30]

191.    Basil did not instruct Kennedy to seek the advice of independent legal counsel regarding his conflicting positions as the attorney for the Company who negotiated a loan transaction where Basil's company, Artifect, received interest payments on the $250,000 credit line and full repayment of the principal borrowed while <u>also</u> receiving a 35% ownership interest in the Company.[31]

192.    This was a finance arrangement that the Company's Chief Operating Officer, Shan Reddy ("Reddy"), testified he had not seen in his 25+ years of advising over 50 fashion start-up and distressed companies.[32]

**D.  The Company Prepares for Its First Fashion Show and Funds are Frozen by Basil**

193.    In December 2015, the Company was gearing up for its first fashion show, but was experiencing a cash shortage.[33]

194.    At this time, Basil decided to unilaterally withhold funding from the Artifect line of credit,[34] notwithstanding that withdrawals on the line of credit were available "on demand" without restriction.[35]

---

[29] Ex. 3 at § 1.
[30] Kennedy Decl., ¶ 13.
[31] *Id*.
[32] Ex. 6 at 30:11 – 31:15.
[33] Kennedy Decl., ¶ 17.
[34] Ex. 7 at KENNEDY 5856.
[35] Kennedy Decl., ¶ 17; Ex. 3 at § 5.

195.    The capital freeze forced Kennedy to personally cover the Company's expenses for the fashion show premiere.[36]

196.    Plaintiff raised $105,000 to fund the Company, of which no monies were repaid to her by the Company and Kennedy never received equity in the Company for those loans.[37]

197.    In January and April 2016, Basil, through his wholly owned company, WFT, provided the Company with a $100,000 line of credit and a $110,000 line of credit that were both secured by the Company's assets and revenues. [38]

198.    At the time of the WFT lines of credit, Basil did not advise Kennedy of his interests as owner, lender and attorney to the Company, nor did he instruct Kennedy to seek the advice of independent counsel on the WFT lines of credit.[39]

199.    At this time, Basil asked Plaintiff how much she thought the Company would offer an investor in exchange for $500,000 to $1,000,000.[40]

200.    In response, Plaintiff told Basil that she "just really [did not] know for sure" and that it was "hard to predict the future."[41]

201.    In February 2016, Plaintiff asked Basil to hire a financial consultant to prepare sales projections to show potential investors.[42]

202.    In response, Basil told Plaintiff "[s]ales projections are meaningless at this point because we are in uncharted territory."[43]

---

[36] Kennedy Decl., ¶ 18.
[37] *Id*.
[38] *Id*., ¶ 19.
[39] *Id*.
[40] Ex. 8 at KENNEDY 6357.
[41] *Id*. at KENNEDY 6356.
[42] Ex. 9.
[43] *Id*. (emphasis added).

203.    Throughout 2016, Plaintiff repeatedly reminded Basil that he should not rely on Plaintiff's projections because Plaintiff had no experience or the skillset to properly budget or prepare sales projections.[44]

204.    After months of pleading with Basil to hire a finance consultant, in September 2016, Plaintiff again told Basil that the Company had to hire someone with a finance background and that Plaintiff did not "feel comfortable putting together another budget without someone who truly understands cash flow…."[45]

### E.  Basil Prepares a Second Amendment to the Company's Operating Agreement

205.    In April 2016, Basil advised Plaintiff in her review and execution of a second amendment to the Company's Operating Agreement (the "Second Amendment") that was drafted by Basil.[46]

206.    The Second Amendment memorialized a new ownership structure in which Basil's other company, WFT, received a 20% interest in the Company and Artifect's 35% interest remained unchanged.[47]

207.    Kennedy's interest was reduced from 51% to 43% and Harkness' interest was reduced from 14% to 2%.[48]

208.    In exchange, the Company received an interest free $500,000 line of credit from WFT.[49]

209.    The prior lines of credit issued by Artifect ($250,000) and WFT ($210,000) were fully exhausted.[50]

---

[44] Kennedy Decl., ¶ 22; Ex. 30 at 102:12 – 103:2.
[45] Ex. 10 at KENNEDY 4782.
[46] Kennedy Decl., ¶ 23; Ex. 2 at 150:24-151:2; Ex. 11.
[47] Ex. 11 at § 2.
[48] *Id.*
[49] *Id.* at § 1.
[50] *Id.*

210.    The WFT $500,000 line of credit was secured by the Company's assets and revenues.[51]

211.    The Second Amendment restricted Plaintiff's right to compete if she was no longer a member of the Company.[52]

212.    The non-compete restriction was Basil's idea and was opposite to the terms of the original Operating Agreement which placed no restrictions on Plaintiff's right to pursue other business opportunities, whether they were unrelated or in direct competition with the Company's interests.[53]

213.    Before signing the Second Amendment, Plaintiff sought assurance from Basil that she owned the rights to use her personal name, including the KENNEDY Marks that bear her name, and that changes Basil was making to the Operating Agreement would not alter those rights.[54]

214.    Kennedy stated her "wholehearted" trust in Basil to protect her interests, stating:

All I care about is being able to continue working, and to maintain 100% creative control, ownership of my name, and decision-making rights- all of which we can put in the legal operating agreement…**I honestly really trust you and artifect wholeheartedly**….[55]

215.    In response, Basil represented to Kennedy that the Second Amendment did not affect her "right to control the use of [her] own name" and referred to the Kennedy Marks as "your [*i.e.*, Kennedy's] trademark."[56]

216.    Basil also represented:

**You will retain the creative control, control of the ordinary course of business for EKLLC and right to control the use of your own name**…Incidentally, I

---

[51] *Id.* at § 4.
[52] *Id.* at § 11.
[53] Kennedy Decl., ¶ 24; Ex. 1 at § 2.9(b).
[54] Ex. 12.
[55] *Id.* (emphasis added).
[56] *Id.*

never received anything from Greg Winski [Kennedy's former trademark attorney] re **your trademark**.[57]

217.    Basil's statements quoted in ¶ 216 were consistent with § 2.2 of the Operating Agreement, which provided that the Company was obligated to "execute any documentation necessary for [Plaintiff]" to use her personal name in the event she was no longer a member of the Company.[58]

218.    Section 2.2 of the Operating Agreement continues to include that the Company has the obligation to execute documentation necessary for Plaintiff to use her personal name.[59]

219.    At the time the Second Amendment was signed, Basil did not disclose to Kennedy his conflicts of interest as owner, lender and attorney to the Company, and he did not instruct Kennedy to seek the advice of independent counsel before signing the Second Amendment.[60]

**F.  The Noah Bank Loan**

220.    Between April 2016 and September 2016, company sales increased and the Company needed to raise money for expansion.[61]

221.    In June 2016, Basil informed Kennedy that he was telling potential investors that the Company was valued at $3,000,000.[62]

222.    Kennedy advised Basil and his personal accountant who Basil hired to manage the Company's financials, Edward Colville ("Colville"), both of whom had no experience in the fashion industry, to look into factor financing.[63]

223.    A "factor" is a financial intermediary that purchases receivables from a company.[64]

---

[57] *Id.* (emphasis added).
[58] Ex. 1 at § 2.2.
[59] Kennedy Decl., ¶ 28.
[60] *Id.*, ¶ 29.
[61] *Id.*, ¶ 30.
[62] Ex. 13 at KENNEDY 5598.
[63] Kennedy Decl., ¶ 30.
[64] *Id.*, ¶ 31.

224.     A factor is a funding source that agrees to pay the company the value of the invoice less a discount for commission and fees.[65]

225.     Factor arrangements are common in the fashion industry and are used to close revenue gaps in between fashion seasons.[66]

226.     Basil was not interested in factor financings and contacted Noah Bank, a client of Basil's law firm, for a bank loan.

227.     At the time Basil began negotiating the Noah Bank loan, Basil was Noah Bank's attorney in multiple litigation matters and provided general counsel services to Noah Bank.[67]

228.     Basil did not disclose that he was Noah Bank's attorney to Plaintiff and did not consult Plaintiff about the Noah Bank loan terms prior to the loan closing.[68]

229.     On August 13, 2016, Basil filled out a loan application with Noah Bank.[69]

230.     Basil applied for the loan as "Chairman" of the Company.[70]

231.     At this time, Plaintiff was the Company's managing member.[71]

232.     The Company never had a "Chairman" and Basil was never authorized by the Company to apply for this loan on the Company's behalf as "Chairman."[72]

233.     A few weeks before the loan closing, on September 10, 2016, Basil advised the Company's members, including Plaintiff, that if the Noah Bank loan terms were unfavorable, Basil would personally fund $1,000,000 in exchange for an additional 11% of the Company's equity.[73]

234.     Basil did not provide all of the promised funding.[74]

---

[65] *Id.*
[66] Kennedy Decl., ¶ 31; Ex. 6 at 67:11 – 25.
[67] Ex. 2 at 197:14-21.
[68] Kennedy Decl., ¶ 33.
[69] Ex. 14.
[70] *Id.*
[71] Ex. 11 at §7.
[72] Kennedy Decl., ¶ 34.
[73] Ex. 15.
[74] Kennedy Decl., ¶ 35.

235.    Basil only obtained $500,000 from Noah Bank[75] and he did not fund the additional $500,000 he previously promised.[76]

236.    Basil assured Plaintiff, notwithstanding her reservations about borrowing money from Noah Bank, that $500,000 was sufficient to fund the Company and the Company was getting excellent terms on the Noah Bank loan.[77]

237.    At the loan closing, on September 26, 2016, Basil stated that the Noah Bank loan was collateralized by his personal residence and nothing else.[78]

238.    In truth, the Noah Bank loan was also secured by the Company's assets, which including the KENNEDY Marks.[79]

239.    Basil did not tell Plaintiff that the Noah Bank loan was secured by the KENNEDY Marks.[80]

240.    At the closing, Basil told Plaintiff he read the lengthy Noah Bank loan documents (85 pages of fine print) and all Plaintiff had to do was sign her name as a Company member.[81]

241.    Plaintiff, a fashion designer with no legal or financial training, relied on Basil's legal advice and signed the Noah Bank loan documents that she had never seen before the closing.[82]

242.    The Noah Bank loan was issued after months of negotiations between Basil and Noah Bank's CEO, Edward Shin ("Shin"), who considered Basil an "interest[ed] party" under

---

[75] Compl., ¶ 55; Defs. Answers, ¶ 55 (admitting allegation).
[76] Ex. 15.
[77] Kennedy Decl., ¶ 36.
[78] Id., ¶ 37.
[79] Compl., ¶ 55; Defs. Answers, ¶ 55 (admitting allegation).
[80] Kennedy Decl., ¶ 37.
[81] Id.
[82] Id.

Regulation O[83] and a "VVIP customer" based on Basil's representation and prior business dealings with Noah Bank.[84]

243.    Neither Noah Bank nor Basil informed Plaintiff of their insider relationship prior to the loan closing.[85]

244.    Post-closing, Basil stated that the Noah Bank loan was secured only by his personal residence.[86]

245.    Plaintiff later found out, in or about November 2017, that the Noah Bank loan was also secured by the KENNEDY Marks that Basil had previously advised Plaintiff would remain in her control.[87]

246.    Immediately after Noah Bank issued the loan, Basil unilaterally withheld funds on the basis that the Company had purportedly misrepresented its finances to Noah Bank to obtain the loan and had engaged in "bank fraud."[88]

247.    Without explanation or resolution of the purported "bank fraud," Basil released some Noah Bank funds in or about December 2016.[89]

### G. Basil Prepares the Third Amendment to the Company's Operating Agreement

248.    In October 2016, Basil advised Plaintiff in her review and execution of a third amendment to the Company's Operating Agreement (the "Third Amendment") prepared by Basil.[90]

---

[83] "Regulation O governs any extension of credit by a member bank to an executive officer, director, or principal shareholder of that bank, of a bank holding company of which the member bank is a subsidiary, and of any other subsidiary of that bank holding company." *See* https:// www.federalreserve.gov/supervisionreg/regocg.htm. *See also* 12 C.F.R. § 215.
[84] Ex. 16.
[85] Kennedy Decl., ¶ 33.
[86] Ex. 17.
[87] Kennedy Decl., ¶ 38.
[88] Ex. 18 at KENNEDY 4804.
[89] Kennedy Decl., ¶ 39.
[90] *Id.*, ¶ 40.

249.    The Third Amendment increased Basil's power and authority over the Company by appointing WFT as the only managing member "solely responsible for the day-to-day operation of EKLLC, including the hiring and firing of all employees, as well as the sole determiner of their compensation," and Basil was named as the "sole determiner" of additional financing by requiring a majority vote of the Company's members (*i.e.*, WFT) for all "debt transactions."[91]

250.    The Third Amendment memorialized another revised ownership structure that further diluted Plaintiff's ownership interest in the Company from 43% to 27% and gave WFT and Artifect a collective 71% interest in the Company.[92]

251.    WFT and Artifect's increased equity was transferred from Plaintiff based on a finder's fee Basil claimed for introducing Noah Bank to the Company and because the Noah Bank loan was secured by his personal residence.[93]

252.    The Noah Bank loan, however, was also secured by the Company's assets, including the KENNEDY Marks that bear Plaintiff's name, with a UCC lien, none of which was disclosed to Plaintiff prior the Noah Bank closing or execution of the Third Amendment.[94]

253.    Basil did not include the fact that the Noah Bank loan was secured by the KENNEDY Marks in the Third Amendment, notwithstanding the fact that he explicitly referred to other loans in prior amendments to the Operating Agreement as secured by the Company's assets with UCC liens.[95]

254.    Basil also amended Plaintiff's non-compete clause by extending the non-compete period while simultaneously advising Plaintiff of her legal rights and the implications of such an amendment.[96]

---

[91] Ex. 19 at § 5.
[92] *Id*. at § 4.
[93] Basil Decl., ¶ 43 (ECF Doc. 77).
[94] Kennedy Decl., ¶ 43.
[95] Ex. 3 at § 3; Basil Dep., Ex. 11 at § 4.
[96] Kennedy Decl., ¶ 45.

255.    In consideration for the non-compete extension, WFT promised to adequately compensate Plaintiff with "an acceptable compensation and incentive arrangement."[97]

256.    WFT did not develop a compensation or incentive arrangement for Plaintiff.[98]

257.    With no compensation or incentive arrangement, Plaintiff was forced to borrow money from her family and work a consulting job for a company call Adeam for income since the Company could not afford to pay her.[99]

258.    The Third Amendment also waived all repayments rights or interest payments on "any loans, advances, equity contributions or other contributions" to the Company, except for interest payments and repayments of the Noah Bank line of credit.[100]

259.    The waiver also extinguished the rights Plaintiff had to recover monies she personally loaned to the Company.[101]

260.    Days before Plaintiff signed the Third Amendment, Basil acknowledged in writing the influence and power he had over Plaintiff, stating:

> I know you would accept whatever I propose because you understand that I am not trying to take undue advantage, and that if you say 'no' the company dies.[102]

261.    At the time Kennedy signed the Third Amendment, Basil did not advise Plaintiff of his conflicts of interest as owner, lender and attorney to the Company, nor did he instruct Kennedy to seek the advice of independent counsel on the WFT lines of credit.[103]

---

[97] Ex. 19 at § 9.
[98] Basil Dep. Tr. at 227:16 – 228:4.
[99] Kennedy Decl., ¶ 46.
[100] Ex. 19 at § 2.
[101] Compl., ¶ 62; Defs. Answers, ¶ 62 (admitting allegation).
[102] Ex 20.
[103] Kennedy Decl., ¶ 48.

## H. Basil Misappropriates Over $300,000 In Company Funds

262.    Notwithstanding the waiver of further rights to repayment in the Third Amendment,[104] the Company's bank statements show continued withdrawals by Basil after the Third Amendment was signed totaling approximately $120,000.[105]

263.    Basil withdrew an additional $103,000 from the Company's bank accounts prior to the Third Amendment,[106] with an additional $90,000 in withdrawals by Basil's accountant, Colville.[107]

264.    In total, Basil and Colville withdrew over $311,000 from the Company from August 2015 to October 2017.[108]

265.    These withdrawals are unaccounted for in the Company's books and records.[109]

## I. The Company Hires Reddy as Its Chief Operating Officer as Sales Increase

266.    In October 2016, the Company hired Reddy as its Chief Operating Officer to reorganize the Company's financials and operations.[110]

267.    Reddy is a business consultant for startup and distressed fashions companies.[111]

268.    Reddy has advised over 50 fashion companies on matters concerning finance and business growth for over 25 years.[112]

269.    Reddy was required to report directly to Basil, as the Company's managing member who was "solely responsible" for the Company's operations and management.[113]

---

[104] Ex. 19 at § 2.
[105] Ex. 21; Kennedy Decl., ¶ 49.
[106] Ex. 22.
[107] Id.
[108] Id.
[109] Kennedy Decl., ¶ 51.
[110] Compl., ¶ 58; Defs. Answers, ¶ 58 (admitting allegation).
[111] Ex. 6 at 12:19 – 23; 14:8 – 20.
[112] Id.
[113] Ex. 19 at § 5.

270.     On October 31, 2016, Reddy recommended to Basil that he restructure the Company's equity to increase Plaintiff's share by 15% "by virtue of lending her name to the company as I imagine she owns this."[114]

271.     Basil did not dispute Reddy's statement that Plaintiff owned her name.[115]

272.     Reddy's rationale for the equity restructuring was "to avert the risk of Elizabeth becoming dis-enchanted down the road and also to create a strong motivating structure to align her creativity with profitability."[116]

273.     Basil did not take Reddy's advice on developing an equity restructuring plan.[117]

274.     In December 2016, Plaintiff was let go from her employer, Adeam, because she spent most of her time at the Company and Adeam needed someone that could contribute more hours for consulting.[118]

275.     Plaintiff informed Reddy and Basil that she needed to take a salary from the Company to cover her personal expenses.[119]

276.     Basil agreed to pay Plaintiff $8,350 a month as the Company's Creative Director, but Plaintiff was only paid $87,650 for the 13 months she took a salary, $20,900 short of the salary she was promised.[120]

277.     Basil and Plaintiff discussed Plaintiff's salary payments multiple times.[121]

278.     In each discussion, Basil did not object to Plaintiff taking a salary from the Company.[122]

---

[114] Ex 23.
[115] Ex. 6 at 40:24 – 41:17.
[116] Ex. 23.
[117] Ex. 6 at 46:8 – 15.
[118] Kennedy Decl., ¶ 55.
[119] *Id*.
[120] *Id*., ¶ 56.
[121] Ex. 24 at KENNEDY 6909; Exs. 25- 27.
[122] *Id*.

**J. The Company Experiences Capital Shortfalls And Basil Prepares A Fourth Amendment To The Company's Operating Agreement To Raise Money**

279.    In 2017, the Company needed cash due to strong increases in sales.[123]

280.    The Company earned an almost 200% increase in revenue from 2016 to 2017 totaling $1,357,976 and increased its sales 1,400% from $92,882 to $1,357,976 from 2015 to 2017.[124]

281.    As a result, the Company required substantial working capital surplus to operate within the concentrated economic seasons that the fashion industry dictates – a customary trend among fashion companies.[125]

282.    In or about April 2017, Reddy developed a business plan that contained Company revenue projections for years 2017 through 2020.[126]

283.    Reddy provided his projections to Basil.[127]

284.    The projections showed sales increases over a three-year period from $1,710,000 (2017) to $15,325,000 (2020).[128]

285.    Based on the Company's strong sales from 2016 to 2017, Reddy testified, based on his experience advising fashion startups, that his projections were conservative and "very achievable."[129]

286.    Also in April 2017, Basil prepared a fourth amendment to the Company's Operating Agreement (the "Fourth Amendment").[130]

287.    The purpose of the Fourth Amendment was to raise capital.[131]

---

[123] Kennedy Decl., ¶ 58.
[124] Crane Decl., Ex A at 14.
[125] Kennedy Decl., ¶ 60.
[126] Ex. 28.
[127] Ex. 6 at 53:5 – 14; 59:21 – 60:3; 62:20 – 63:8; 64:19 – 25.
[128] Ex. 28.
[129] Ex. 6 at 57:6 – 19.
[130] Ex. 29.
[131] Ex. 2 at 234:10 – 16.

288.     The Company's members contributed a total of 4% of the Company's equity valued at $200,000 for the purpose of raising capital.[132]

289.     The contribution placed the value of the Company at $5,000,000.[133]

290.     The contributions further diluted Plaintiff's interest in the Company.[134]

291.     One percent of the Company was sold to Plaintiff's parents for $50,000, and another 1% was sold to one of Basil's colleagues for $50,000.[135]

292.     These interests are not reflected in the Company's 2017 tax return that were prepared by Basil's accountant, Colville, and signed by Basil as the Company's Tax Matters Partner.[136]

293.     The Company's 2016 tax return also does not list WFT as an owner of the Company, notwithstanding the amendments prepared by Basil that state the opposite.[137]

294.     In fact, the Company's tax returns list Basil as a Company member holding 54% of the Company.[138]

295.     In addition, the Company's 2016 and 2017 general ledgers do not tie into the tax returns.[139]

296.     The tax returns did not allocate the 2016 and 2017 profits and losses in accordance with the indicated ownership percentages on the tax returns.[140]

---

[132] Ex. 29 at § 1.
[133] *Id*.
[134] *Id*.
[135] Ex. 30 at 114:18 – 20.
[136] Ex. 31 at 3.
[137] Crane Decl., Ex. A at 11; Ex. 32.
[138] Crane Decl., Ex. A at 9-11.
[139] *Id*. at 10.
[140] *Id*. at 11.

297.    For example, the 2016 tax return lists Basil (individually) as a 54% owner of the Company, but Basil takes 83% of the Company's 2016 losses totaling $1,171,059.  Conversely, Plaintiff, a 27% of the Company at that time, is given 3.53% of the Company's losses.[141]

298.    Basil represented Plaintiff himself and advised Plaintiff of her legal rights and interests in executing the Fourth Amendment.[142]

299.    At the time the Fourth Amendment was executed, Basil did not advise Plaintiff of his multiple conflicts of interests with the Company, nor did he instruct Plaintiff to seek advice from independent counsel regarding his roles or obtain Plaintiff's written consent.[143]

**K. In Desperate Need Of Capital, Reddy Makes Multiple Attempts To Get Basil To Consider Outside Funding; Basil Ignores Reddy's Pleas**

300.    In June 2017, the Company's sales director, Curtis Farnham ("Farnham"), reported to Basil and Reddy that the Company's sales were projecting a 120% increase from 2016 sales figures.[144]

301.    In response, Reddy advised Basil that the Company was doing "exceptionally well considering current market conditions" and that the Company was "growing while most companies are shrinking."[145]

302.    Also in June 2017, Plaintiff sought out Basil's advice concerning her diluted equity position and Artifect's disproportionate equity stake in the Company.[146]

303.    Plaintiff expressed concern about attracting future investment given her minority position and asked Basil if there was a way to earn back equity from Basil's companies, WFT and Artifect.[147]

---

[141] Ex. 32; Crane Decl., Ex. A at 11.
[142] Kennedy Decl., ¶ 62.
[143] *Id*.
[144] Ex. 33.
[145] *Id*.
[146] Ex. 34.
[147] *Id*.

304.   Basil advised that a method had to be developed for increasing Plaintiff's equity stake and preventing further erosion.[148]

305.   However, after Plaintiff and Reddy's multiple requests to put one in place, no method was ever developed by Basil.[149]

306.   In July 2017, Reddy advised Basil that the Company desperately needed additional funding to support its growth and that such funding could be through a factor arrangement.[150]

307.   Reddy suggested to Basil to use a factor company called "Fundbox" to loan the Company money against its receivables.[151]  Basil rejected Fundbox.[152]

308.   Reddy continually pleaded with Basil to provide him with clarity and direction as to how the Company was going to fund itself.[153]

309.   Reddy advised Basil that the Company was "tracking the best for its time in business," was "executing on a daily basis and closing deals" and had "doubled sales from 2016 to 2017."[154]

310.   Reddy told Basil time was "of the essence" to raise money to fund he Company.[155]

311.   Basil was unresponsive to Reddy's funding pleas.[156]

312.   In August 2017, Reddy advised Basil that he met with potential investors that were interested in funding the Company.[157]

---

[148] *Id*.
[149] Kennedy Decl., ¶ 65.
[150] Ex. 6 at 95:18 – 96:11.
[151] *Id*.
[152] *Id*. at 97:3 – 20.
[153] Ex. 35 (Reddy telling Basil his emails were "unclear and thereby prevent[ed] [Reddy] from moving forward" and was "desperately trying to get clarity [from Basil]….").
[154] *Id*.
[155] *Id*.
[156] Ex. 6 at 107:6 – 15.
[157] Ex. 36.

313.    Reddy told Basil "[t]he company is in difficult times at the moment due to aggravated cash flow stemming from the current production delay. I'm doing my best to salvage the situation but I'm running out of remedies."[158]

314.    Basil did not respond to Reddy or even bother soliciting a proposal from Reddy's potential investors.[159]

315.    In August 2017, Basil drafted a convertible note for the purpose of raising money or the Company.[160]

316.    The convertible note prepared by Basil valued the Company at $5,000,000.[161]

317.    In September 2017, Basil advised Reddy that he had a potential investor interested in funding the Company.[162]

318.    Reddy offered to speak with Basil's investors as he was "best equipped to explain the opportunity."[163]

319.    Basil never produced the purported investor to Reddy.[164]

320.    Notwithstanding the Company's capital shortfalls, sales continued to increase and money came into the Company in or about September 2017.[165]

321.    At that time, Basil asked Reddy if a "partial paydown" of the Noah Bank loan "could be in the cards" so that the Noah Bank loan could be extended.[166]

322.    Reddy asked Basil for more information about the loan and why Noah Bank was "calling" in the loan.[167]

---

[158] *Id.*
[159] Ex. 6 at 112:12 – 17.
[160] Ex. 37 at KENNEDY 6240.
[161] *Id.*
[162] Ex. 38.
[163] *Id.*
[164] Ex. 6 at 117:6 – 10.
[165] Ex. 39 at KENNEDY 2048.
[166] *Id.*
[167] *Id* at KENNEDY 2047.

323.    Basil told Reddy he would describe the loan terms "later" and that most of Basil's discussions with Noah Bank were "oral due to [his] relationship with Noah."[168]

324.    In truth, the Noah Bank loan was not "called in" and no default was ever declared on the loan.[169]

325.    In October 2017, about a year after the closing, Basil told Shin, Noah Bank's CEO, that he had an agent working on selling WFT and Artifect's stake in the Company that would pay back the entire Noah Bank loan.[170]

326.    Basil told another Noah Bank executive that there were potential buyers that would buy his 71% stake for at least $1.5 million.[171]  No buyers materialized.

## L.  The Company's Additional Funding Options and Possible Bankruptcy

327.    On November 16, 2017, Reddy requested a meeting concerning the Company's finances.[172]

328.    Reddy advised the Company's members, including Basil and Plaintiff, that the Company had failed to pay its rent in months, had not paid sales tax assessments and was behind on paying bills.[173]

329.    Basil was aware of the Company's financial shortcomings and mounting debt as early as July 2017, well before Reddy requested the November  meeting.[174]

330.    Notwithstanding the Company's financial problems, Reddy also stated the Company had tripled its sales in 2017 from the year prior.[175]

---

[168] *Id*.
[169] Kennedy Decl., ¶ 89.
[170] Ex. 40 at NOAH 1269.
[171] *Id.* at NOAH 1269-70.
[172] Ex. 41 at KENNEDY 4727-28.
[173] *Id*.
[174] Exs. 42, 43.
[175] Ex. 41 at KENNEDY 4728.

331.    On the same day, Plaintiff advised Basil that if the Company did not raise desperately needed money to pay its debts and finish two fashion collections for the next fashion season, Resort and Spring, the Company would be forced into bankruptcy.[176]

332.    In desperate need of cash, Basil relented and agreed to factor financing.[177]

333.    Based on Basil's approval of a factor arrangement, the Company bought fabric, paid vendors and collected deposits from stores for the Resort Collection.[178]

334.    The Company proceeded to line up a factor company who agreed to fund the Company called Express Trade Capital and Basil pushed Plaintiff and Harkness to sign the funding documents.[179]

335.    Express Trade required any funding to be secured by the Company's assets, which required Noah Bank to subordinate its interests to Express Trade.[180]

336.    Noah Bank was eager to close the factor deal and agreed to waive its rights and subordinate its secured interests in the Company.[181]

337.    However, Basil told Noah Bank that the Express Trade deal was on hold and that he was "trying to get a better factoring contract."[182]

338.    No evidence has been produced of Basil making attempts to get a better factor deal.[183]

339.    Basil was also offered factoring options with other factor companies, Hildun and Star Funding.[184]

---

[176] *Id*. at KENNEDY 4726-27.
[177] Kennedy Decl., ¶ 68.
[178] *Id*., ¶ 69.
[179] Ex. 44 at KENNEDY 5191.
[180] Ex. 45.
[181] Ex. 46.
[182] *Id*.
[183] Kennedy Decl., ¶ 72.
[184] *Id*., ¶ 75.

340.    Basil refused to entertain any factor option and stated it would be better for him to finance the Company instead of a factor.[185]

341.    Basil did not provide any further financing to the Company.[186]

342.    Around this time, Plaintiff discovered that the Company had not made payroll.[187]

343.    Plaintiff immediately reached out to Colville who handled payroll to ask when employees would receive their paychecks.[188]

344.    Colville told Basil and Plaintiff he was "unaware about payroll."[189]

345.    In response, Basil offered no solution to the payroll problem, simply asking Plaintiff to get a "temperature check" on employees who were not paid their wages.[190]

**M. The Company Struggles To Pay Its Vendors And Employees And Ceases Operations**

346.    Throughout December 2017, the Company's members, including Basil and Plaintiff, were discussing a plan to raise funds and satisfy the Company's obligations to its vendors, employees and tax authorities.[191]

347.    One solution proposed by Basil was to convert part of his 71% equity into debt.[192]

348.    When Basil proposed this solution, he assured Plaintiff that she was "not personally liable for [the Company's] existing debt to [Basil] or any future increase."[193]

349.    Jeanne Hardy, a business consultant approved by Basil and hired by the Company to advise on its financial options[194], told Basil that the Company needed to raise at least $350,000 or would have to pause operations.[195]

---

[185] *Id*.
[186] *Id.*
[187] Ex. 47 at KENNEDY 7358-59.
[188] *Id*. at KENNEDY 7358-59.
[189] *Id*. at KENNEDY 7358.
[190] Kennedy Decl., ¶ 76.
[191] *Id*., ¶ 77.
[192] Ex. 48.
[193] *Id*.
[194] Ex. 2 at 262:18 – 19.
[195] Ex. 49 at KENNEDY 4049

350.    No money was raised by Basil.[196]

351.    Basil then declared that WFT was resigning as the managing member of the Company.[197]

352.    Plaintiff immediately sought to fill the management void by proposing to Basil to personally assume all of the Company's debts which would allow Basil to walk away from his obligations to the Company.[198]

353.    Basil acknowledged Plaintiff's offer and asked her to consider having the Company file for bankruptcy.[199]

354.    If the Company filed for bankruptcy, Basil stated the Company's lenders, including Noah Bank (Basil's client), would have to be paid first.[200]

355.    Ultimately, Basil rejected Plaintiff's  proposal to assume the Company's debt.[201]

356.    Basil then falsely claimed the Company had not paid any of its payroll taxes when, in fact, Basil had already paid payroll taxes through WFT's bank account.[202]

357.    During December 2017, Plaintiff had several conversations with Basil that the Company's employees were not getting paid.[203]

358.    On December 20, 2017, Colville sent a payroll summary to Basil and Plaintiff that listed all the Company's unpaid wages to its employees for December 2017.[204]

359.    Basil offered no support or suggestion on how to cover payroll.[205]

---

[196] Kennedy Decl., ¶ 79.
[197] Ex. 50.
[198] Ex. 51.
[199] Ex. 52.
[200] *Id*.
[201] Kennedy Decl., ¶ 81.
[202] Ex. 51.
[203] Kennedy Decl., ¶ 83.
[204] Ex. 53.
[205] Kennedy Decl., ¶ 84.

360.    To address the Company's failure to cover payroll, Plaintiff, out of a sense of moral duty, began paying wages out of her personal funds and through payments the Company received from the Resort Collection.[206]

361.    Plaintiff kept a record of the Company's payroll obligations and vendor bills since Basil, through WFT, abandoned his duties as the Company's managing member.[207]

362.    Plaintiff paid $130,508.95 from her personal bank accounts to cover payroll and the Company's expenses for December 2017 and early January 2018.[208]

363.    During that same time period, the Company received $119,766.82 in income.[209]

364.    The additional $10,742.13 ($130,508.95 less $119,766.82) to cover payroll came out of her own pocket to ensure the Company's employees were paid their wages.[210]

365.    A month later, Basil falsely accused Plaintiff of "theft/embezzlement,"[211] despite the fact that Plaintiff had transferred more than $10,000 of her own money (of which she received nothing in return) so that the Company's employees would be paid their wages.[212]

366.    On January 2, 2018, Plaintiff informed Basil that the Company was forced to cancel the Spring collection, as well as part of the Resort Collection due to cash flow issues.[213]

367.    On January 8, 2018, Basil told the Company members, including Plaintiff, that "Noah Bank's loan is in default" and that "[a]bsent agreement, Noah Bank will go to court and have judgment entered against" Basil, his wife, WFT and the Company.[214]

---

[206] *Id.*, ¶ 85.
[207] Ex. 54.
[208] *Id.*
[209] *Id*
[210] *Id.*
[211] Ex. 55.
[212] Ex. 54.
[213] Kennedy Decl., ¶ 88.
[214] Ex. 56.

368.     But, the Noah Bank loan was not in default as no notice of default was ever issued by Noah Bank, and in February 2018 a Noah Bank executive confirmed to Basil the "loan is current."[215]

369.     Notwithstanding, Basil insisted there was a default and proposed that his client, the Company, confess judgment to his other client, Noah Bank.[216]

370.     The Company's other members (Plaintiff and Harkness) did not approve Basil's proposal to confess judgment in favor of Noah Bank.[217]

371.     Notwithstanding, Basil and his law firm, BL, secretly commenced a lawsuit on January 22, 2018 in New York Supreme Court to have the Company confess judgment in favor of Noah Bank.[218]  The lawsuit was dismissed due to a defective filing.

372.     Basil did not advise Plaintiff to seek advice from independent counsel on whether to confess judgment to Basil's other client (Noah Bank) that would have handed over the KENNEDY Marks to Noah Bank, nor did Basil obtain written consent from Plaintiff on his conflict of interest in simultaneous representation of the Company, Noah Bank and Plaintiff.[219]

373.     On January 12, 2018, Basil sent an email to Plaintiff's attorney, Benjamin Thompson ("Thompson"), proposing to dissolve the Company by selling all Company assets, as well as reappoint himself, through Artifect, as managing member of the Company.[220]

374.     Basil also proposed to sue Plaintiff personally and have the Company appoint him as "litigation counsel."[221]

---

[215] Ex. 57.
[216] Ex. 56.
[217] Kennedy Decl., ¶ 90.
[218] Ex. 58.
[219] Kennedy Decl., ¶ 92.
[220] Ex. 59.
[221] Id.

375. On the same day, Basil attempted to persuade Harkness to convince Plaintiff to terminate her engagement with Thompson who was questioning Basil's actions, advising Harkness that Plaintiff was receiving "horrible advice" and Thompson "must be fired immediately as a first step."[222]

### N. Plaintiff's Resignation As Creative Director And Withdrawal From The Company

376. On January 18, 2018, Plaintiff advised the Company that she was resigning as its Creative Director because her former attorney, Basil, was threatening to sue her personally, among other reasons, such as threatening to sell the KENNEDY Marks at auction.[223]

377. Two days later, on January 20, 2018, Basil demanded that all Company members, including Plaintiff, turn over all money they received from the Company for the past two years to Basil.[224]

378. On the same day, Basil sent an email to Plaintiff stating, "Still want to fight me?"[225]

379. Basil then rejected Plaintiff's resignation as Creative Director and wanted a more restrictive covenant in place to prevent Plaintiff from working in the fashion industry.[226]

380. Basil requested Plaintiff "assist" him, as a member of the Company, in placing these restrictive covenants on herself.[227]

381. On January 22, 2018, Plaintiff declared insolvency and withdrew as a member of the Company pursuant to § 12.1(b) of the Operating Agreement.[228]

382. At the time of her withdrawal, one of Kennedy's gowns was worn by Oprah Winfrey on the cover of Vanity Fair magazine.[229]

---

[222] Ex. 60.
[223] Ex. 61.
[224] Ex. 62.
[225] Ex. 63.
[226] Ex. 64 at KENNEDY 1359.
[227] Id.
[228] Kennedy Decl., ¶ 99; Ex. 1 at § 12.1(b).
[229] Kennedy Decl., ¶ 100.

383.    Kennedy was also invited to sponsor the Frick Gala where every year a designer sponsors and dresses major attendees, including celebrities.[230]  Past fashion sponsors include Carolina Herrera, Donna Karan and Christian Dior.[231]

384.    After Plaintiff's withdrawal, the Company received at least $50,000 in deposits for the Resort Collection that was never completed.[232]

385.    Rather than return the money to retailers who did not receive their dress/grown orders, Basil transferred all of the deposit money to Noah Bank.[233]

**O.  Defendants Engage In A Smear Campaign Against Plaintiff**

386.    On January 24, 2018, Basil fired all Company employees and attempted to back-date their termination date to December 17, 2017 to avoid paying five weeks of earned wages.[234]

387.    Basil and an Artifect employee, Rachel Vierschilling ("Vierschilling"), developed the backdating plan where Vierschilling prepared a general message to send to all Company employees who inquired about their unpaid wages.[235]

388.    The message stated, in part, that the "official termination date of employment is Dec 17, 2017" based on an alleged "directive" Plaintiff gave to Colville to cancel payroll so that no employee would be paid after December 17, 2017.[236]

389.    In response to Vierschilling's email, Basil stated "Everyone should be told that the Date [December 17] was given to us by Elizabeth." [237]

390.    Plaintiff never told Basil, or anyone else for that matter, that the termination date for employees was December 17, 2017, nor did she have the authority to make that statement since

---

[230] Ex. 65.
[231] Id.
[232] Ex. 2 at 252:9 – 20.
[233] Id.
[234] Ex. 66.
[235] Id.
[236] Id.
[237] Id.

Basil was the sole managing member of the Company responsible for "hiring and firing of all employees, as well as the sole determiner of their compensation."[238]

391.    Moreover, telling employees they were terminated on December 17, 2017 makes no sense given Plaintiff's continued payment of earned wages out of her own bank account after December 17, 2017.[239]

392.    On January 25, 2018, Basil sent an email to Shin falsely stating Plaintiff "quit" the Company.[240]  In reality, Plaintiff withdrew due to insolvency.[241]

393.    Basil also falsely told Shin Plaintiff "stole Noah Bank's collateral." [242]

394.    Basil also told Shin that his law firm, BL, filed an "uncontested judgment on Noah Bank's behalf this week against the company."[243]

395.    The uncontested judgment was not approved by the other Company members.[244]

396.    On January 24, 2018, Plaintiff demanded that the Company immediately change its name from "Elizabeth Kennedy, LLC" and assign the registrations of the KENNEDY Marks to Plaintiff so that she could use the name "Elizabeth Kennedy" without contraindicating the KENNEDY Marks as she had been advised by her previous attorney, Basil, that she could do.[245]

397.    On January 29, 2018, Basil changed the name of the company from "Elizabeth Kennedy, LLC" to "WFT Fashion LLC," but refused to provide any record of Plaintiff's ownership of the KENNEDY Marks.[246]

---

[238] Kennedy Decl., ¶ 104; Ex. 19 at § 5.
[239] Ex. 54 at KENNEDY 9020 (showing 17 payments made by Plaintiff to employees from December 18, 2017 to January 11, 2018 totaling $40,244.78).
[240] Ex. 67.
[241] Kennedy Decl., ¶ 99; Ex. 1 at § 12.1(b).
[242] Ex. 67.
[243] *Id*.
[244] Kennedy Decl., ¶ 90.
[245] *Id.*, ¶ 107.
[246] *Id*.

398.    Basil then advised Plaintiff that the Company intended on using and/or selling the KENNEDY Marks.[247]

399.    Subsequently, Basil contacted vendors and former Company employees falsely claiming Plaintiff misrepresented the Company's financial status and ability to repay its debts.[248]

400.    Basil falsely told Company vendors that Plaintiff extending lines of credit "knowing the amounts owed would never be paid" and the "only true source of funds for unsecured creditors resides in claims against Elizabeth's financial and legal advisors, who may have been complicit in Elizabeth's extensions of credit knowing that the amounts owed would never be paid. I am gathering up such evidence to evaluate the viability of filing suit."[249]  No suit has been filed against Plaintiff's so-called "financial and legal advisors."

401.    Basil also sent an email to the Company's former employees, falsely stating Plaintiff made "misrepresentations to all of [the employees]" who were owed money, that Plaintiff was "not volunteering to contribute one dime" for employee wages, that the employees had each been a "victim of serial misrepresentations [by Plaintiff] concerning the status of the company…[and Artifect and WFT] had no part in those misrepresentations….[and] Plaintiff "voluntarily and strategically (for herself, not the company)…" withdrew as a member of the Company.[250]

**P.  Defendants Sell Dresses And Gowns Bearing The Kennedy Marks Without Plaintiff's Permission**

402.    In March 2018, the Company advertised the sale of "(150) Designer Dresses" of "HIGH END DESIGNER – Elizabeth Kennedy" through Caspert, an auction and appraisal company.[251]

---

[247] *Id.*.
[248] Ex. 68 at KENNEDY 1827; Ex. 69 at TB 741-742.
[249] Ex. 69 at TB 741-42.
[250] Ex. 68.
[251] Ex. 70.

403.    On March 20, 2018, the Company held a public auction and sold Kennedy dresses and gowns with the KENNEDY Marks attached at heavily discounted prices.[252]

404.    Plaintiff did not authorize advertising or sales of product bearing the KENNEDY Marks and only become aware of the auction months after it took place.[253]

405.    In a prior Court filing, Basil stated that the "advertising and auction sale discovered by Ms. Kennedy were not the doing of the Company.  Rather, the advertising and auction sale were undertaken by Noah Bank."[254]

406.    But, Basil later admitted at his deposition that he (not Noah bank) contacted Caspert and "ran" the auction for Noah Bank who received all of the auction proceeds ($7,000).[255]

407.    Contemporaneous communications between Basil and Noah Bank also reveal that Noah Bank did not want to liquidate any of the Company's assets because the "loan [was] current" and the Company was not in "litigation status."[256]

408.    But, Basil pushed to liquidate and assured Noah Bank that it had "consent from the borrower, so the lack of default is not an issue."[257]

409.    Basil made these statement without consent from Plaintiff to sell her dresses bearing the KENNNEDY Marks at a heavy discount, and after falsely representing to Plaintiff and others that the Noah Bank loan had been in default.[258]

### Q.  Basil And His Law Firm Continue To Represent Noah Bank In This Action And The Bankruptcy Proceeding

410.    On July 15, 2018, the Company was served with an involuntary bankruptcy petition.[259]

---

[252] *Id.*
[253] Kennedy Decl., ¶ 113.
[254] Basil Decl., ¶ 9 (ECF Doc. 53).
[255] Ex. 2 at 253:21 – 254:21.
[256] Ex. 57.
[257] *Id.*
[258] *Id.*
[259] Ex. 71.

411.    In the involuntary bankruptcy, Basil represents the Company and prepared and filed a schedule of assets claiming Noah Bank (Basil's other client) has a secured interest in the Company's personal property, which, according to Basil, includes the KENNEDY Marks.

412.    In preparing and filing the schedule of assets in the bankruptcy court, Basil omitted Plaintiff's claims in this action against the Company from the bankruptcy court filings, claims Basil is aware of from this action.[260]

413.    Basil also prepared and filed a creditor matrix, but again omitted Kennedy as a creditor.[261]

414.    Basil, as counsel to Noah Bank, has issued multiple threats to Plaintiff that Noah Bank is preparing to sue Plaintiff, his former client, based on the purported secured interest in the KENNEDY Marks held by Noah Bank, his current client.  Basil has also admitted to assisting in the attempted sale of the KENNEDY Marks to Noah Bank.[262]

415.    Prior to June 2019, Basil also represented Noah Bank in this action relating to a discovery dispute concerning a subpoena Plaintiff issued to Noah Bank.  On June 17, 2019, Basil advised Plaintiff's counsel that he was "dismissed as Noah Bank's counsel…[and] no substitute has been designated" to replace him.[263]

416.    Around the same time of Basil's "dismissal," Noah Bank's CEO and Basil's direct contact, Shin, was indicted by the U.S. Government for allegedly taking bribes in connection with Noah Bank's issuance of small business loans (like the one issued to the Company) and the issuance of loans to companies in which Shin had a secret interest.[264]

---

[260] Ex. 72.
[261] Ex. 73.
[262] Ex. 2 at 257:12-258:25.
[263] Ex. 74.
[264] Ex. 75.

### R.  Retailers And Vendors Refuse To Work With Plaintiff

417.    Since the filing of this lawsuit in March 2018, retailers and vendors have declined to do business with Plaintiff due to the conflicted state of ownership of the KENNEDY Marks.[265]

418.    Vendors have also refused to work with Plaintiff until they are fully paid what they are owed by the Company.[266]

419.    Although these debts belong to the Company, vendors refuse to distinguish between the Company f/k/a "Elizabeth Kennedy" and Plaintiff herself, notwithstanding the fact the Company was majority-owned and controlled by Basil when it incurred the unpaid debt, became insolvent and subsequently declared bankruptcy.[267]

420.    Due to New York's ever-shrinking garment industry, there are only a handful of vendors with whom Plaintiff can do business to manufacture dresses and gowns, and almost all of them are owed money from the Company totaling approximately $900,000.[268]

421.    As a result, all attempts Plaintiff has made to continue to make dresses and gowns has been met with hostility, aggression, harassment, and, in most cases, rejection by angry vendors who expect repayment from Plaintiff and not the Company.[269]

Dated:  New York, New York
       August 23, 2019                   THOMPSON LLP

                                         By: /s/ Andrew R. Goldenberg
                                         Andrew R. Goldenberg, Of Counsel (AG 8213)
                                         Benjamin S. Thompson (BT2176)
                                         75 Broad Street, Suite 2120
                                         New York, New York 10004
                                         Telephone: (212) 920-6050
                                         Facsimile: (646) 924-3040

                                         *Attorneys for Plaintiff*

---

[265] Kennedy Decl., ¶ 114.
[266] *Id*., ¶ 115.
[267] *Id*., ¶ 116.
[268] *Id*., ¶ 117.
[269] *Id*., ¶ 118.