UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                               :

ELIZABETH KENNEDY,                 :       Case No. 1:18-cv-02501-ALC-KNF

                                                :

                         Plaintiff,    :

                                                :

               -against-             :

                                                :

ROBERT BASIL, THE BASIL LAW GROUP  :
P.C., ARTIFECT LLC, WFT REALTY LLC,  :
WFT FASHION LLC,                    :

                                                :

                        Defendants.  :

                                                :
------------------------------------------------------------x

## **PLAINTIFF'S RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT**

Plaintiff Elizabeth Kennedy ("Plaintiff" or "Kennedy") submits this response to Defendants'[1] Local Rule 56.1 Statement (ECF Doc. 140).

1.      On or about May 22, 2012, Elizabeth Kennedy and Jayne Harkness entered into an agreement entitled "Limited Liability Company Operating Agreement of Elizabeth Kennedy, LLC", (the "Operating Agreement", Exhibit 6).

**Response**: Not disputed.

2.      The Operating Agreement provided at its Schedule A on its page 20 that each of Ms. Kennedy and Ms. Harkness would own 50% of Elizabeth Kennedy LLC (the Company"). Operating Agreement, Exhibit 6.

**Response**: Not disputed.

3.      As set forth in Paragraph 2.1 of the Operating Agreement, the Company was a New York limited liability company, Operating Agreement, Exhibit 6.

---

[1] Robert Basil ("Basil"), The Basil Law Group, P.C. ("BL"), Artifect LLC ("Artifect") and WFT Realty LLC ("WFT").

**Response**: Not disputed.

4.      Beginning no later than June of 2015, Jayne Harkness and a member or members of Artifect had entered into communication regarding a possible investment in the Company, Exhibit 2; Decl. ¶¶ 27-29.

**Response**: Not disputed.

5.      On or about June 24, 2015, Ms. Harkness presented Artifect with what purported to be projected financial information regarding the Company for the years 2015, 2016 and 2017. Exhibit 2.

**Response**: Not disputed, except Plaintiff objects to the word "purported" as a mischaracterization of the financial data Jayne Harkness ("Harkness") provided to Brian O'Connor ("O'Connor").   Harkness provided financial projections to O'Connor with assumptions and budgets for years 2015, 2016 and 2017.  *Id*.

6.      The financial information presented by Ms. Harkness to Artifect on June 24, 2015 indicated that the Company would enjoy gross revenues of $300,000 during the then-current year, 2015.  Exhibit 2.

**Response**: Not disputed that the financial projections Harkness provided to O'Connor showed projected "Gross Sales" of $300,000 for year 2015 under the title "Assumptions." *Id*.  The Company's <u>actual</u> net revenue for 2015 was $92,882.  Crane Decl., Ex. A at 14 (ECF Doc. 153-1).  The financial projections also projected gross sales of $800,000 for 2017.  Basil Decl., Ex. 2. The Company's <u>actual</u> net revenue for 2017 exceeded the projections by more than $500,000 to $1,357,975.  Crane Decl., Ex. A at 14.

7.      At the time on June 24, 2015 that Ms. Harkness presented Artifect with projected financial information regarding the Company, she indicated that the Company would be at "almost

break-even" within two years.  Exhibit 2.

**Response**:  Not disputed.  Harkness also welcomed "any feedback" on the financial projections from O'Connor.  *Id*.  None was given by O'Connor and Defendants performed no due diligence on the projections.  *See* Plaintiff's Rule 56.1 Statement of Undisputed Material Facts dated August 23, 2019 ("SF"), Ex. 2 at 136:4 – 6; 144:17 – 19; 147:2 – 7.

8.      The projections supplied to Artifect by Ms. Harkness indeed indicated that the Company would be expected to lose $98,738 during the year 2015, $135,799 during 2016, but only $23,799 during 2017.  Exhibit 2.

**Response**:   Not disputed that the projected "Operating Profit" under the title "Assumptions" had projected losses of -$98,738, -$135,799 and -$23,799 for years 2015-17, respectively.  *Id*.  The Company's actual gross profits were $37,898, -$35,238 and $45,447 for years 2015-17, respectively.  *See* Crane Decl., Ex. A at 14.

9.      On July 17, 2015, Mr. Basil emailed a proposal for an investment by Artifect in the Company to Ms. Harkness and Ms. Kennedy.  Exhibit 7.

**Response**:  Not disputed that the email was sent.

10.      Within an hour of receiving Mr. Basil's proposal, Ms. Kennedy forwarded that proposal to "Jim Caputo".  Exhibit 7.

**Response**:  Not disputed that the email was sent.

11.      Later on that same day, July 17, 2015, Ms. Kennedy emailed Mr. Basil regarding Artifect's proposal and advised, "I had my attorney (my uncle) look at the terms -- everything looks great."  Exhibit 8.

**Response**:  Not disputed that the email was sent.  In the same email Kennedy told Basil "I trust you completely" in response to legal advice Basil gave Kennedy on the differences between

a corporation versus a limited liability company.  *Id.* at D-Supp 1346.  In a follow-up email, Basil stated he would draft a formal amendment to the Company's Operating Agreement and that he looked forward to a "great relationship" with Kennedy.  *Id.*

12.     Ms. Kennedy has confirmed in her deposition testimony in this action that Mr. Caputo is both her uncle and her attorney.  Excerpts from Ms. Kennedy's deposition testimony, Exhibit 85, at 27:8-21 and at 62:18-24.

**Response**:  Disputed.  The excerpted testimony from Kennedy's deposition shows Kennedy sent Basil's proposed investment to her uncle, James Caputo ("Caputo"), seeking general advice because he was an attorney and her uncle and had asked for business advice from other family members as well.  Basil Decl., Ex. 85 at 27:17-21; *see also* Ex. 1 at 30:10-15.  When asked about a separate email dated April 4, 2016 in which Kennedy told Basil she had reviewed a document with her lawyer, Kennedy stated that the "lawyer" she was referring to was Caputo.  *Id.* at 62:15-24.  However, Kennedy has retracted that attorney-client characterization as Caputo did not provide legal services to her as her attorney.  Kennedy Decl., ¶ 6.  At no time did Caputo represent Kennedy as her lawyer in connection with her dealings with Basil.  *Id.*, ¶ 7.  Caputo did not (i) provide Kennedy with any legal advice as to the amendments of the Operating Agreement; (ii) interpret the law for Kennedy; (iii) provide Kennedy with any legal opinion as to the effect of the Operating Agreement or the amendments prepared by Basil; (iv) participate in any negotiations with Basil as Kennedy's lawyer; and (v) have any conversations with Basil or other members of his law firm.  *Id.*, ¶¶ 8-10.  Furthermore, Kennedy has not maintained attorney-client privilege of communications she had with Caputo during the relevant time period and has testified openly at various times about the conversations she had with Caputo.  *Id.*, ¶ 11; *see also* Ex. 1 at 34:18-24; 35:16-22; 62-63; 81:19-24.

4

13.     On or about July 19, 2015, Ms. Kennedy, Ms. Harkness and Artifect entered into an agreement headed "Amendment to Elizabeth Kennedy LLC ("EKLLC") Operating Agreement" effective as of July 19, 2015 amending the Company's already existing Operating Agreement ("First Amendment").  Exhibit 9.

**Response**:  Not disputed.

14.     The First Amendment provided among other things that Artifect would provide the Company with a credit line in the amount of $250,000 (the "Artifect Line"), the availability of those funds being personally guaranteed by Robert Basil.  Exhibit 9, Paragraph 3.

**Response**:  Not disputed.  The $250,000 credit line was available "on demand" without restriction.  SF, Ex. 3 at § 5.  Notwithstanding, a few months after it was issued, Basil unilaterally withheld funding from the credit line.  *Id*., Ex. 7 at KENNEDY 5856.

15.     The First Amendment provided among other things that the Artifect Line would be secured by the Company's assets and revenues, such security interest to be perfected by appropriate UCC filings. Exhibit 9, Paragraph 3.

**Response**:  Not disputed.

16.     The First Amendment specifically provided that neither Ms. Kennedy nor Ms. Harkness would be required to provide any personal guarantees in connection with the Artifect Line.  Exhibit 9, Paragraph 3.

**Response**:  Not disputed.

17.     The First Amendment provided among other things that the Company would pay simple interest to Artifect at the rate of 6% per annum with respect to the first $150,000 drawn on the Artifect line, and would pay simple interest to Artifect at the rate of 3% per annum with respect to the remaining $100,000 drawn on the Artifect Line. Exhibit 9, Paragraph 3.

**Response**:  Not disputed.

18.     The First Amendment provided among other things that the principal balance of the Artifect Line would be repaid by the Company in full by January 1, 2021 or, at the Company's option, January 1, 2022.  Exhibit 9, Paragraph 4.

**Response**:  Not disputed.

19.     The First Amendment restated the ownership of the Company, with Ms. Kennedy's ownership interest therein being increased from 50% to 51%, with Ms. Harkness's ownership interest therein being reduced from 50% to 14%, and with Artifect receiving an ownership interest of 35%. Exhibit 9, Paragraph 1.

**Response**:  Not disputed.

20.     The First Amendment stated that management of the Company would "be the responsibility of Elizabeth Kennedy as Managing Member."  Exhibit 9, Paragraph 6.

**Response**:  Not disputed.

21.     The First Amendment provided among other things that the Company would not be required to make any distributions to members during the three–year period following entry into the First Amendment, with Ms. Kennedy being free to direct revenues either into the Company to promote its growth, or to her own salary, as she might choose.  Exhibit 9, Paragraph 7.

**Response**:  Not disputed, except that Paragraph 7 states that "EKLLC," not Kennedy, "would invest any revenues in business expenses, growth, or salary for Elizabeth Kennedy."  *Id.*

22.     The First Amendment provided among other things that Artifect would provide specified services to the Company without cost (apart from reimbursement for out-of-pocket expenses) and might provide the Company with other services at fair market value.  Exhibit 9, Paragraphs 9 to 13.

**Response**:  Not disputed.

23.     The First Amendment provided that among the services Artifect was to provide to the Company without cost (apart from reimbursement for out-of-pocket expenses) were certain specified legal services to be provided by The Basil Law Group, P.C. Exhibit 9, Paragraph 9.

**Response**:  Not disputed

24.     The May 22, 2012 Operating Agreement makes no mention of trademarks, Exhibit 6.

**Response**:  Disputed.  Section 2.2 of the Operating Agreement provides that the Company was obligated to "execute any documentation necessary for [Plaintiff]" to use her personal name in the event she was no longer a member of the Company.  SF, Ex. 1 at § 2.2.  The "Elizabeth Kennedy" trademarks registered with the USPTO, Registration Nos. 4811444 and 4811445 (the "KENNEDY Marks" or "Marks"), bear Kennedy's personal name.  The KENNEDY Marks are incorporated into the Operating Agreement.  *Id*.

25.     Late in 2014, acting through its attorneys, Archer & Greiner, P.C., the Company made application to the U.S. Patent & Trademark Office for the registration of certain trademarks (the "Trademarks").  Exhibits 4 and 5.

**Response**: Not disputed that Archer & Greiner, P.C. ("Archer") applied for the registration of the KENNEDY Marks on behalf of the Company.  In December 2014, Kennedy instructed Archer to register the Marks, paid for the trademark application fees and submitted the logo used on Kennedy's website, dresses and gowns as the trademark specimens to the USPTO.  Kennedy Decl., ¶ 6 (ECF Doc. 152).

26.     Those applications for registration of the Trademarks identified the Company as the owner of the Trademarks. Exhibits 4 and 5.

**Response**: Not disputed that Archer applied for the KENNEDY Marks and listed the Company as the owner of the Marks.  It is also undisputed the KENNEDY Marks have acquired a secondary meaning as a result of (i) Plaintiff's senior use of the logo on a wide variety of gowns and dresses since at least 2011; (ii) the extensive marketing and advertising of products bearing the KENNEDY Marks; and (iii) the fame the logo has achieved as a result.  Compl., ¶ 145; Defs. Answers, ¶ 145 (admitting allegation).  It is also not disputed that Section 2.2 of the Operating Agreement provides that the Company was obligated to "execute any documentation necessary for [Plaintiff]" to use her personal name in the event she was no longer a member of the Company. SF, Ex. 1 at § 2.2.

27.     On or about July 16, 2015, before Artifect entered into the First Amendment, Robert Basil inquired as to the status of the Company's trademarks, Exhibit 3.

**Response**: Not disputed, except as to Defendants' characterization of the KENNEDY Marks as the "Company's trademarks."  Kennedy was the senior user of the KENNEDY Marks (Compl., ¶ 145; Defs. Answers, ¶ 145 (admitting allegation)), and therefore, is the owner of the Marks.

28.     On or about July 16, 2015, in response to Mr. Basil's inquiry, Ms. Kennedy advised him that the Trademarks were "almost finished".  Exhibit 3.

**Response**: Not disputed the email was sent.

29.     On September 15, 2015, the U.S. Patent & Trademark Office issued certificates showing registration of the Trademarks and identifying the Company as the registrant.   Exhibits 4 and 5.

**Response**: Not disputed.

30.     The Company paid Archer & Greiner P.C. for its work in applying for and

8

registering the Trademarks.  Exhibit 93; Exhibit 85 at 15:12-18:25.

   **Response**: Not disputed, except that the Company made payments for the trademark registrations before Artifect issued its first line of credit in July 2015.  Basil Decl., Ex. 93 at ELI.AG 16.  The money for the trademark application was provided by Kennedy because the Marks bore her personal name and Kennedy's understanding was the Marks "belonged to [her]."  *Id.*, Ex. 85 at 15:24 – 16:15.

   31.   By email dated November 18, 2015, Ms. Kennedy advised Mr. Basil that the $300,000 in revenue that she had previously advised Artifect that the Company would enjoy in 2015, as presented on Exhibit 2, was "not correct".  Exhibit 10.

   **Response**: Not disputed that the email was sent and that Kennedy advised the $300,000 revenue projection was incorrect.  Disputed that Kennedy advised Artifect that it "would enjoy" $300,000 in revenue.  Basil Decl., Ex. 2.  Harkness provided O'Connor financial projections of "Gross Sales" of $300,000 for year 2015 under the title "Assumptions."  *Id.*  The $300,000 revenue projection was based on a planned 2015 fashion collection prior to Artifect's investment that the Company was unable to complete until 2016.  *See* Ex. 1 at 41:25 – 43:8.  As a result of the 2016 launch, the Company had $478,820 in net revenue for 2016.  Crane Decl., Ex. A at 14.

   32.   In that same November 18, 2015 email, Ms. Kennedy provided Mr. Basil with a new set of projections covering the period 2015 to 2017 replacing the "not correct" $300,000 revenue figure previously attributed to 2015 with a new figure of $25,000, and also replacing various other of the July 2015 projections provided to Artifect before it entered into the First Amendment with new figures.  Exhibit 10.

   **Response**: Not disputed the email was sent.

   33.   While the projections presented to Artifect before it entered into the First

Amendment indicated that Company losses would amount to $98,738 during the year 2015, $135,799 during 2016, and $23,799 during 2017, the new projections of November 2015 indicated that Company losses would amount to $129,942 during 2015, $160,500 during 2016 and $72,139 in 2017, this last figure being more than 3 times higher than the $23,799 figure provided in July 2015 that Ms. Harkness had characterized before Artifect made the investment as being "almost break-even". *Compare,* Exhibits 2 and 10.

     **Response**: Not disputed.

34.    By email dated November 25, 2015, Ms. Kennedy assured Mr. Basil that "we are not far off budget. My development budgets are all on track. There's maybe $5k of misc costs that were not anticipated in the original projections. We are just lacking in revenue." Exhibit 11.

     **Response**: Not disputed that the email was sent, except that Kennedy also noted that the Company needed to "increase revenue for 2016 to get back on track." *Id.* At this time, the Company's "overhead and development budgets" were accurate. *See* Ex. 1 at 44:5 – 45:7.

35.    Just two months later, by email dated January 15, 2016, Ms. Kennedy advised Mr. Basil that "we are dead in the water" unless new sponsors or investors were found. Exhibit 12.

     **Response**: Not disputed that the email was sent and that Kennedy advised Basil that the Company needed a capital infusion in order to survive. *Id.* In December 2015, the Company was gearing up for its first fashion show, but was experiencing a cash shortage. Kennedy Decl., ¶ 17 (ECF Doc. 152). At this time, Basil decided to unilaterally withhold funding from the Artifect line of credit (SF, Ex. 7 at KENNEDY 5856), notwithstanding that withdrawals on the line of credit were available "on demand" without restriction (*id.*, Ex. 3 at § 5). The capital freeze forced Kennedy to personally cover the Company's expenses for the February 2016 fashion show premiere. Kennedy Decl., ¶ 18 (ECF Doc. 152). During this time period, Kennedy and Basil

10

agreed that the Company needed to raise money and get sponsors for the fashion show. *See* Ex. 1 at 46:19 – 48:23.

36.     Ms. Kennedy's January 15, 2016 email noted also that she had forgotten some $13,090 in expenses related to a photo shoot. Exhibit 12.

**Response**: Disputed. The email states Kennedy "forgot photoshoot expenses" totaling $6,940 for the fashion show premiere. Basil Decl., Ex. 12.

37.     On or about January 16, 2016, WFT Realty provided the Company with a $100,000 line of credit (the "$100,000 Line") with interest at the rate of 6% per annum to accrue on amounts drawn and with payment of all outstanding amounts due 90 days following demand. Exhibit 13.

**Response**: Not disputed.

38.     By email dated February 3, 2016, Ms. Kennedy advised Ms. Caitlin Smyth of Artifect that the $100,000 Line would be exhausted by the third week of March 2016. Exhibit 15.

**Response**: Not disputed that the email was sent. Kennedy advised Basil the $100,000 line of credit would last until mid-April 2016. *Id.* Due to unanticipated costs in connection with the fashion show (*id.*), a lack of sponsors for the fashion show that were promised by Artifect (Ex. 1 at 51:17 – 52:8) which increased costs and a snowstorm that slowed production, the $100,000 line of credit was expected to be exhausted a few weeks earlier than predicted.

39.     By that same email dated February 3, 2016, Ms. Kennedy advised Ms. Smith that some $32,350 in expenses had not been planned for and/or anticipated. Exhibit 15.

**Response**: Not disputed that the email was sent.

40.     On or about February 21, 2016, WFT Realty provided the Company with a second line of credit, this one being in the amount of $110,000 (the "$110,000 Line"). Decl ¶ 51.

**Response**: Not disputed.

41.     On March 21, 2016, Mr. Basil advised Ms. Kennedy that the $100,000 Line and the $110,000 Line had both been exhausted, apart from $25,000 that remained in the Company's bank account.   Exhibit 16.

**Response**: Not disputed that the email was sent.  In the same email, Basil advises that an investor offered $350,000 in exchange for 35% of equity in the Company.  Basil Decl., Ex. 16. Basil stated the offer was "not acceptable."  *Id*.  However, less than a year prior, Basil negotiated a less favorable deal for the Company where Basil's company, Artifect, received a 35% ownership interest in the Company for a $250,000 line of credit that required full repayment of the principal with interest.  SF, Ex. 3 at § 1.

42.     By email dated March 31, 2016, Ms. Kennedy conveyed to Mr. Basil that the Company would need $500,000 in additional funding to cover operations through the end of September 2016.  Exhibit 17.

**Response**: Not disputed that the email was sent.

43.     In her March 31, 2016 email, Exhibit 17, Ms. Kennedy volunteered to surrender equity she held in the Company provided she was able to maintain full creative control, stating:

> I also can give up equity. Although originally, I wanted to maintain majority, I really don't think it matters.  All I care about is being able to continue working, and to maintain 100% creative control, ownership of my name, and decision –making rights.

**Response**: Not disputed that Kennedy agreed to relinquish equity under the conditions listed above, including maintaining ownership of her name and the KENNEDY Marks.  Basil Decl., Ex. 17; *see also* Ex. 1 at 56:2 – 21.

44.     In her March 31, 2016 email, Exhibit 17, Ms. Kennedy expressed a desire not to look for new sources of funding for the Company and expressed a preference for obtaining funding from Mr. Basil and/or Artifect:

If it is an option, I would much rather continue working as we have been, with you and artifect as the sole investors.

**Response**: Not disputed that the email was sent.  At this time, members of Artifect advised Kennedy that Basil would invest additional funds into the Company and told her to write an email to Basil explaining that she preferred Artifect provide funding through September 2016.  *See* Ex. 1 at 57:12 – 58:7; 59:19-24.

45.    In her March 31, 2016 email, Ms. Kennedy suggested that Mr. Basil be given an equity stake in the Company in exchange for $500,000 in funding and asked him how much equity he would consider fair for him to receive. Exhibit 17.

**Response**: Not disputed that the email was sent and that Kennedy asked Basil what he thought was a "fair" exchange for a $500,000 investment.  *Id.* at KENNEDY 5676.  Kennedy told Basil she trusted him "wholeheartedly," stating: "[I]'m open to whatever you suggest as a fair equity balance between us. **I honestly really trust you and artifect wholeheartedly**, and I know whatever decision/suggestion you propose will be fair and in the company's best interest."  *Id.* (emphasis added).

46.    In her March 31, 2016 email, Ms. Kennedy proposed to Mr. Basil that in exchange for providing the Company with $500,000 in funding, that he be given a 22% ownership stake in the Company, consisting of 12% of Company ownership to be contributed by Jayne Harkness and 10% of Company ownership to be contributed by Ms. Kennedy herself.  Exhibit 17.

**Response**: Not disputed that the email was sent and that Kennedy made this proposal with the understanding that Basil would decide an equity structure that would be "fair and in the company's best interest."  *Id.* at KENNEDY 5676.

47.    Mr. Basil responded on April 2, 2016 by stating "I understand your concern about bringing in an outside investor" and by offering to have WFT Realty provide $500,000 in funding

in exchange for 20% ownership in the Company comprised of 12% of Company ownership to be contributed by Jayne Harkness and 8% of Company ownership to be contributed by Ms. Kennedy herself.  Exhibit 17.

**Response**: Not disputed Basil made this proposal and also promised Kennedy that she would "retain the creative control, control of the ordinary course of business for EKLLC and the right to control the use of your own name."  *Id.* at KENNEDY 5675.

48.     WFT Realty thus agreed to provide the requested $500,000 in financing in exchange for only 20% of Company equity, an amount less than the 22% of Company equity Ms. Kennedy had offered him.  Exhibit 17.

**Response**: Not disputed.  *See supra* at Response No. 47.

49.     The offer Mr. Basil made also stated that Ms. Kennedy "will retain creative control, control over the ordinary course of business for EKLLC and right to control the use of your own name."  Exhibit 17.

**Response**: Not disputed.

50.     Ms. Kennedy responded to Mr. Basil's offer on April 2, 2016 by stating, "Thank you so much.  I am so excited, and can't tell you how appreciative I am.  All of the below sounds good."  Exhibit 17.

**Response**: Not disputed the email was sent.

51.     By email dated April 3, 2016, Mr. Basil forwarded a draft document entitled "Second Amendment to the Elizabeth Kennedy LLC ('EKLLC') Operating Agreement ('Second Amendment')" to Ms. Kennedy and Ms. Harkness for their review.  Exhibit 18.

**Response**: Not disputed that the email was sent.

52.     The draft document entitled "Second Amendment" contained the terms of the offer

made by Mr. Basil in his April 2, 2016 email to Ms. Kennedy and approved by Ms. Kennedy in her return email of April 2, 2016.  Exhibits 17 and 18.

**Response**: Not disputed that the Second Amendment contained some of the terms from the April 2, 2016 email, in addition to other terms prepared by Basil.  Basil Decl., Ex. 18.  For example, the WFT $500,000 line of credit was secured by the Company's assets and revenues.  SF 11, § 4.  The Second Amendment restricted Kennedy's right to compete if she was no longer a member of the Company.  *Id.*, § 11.  The non-compete restriction was Basil's idea and was opposite to the terms of the original Operating Agreement which placed no restrictions on Kennedy's right to pursue other business opportunities, whether they were unrelated or in direct competition with the Company's interests.  Kennedy Decl., ¶ 24 (ECF Doc. 152); SF, Ex. 1 at § 2.9(b).

53.     By email to Mr. Basil dated April 4, 2016, Ms. Kennedy advised Mr. Basil that "I went over this with my lawyer and have a couple of questions", and then listed 3 items.  Exhibit 19.

**Response**: Not disputed that the email was sent.  However, *see supra* at Response No. 12.

54.     Changes were made to the draft document in response to Ms. Kennedy's April 4, 2016 email that followed her consultation with her lawyer and the document was then finalized and signed by Ms. Kennedy on April 12, 2016 (the document as finalized is referred to herein as the "Second Amendment").  Exhibits 18-20.

**Response**: Disputed.  Kennedy did not consult with her lawyer.  Kennedy Decl., ¶ 2.  She sought general advice from her uncle.  *Id.*, ¶ 3.  Furthermore, disputed that Kennedy's suggested changes were made.  For example, Kennedy questioned the 90-day non-compete provision Basil added into the proposed Second Amendment.  Basil Decl., Ex. 19.  However, the 90-day restriction period remained in the final version of the Second Amendment.  *See* Basil Decl., Ex. 20 at § 11.

55.     The Second Amendment among other things set forth the members' percentage ownership of the Company by stating that Ms. Kennedy owned 43%, Ms. Harkness owned 2%; Artifect owned 35% and WFT Realty owned 20%.  Exhibit 20.

**Response**: Not disputed.

56.     The Second Amendment, Exhibit 20, also stated at its Paragraph 7 that:

The management of EKLLC will continue to be the responsibility of Elizabeth Kennedy, as sole Managing Member, whose duties shall include being solely responsible for the day-to-day operation of EKLLC, including sole discretion regarding all creative decisions and other decisions in the regular course of EKLLC's business.

**Response**: Not disputed.

57.     The Second Amendment, signed by Ms. Kennedy, also acknowledged that the Artifect Line, the $100,000 Line and the $110,000 Line had all been exhausted, were to be repaid by January 1, 2021 or, at the Company's option, January 1, 2022 and were "secured solely by the assets and revenues of EKLLC, with appropriate UCC-1 filings, and there are no personal guarantees to be provided by any members."  Exhibit 20, Paragraphs 4 and 6.

**Response**: Not disputed.

58.     On June 16, 2016, Mr. Basil and Ms. Kennedy engaged in an email exchange in which Mr. Basil complained that the Company's "burn rate" amounted to $6,000 per day, that the Company's funding amounted to $137,000 that would not last long and in which Ms. Kennedy stated that she really had no idea how the Company had spent $350,000 in two months.  Exhibit 22.

**Response**: Not disputed that Kennedy stated she had "no idea how $350K has been spent in 2 months, other than the fact that we had a lot of fabrics and production to pay for fall and resort simultaneously – but that still sounds really high – I need to see why." *Id*.  At her deposition,

Kennedy testified she had limited knowledge of the Company's finances:

> I wasn't the person responsible for payroll and all of the expenses. I was in charge of booking fabrics and embroideries I needed. Sales came in that really wasn't under me. So I had very limited visibility to the finances. I knew we needed more money and that we constantly had cash shortages, which was a burden and it was preventing us from being able to work and complete product on time, and to hire that staff we needed to support our growing sales.

Ex. 1 at 87:18 – 88:5.

59.     On June 22, 2016, Ms. Kennedy forwarded a budget she had prepared covering the period June 2016 through August 2016 to Mr. Basil and others, that budget showing that during that period the Company's expenses would exceed its revenues by $132,140. Exhibit 23.

**Response**: Not disputed. Throughout 2016, Kennedy reminded Basil that he should not rely on her projections because she had no experience or the skillset to properly budget or prepare sales projections or predict cash flow. Kennedy Decl., ¶ 22 (ECF Doc. 152).

60.     On July 13, 2016 at 10:20 a.m., in response to an inquiry from Ms. Kennedy, accountant E.J. Colville advised that $428,000 of the $500,000 provided by WFT Realty as set forth in the Second Amendment had been spent. Exhibit 24.

**Response**: Not disputed the email was sent.

61.     In emails sent by Ms. Kennedy to Mr. Basil and others on July 13, 2016, she asserted that the Company would receive revenues during the autumn of 2016 in consequence of shows to be held then but required short term lending to cover expenses in the meantime. *Id.*

**Response**: Not disputed that Kennedy anticipated revenues for fall payments to come in August 2016. Basil Decl., Ex. 24 at KENNEDY 8304.

62.     In her July 13, 2016 emails Ms. Kennedy inquired as to whether the Company might obtain a bank loan "to get us through the show, to buy us more time to seek additional investment?" Exhibit 24.

**Response**: Not disputed that the emails were sent.

63.     On August 1, 2016, Mr. Basil advised that he was providing the Company with a $50,000 line of credit that would bear interest at the rate of 10% per annum, stating that this credit line was a "band-aid" and that a more permanent solution to the Company's problems was needed. Exhibit 26.

**Response**: Not disputed that Basil stated he would open a "$50,000 line of credit at 10%." *Id*.

64.     On August 7, 2016, Mr. Basil advised Ms. Kennedy and others that he had obtained a bank's commitment to provide the Company with a $1million line of credit, in exchange for, among other things, Mr. Basil's personal guarantee of repayment.  Exhibit 28.

**Response**: Not disputed that Basil proposed a 20% equity increase for WFT in the Company if he was the "only guarantor" on the $1 million line of credit. *Id*.

65.     Mr. Basil's August 7, 2016 email stated also that the bank loan commitment he had obtained for the Company also required that the lender's right to repayment and access to all Company assets would be superior to all others.  Exhibit 28.

**Response**: Not disputed that the email was sent.  Also not disputed that four months prior, Basil advised Kennedy that she would continue to have the "right to control the use of your own name" and referred to the KENNEDY Marks in an email to Kennedy as "your trademark."  SF, Ex. 12.

66.     In his August 7, 2016 email, Mr. Basil also wrote, "I am open to any proposal, including finding additional guarantors or collateral, if I am able to secure the loan."  Exhibit 28.

**Response**: Not disputed that the email was sent.

67.     In his August 7, 2016 email, Mr. Basil proposed that in the event no such additional

guarantors or collateral were found that he be compensated for the risk he was taking by an award of additional equity to his company WFT Realty.  Exhibit 28.

**Response**:  Not disputed that Basil proposed a 20% equity increase for WFT in the Company if he was the "only guarantor" on a $1 million line of credit.  *Id*.

68.     On September 10, 2016, Mr. Basil emailed Ms. Kennedy and others stating among things that during the six-week period commencing on August 1, 2016, he had made short-term loans to the Company, referred to as "band-aid" loans, aggregating $230,000. Exhibit 29.

**Response**:  Not disputed during this time period Basil transferred money into the Company totaling $230,000.  SF, Ex. 22.  Basil provided no terms or conditions to the Company on the "band-aid" loans.

69.     Mr. Basil's September 10, 2016 email stated also that Noah Bank was willing to provide the Company with a loan in the amount of $600,000 to be secured in part by a mortgage on Mr. Basil's home, which, at the time, was unencumbered by any mortgage.  Exhibit 29.

**Response**:  Not disputed that the email was sent.

70.     In his September 10, 2016 email, Mr. Basil proposed that he be compensated for the risk he would incur if a loan was obtained from Noah Bank by a transfer of additional equity to WFT Realty by the other Company members.  Exhibit 29.

**Response**:  Not disputed that the email was sent.  In the email, Basil also advised the Company's members, including Kennedy, that if the Noah Bank loan terms were unfavorable, Basil would personally fund $1,000,000 in exchange for an additional 11% of the Company's equity.  Basil Decl., Ex. 29.  Basil did not provide all of the promised funding.  Kennedy Decl., ¶ 35 (ECF Doc. 152).

71.     On September 12, 2016, Mr. Basil notified the other members that he had reached

a deal with Noah Bank and that "funding is assured", to which news Ms. Kennedy responded by writing, "I love you Bob!!!".  Exhibit 30.

**Response**: Not disputed the email was sent.

72.    On September 22, 2016, Mr. Basil forwarded closing instructions he had received from Noah Bank to Ms. Kennedy and others, and also asked them to provide certain documentation.  Exhibit 94.

**Response**: Not disputed the email was sent.

73.    Noah Bank's instructions required Mr. Basil, his wife and Ms. Kennedy to sign the loan documents.  Exhibit 94.

**Response**: Not disputed.

74.    On September 26, 2016, Noah Bank extended a $500,000 line of credit (the "Noah Bank Line") to Robert Basil, individually, and the Company, as co-borrowers, which line of credit was guaranteed by WFT Realty LLC and Colleen M. Basil and which was secured in part by a mortgage on the Basils' home, see excerpts from loan documents, Exhibit 95.

**Response**: Not disputed.  The Noah Bank loan was also secured by the Company's assets, which, including the KENNEDY Marks Compl., ¶ 55; Defs. Answers, ¶ 55 (admitting allegation). Basil did not tell Kennedy that the Noah Bank loan was secured by the KENNEDY Marks. Kennedy Decl., ¶ 37 (ECF Doc. 152).

75.    The documents effectuating the Noah Bank Line were signed as appropriate by all Company members, including Ms. Kennedy, as well as by the members of Artifect and by Colleen M. Basil.  Exhibit 95.

**Response**: Not disputed.  At the closing, Basil told Kennedy he read the lengthy Noah Bank loan documents (85 pages of fine print) and all Kennedy had to do was sign her name as a

Company member.  Kennedy Decl., ¶ 37 (ECF Doc. 152).  Kennedy had not seen the Noah Bank loan documents until the closing and had no time to review the provisions contained therein. Kennedy Decl., ¶ 37 (ECF Doc. 152).

76.     Elizabeth Kennedy, individually, was not required to give any personal guarantees in connection with the Noah Bank Line nor to provide any collateral to secure it.  Exhibit 95.

**Response**: Disputed.  The Noah Bank loan was also secured by the KENNEDY Marks without Kennedy's knowledge.  Kennedy Decl., ¶ 43 (ECF Doc. 152).

77.     On September 28, 2016, two days after Noah Bank provided the Company with the Noah Bank Line, Company accountant Edward Colville advised Ms. Kennedy and Mr. Basil that the Company required $100,000 to pay its September 2016 bills, and also provided other financial information regarding the Company's accounts payable.  Exhibit 32.

**Response**: Not disputed the email was sent.

78.     Mr. Basil then emailed Ms. Kennedy complaining that a prior budget she had provided showing that $350,000 in financing would be sufficient to meet the Company's needs for the period September 2016 to February 2017 was inaccurate; in fact, the Company had spent $350,000 in the month of September 2016 alone.  Exhibit 32.

**Response**: Disputed.  The budget provided by Kennedy to Basil totaled $841,082 to fund the Company from September 2016 through February 2017.  *See* Ex. 5 at KENNEDY 4812.  The $350,000 figure represented the "estimated actual cash" needed <u>after</u> the Company received $500,000 in estimated income.  *Id*.  On the same day Basil complained to Kennedy about her projections, Kennedy advised Basil of various issues with budgeting, Kennedy's lack of experience with financial forecasting and lack of understanding of the Noah Bank loan she signed two days prior:

- "One of the issues I am having is that bills aren't always being paid immediately. [EJ Colville] is doing his best to calibrate payments and cashflow, but it makes it difficult for me to evaluate what we are spending, and how to project future spending. There are bills from months ago that I though were already paid, so I was't accounting for them in august/september cash flows."

- "I also have no idea how to calculate interest payments or disability pay etc. We need someone with a financial background to be analyzing my design budgets, because all I am capable of doing is estimating how much money I need for materials and labor. At this point, I'm projecting sales increases, growing production costs each season... this is not my area of expertise and I don't feel comfortable putting together another budget without someone who truly understands cash flow with experience in fashion is involved."

- "And even with a budget - as closely as I can stick to a spending budget for materials etc... I cannot predict everything. There are so many decisions made on a weekly basis…."

- "I don't fully understand the agreement with Noah Bank, and how closely they are going to be monitoring our spending, so would like to discuss more with you so I know exactly what is expected."

SF, Ex. 10 at KENNEDY 4782.

79.     Mr. Basil also noted that this new information contradicted information previously supplied to Noah Bank in connection with the Noah Bank Line, and he expressed concern about the propriety of drawing down on the Noah Bank Line under those circumstances. Exhibit 32.

**Response**: Disputed.   The projections state a "total funding need: Sept-February" of $841,082.  *See* Ex. 5 at KENNEDY 4812.

80.     On September 30, 2016, Ms. Kennedy acknowledged that the Company was $200,000 over budget.  Kennedy 7168-69.

**Response**: Disputed.   Kennedy stated "we are $200k off plan" without referencing a specific budget.   *See* Ex. 6 at KENNEDY 7169.   Kennedy explained the reason for the gap, including "a lot of unpaid old bills from fall and resort that I did not know were outstanding when I made my new revised projects for july through february 2018." *Id*.

81.     On September 30, 2016, Ms. Kennedy emailed that she was hesitant to draw down

on the Noah Bank Line, and stated that if the Company used the Noah Bank Line, it would be exhausted by May 2017.  Exhibit 33.

**Response**: Disputed.  Exhibit 33 of the Basil Declaration does not include these statements.

82.     Also on September 30, 2016, Ms. Kennedy revised her projections of Company expenses and sent revised figures to Mr. Basil, who observed that these projections excluded various items and was hence incomplete; Ms. Kennedy agreed with his observation.  Exhibit 34.'

**Response**: Not disputed that email was sent.

83.     During October of 2016, the Company communicated with a consultant named Shan Reddy who reviewed the Company's situation and who developed a plan he said was intended to bring the Company "forward in a thoughtful and healthy manner", Exhibit 36.

**Response**: Not disputed that email was sent.

84.     Mr. Reddy's plan included the appointment of Mr. Basil and/or WFT Realty as managing member and majority owner, Exhibit 36.

**Response**: Not disputed.  Shan Reddy's ("Reddy") plan was based on conversations Reddy had with Basil.  *See* Ex. 2 at 24:8 – 25:12.  Basil insisted on becoming managing member of the Company so that he would have sole control over the Company's operations.  *Id*.

85.     Mr. Reddy's plan also involved procurement of new investments in the Company, Exhibit 36.

**Response**: Not disputed.

86.     Mr. Reddy's plan was intended to result in the Company running "on its own funds with the mindset of reaching sustainability over the course of 2017."  Exhibit 36.

**Response**: Not disputed.

87.     On October 23, 2016, the members entered into a third amendment to the Operating

23

Agreement (the "Third Amendment", Exhibit 37).

**Response**: Not disputed.

88.     The Third Amendment identified $1,910,000 in funding that had been or that would be provided to the Company by WFT Realty (including the Noah Bank Line that had been guaranteed by WFT Realty). Exhibit 37.

**Response**: Not disputed the Third Amendment identified $1,910,000 in funding by WFT. *Id*. Disputed that $1,910,00 is an accurate figure based on approximately $200,000 in unaccounted withdrawals by Basil and his accountant, EJ Colville, prior to executing the Third Amendment. SF, Ex. 22.

89.     The Third Amendment provided that WFT Realty would waive its right to repayment of all amounts due to WFT Realty other than amounts due in connection with the Noah Bank Line.  Exhibit 37.

**Response**: The Third Amendment waived all repayments rights or interest payments on "any loans, advances, equity contributions or other contributions" to the Company, except for interest payments and repayments of the Noah Bank line of credit.  SF, Ex. 19 at § 2.  The waiver also extinguished the rights Kennedy had to recover monies she personally loaned to the Company. *Id*. Notwithstanding the waiver of further rights to repayment in the Third Amendment, the Company's bank statements show continued withdrawals by Basil after the Third Amendment was signed totaling approximately $120,000.  SF, Ex. 21; Kennedy Decl., ¶ 49 (ECF Doc. 152).

90.     WFT Realty thus renounced its right to repayment of $1.41 million in debt it was owed by the Company.  Exhibit 37.

**Response**: Disputed as to whether $1.41 million is an accurate figure.  SF, Ex. 22.  Also disputed based on continued withdrawals by Basil after the Third Amendment was signed totaling

approximately $120,000.  SF, Ex. 21; Kennedy Decl., ¶ 49 (ECF Doc. 152).

91.     The Third Amendment also stated that "all repayment rights or interest payments" due from Company equity holders other than WFT Realty would likewise be waived.  Exhibit 37.

**Response**: Not disputed.

92.     Artifect thus waived its right to repayment of the amounts it was due in connection with the Artifect Line.  Exhibit 37.

**Response**: Not disputed Artifect waived its right to repayment.  Disputed whether Artifect complied with the waiver based on continued withdrawals by Basil after the Third Amendment was signed totaling approximately $120,000.  SF, Ex. 21; Kennedy Decl., ¶ 49 (ECF Doc. 152).

93.     The Third Amendment restated the members' ownership interest as follows: Elizabeth Kennedy, 27%; Jayne Harkness, 2%, Artifect, 17% and WFT Realty, 54%.  Exhibit 37.

**Response**: Not disputed.

94.     The Third Amendment also made WFT Realty the Company's managing member, Exhibit 37.

**Response**: Not disputed that the Third Amendment appointed WFT as the only managing member "solely responsible for the day-to-day operation of EKLLC, including the hiring and firing of all employees, as well as the sole determiner of their compensation," and Basil was named as the "sole determiner" of additional financing by requiring a majority vote of the Company's members (*i.e.*, WFT) for all "debt transactions."  SF, Ex. 19 at § 5.

95.     The Third Amendment however also provided that Elizabeth Kennedy would retain "sole responsibility and authority for creative, artistic, and design decision for EKLLC and its products or services", and denied WFT Realty "discretion regarding all creative decisions". Exhibit 37.

**Response**: Not disputed.

96.     Beginning no later than February 2017, and from time to time thereafter, Mr. Reddy proposed factoring as a way to finance the Company.  Decl. Paragraphs 81-82.

**Response**: Not disputed.  Reddy proposed factoring because of the Company's tremendous sales growth.  SF, ¶¶ 300-01, 306-08.  Funds were needed to cover production costs.  *Id*.  Factors lend companies money against purchase orders so that the Company can afford to pay its production bills before the company gets paid by stores who place orders.  *Id*., ¶¶ 223-25.

97.     Mr. Basil responded to Mr. Reddy's initial proposal regarding factoring by email dated February 9, 2017, in which Mr. Basil stated: "EKLLC cannot factor any receivables.  Noah Bank and WFT have UCC liens on all assets."  Exhibit 48.

**Response**: Not disputed the email was sent.

98.     In a March 10, 2017 email exchange between Mr. Reddy and Mr. Basil in which Mr. Reddy indicated he wanted to factor a Company invoice, Mr. Basil rejected that proposal by stating that "factoring is a death spiral" and by reminding Mr. Reddy that Noah Bank held a lien on all Company assets.  Exhibit 49.

**Response**: Not disputed that Basil stated "factoring violates loan covenants with Noah Bank which give Noah Bank the right to call immediately the $500,000 loan."  *Id*.

99.     In December of 2017, a factor called Express Trading offered factoring services to the Company but required guarantees of payment from Artifect and WFT Realty.  Exhibit 55.

**Response**: Not disputed.

100.     In light of Express Trading's requirement that Artifect and WFT Realty provide Express Trading with guarantees, Mr. Basil rejected Express Trading's proposal to act as Company factor.  Decl. Paragraph 92.

**Response**: Not disputed.  In desperate need of cash to cover production expenses, Basil agreed to factor financing in November 2017.  Kennedy Decl., ¶ 68 (ECF Doc. 152).  Based on Basil's approval of a factor arrangement, the Company bought fabric, paid vendors and collected deposits from stores for the Resort Collection.  *Id*., ¶ 69.  The Company proceeded to line up a factor company, Express Trade Capital, who agreed to fund the Company and Basil pushed Kennedy and Harkness to sign the funding documents.  SF, Ex. 44 at KENNEDY 5191.  Express Trade required any funding to be secured by the Company's assets, which required Noah Bank to subordinate its interests to Express Trade.  *Id*., Ex. 45.  Noah Bank was eager to close the factor deal and agreed to waive its rights and subordinate its secured interests in the Company.  *Id.*, Ex. 46.  However, Basil told Noah Bank that the Express Trade deal was on hold and that he was "trying to get a better factoring contract."  *Id.*  No evidence has been produced of Basil making attempts to get a better factor deal.  Kennedy Decl., ¶ 72 (ECF Doc. 152).

101.    By amendment to the Operating Agreement dated as of June 14, 2017 (the "Fourth Amendment"), the Company members surrendered 4% of their respective equity holdings in the Company to the Company, with the intention of having the Company sell this 4% of equity to investors.  Exhibit 39; Decl. Paragraphs 74-75.

**Response**: Not disputed.

102.    The 4% of equity thus surrendered to the Company was intended to be divided into four units (each, a "Treasury Unit"), each such Treasury Unit representing 1% of ownership in the Company, and each such Treasury Unit to be sold to investors for $50,000 apiece.  Exhibit 39, Decl. Paragraphs 74-75.

**Response**: Not disputed.

103.    The sales price of $50,000 per Treasury Unit set forth in the Fourth Amendment

was selected arbitrarily.  Decl. Paragraph 74.

**Response**: Disputed.  Basil's valuation of the Company was not arbitrary as Basil consistently valued the Company at $5 million in 2017.  Pursuant to the Fourth Amendment dated June 14, 2017, Basil valued the Company at $5,000,000.  *Id*., Ex. 29 at § 1 ($50,000 per 1% = $5,000,000 per 100%).  A few months later, in August 2017, Basil drafted a convertible note for the purpose of raising money for the Company that valued the Company at $5,000,000.  *Id*., Ex. 37 at KENNEDY 6240.  Basil's $5,000,000 valuation is not far off Plaintiff's expert's valuation of $6,273,365.  ECF Doc. 153-1, Ex. 11.

104.     One of the four Treasury Units was sold to a friend of Mr. Basil's for $50,000 on condition that Mr. Basil would repay his friend that $50,000 if the Company failed.  Decl. Paragraph 75.

**Response**: Not disputed.

105.     None of the other Treasury Units were sold.  Decl. Paragraphs 74-75.

**Response**: Disputed.  In September 2017, Kennedy's family loaned the Company $50,000 at 10% interest per annum.  *See* Ex. 7 at KENNEDY 6240.  The loan was to be converted into 1% of Company equity based on a $5,000,000 valuation if the principal with interest was not fully repaid before October 31, 2017.  *Id.*  No interest or principal was repaid.  In addition, Kennedy's family received no equity in the Company.  The interest is not reflected in the Company's 2017 tax return that were prepared by Basil's accountant, EJ Colville, and signed by Basil as the Company's Tax Matters Partner.  SF, Ex. 31 at 3.

106.     However, one of Ms. Kennedy's relatives agreed to pay the Company $50,000 in exchange for a convertible note that might be converted at the lender's option into 1% of Company equity.  Decl. Paragraph 74.

**Response**: Disputed.  *See supra* at Response No. 105.

107.    No such conversion ever occurred.  Decl. Paragraph 74.

**Response**: Not disputed.

108.    By email dated July 16, 2017, Mr. Basil again advised the Company members and Mr. Reddy that he had been covering the Company's shortfalls out of his own pocket and "cannot fund the company like that in the future".  Exhibit 43.

**Response**: Not disputed that the email was sent.  In the prior month, the Company's sales director, Curtis Farnham ("Farnham"), reported to Basil and Reddy that the Company's sales were projecting a 120% increase from 2016 sales figures.  SF, Ex. 33.  Reddy also advised Basil that the Company was doing "exceptionally well considering current market conditions" and that the Company was "growing while most companies are shrinking."  *Id.*  This was after Reddy provided Basil with a business plan that projected sales increases over a three-year period from $1,710,000 (2017) to $15,325,000 (2020).  *Id.*, Ex. 28.  During the same time period, Reddy advised Basil that the Company desperately needed additional funding to support its growth and that such funding could be through a factor arrangement.  *Id.*, Ex. 6 at 95:18 − 96:11  Reddy continually pleaded with Basil, as the managing member of the Company, to provide him with clarity and direction as to how the Company was going to fund itself.  *Id.*, Ex. 35 (Reddy telling Basil his emails were "unclear and thereby prevent[ed] [Reddy] from moving forward" and was "desperately trying to get clarity [from Basil]….").  Reddy advised Basil that the Company was "tracking the best for its time in business," was "executing on a daily basis and closing deals" and had "doubled sales from 2016 to 2017."  *Id.*  Reddy told Basil time was "of the essence" to raise money to fund he Company and that funding could come through a factor.  *Id.*  Basil was unresponsive to Reddy's funding pleas.  *Id.*, Ex. 6 at 107:6 − 15.

109.    By email to Ms. Kennedy dated August 16, 2017, Mr. Basil advised Ms. Kennedy that "I cannot put more money into EKLLC because the cost of acquiring the funds is far too expensive to make any sense. Exhibit 47.

**Response**:  Not disputed that the email was sent.  Disputed as to the suggestion that the cost of financing the Company was "too expensive."  Throughout 2017, Reddy advised Basil of alternative sources of funding through factors or third-party investors.  SF, ¶¶ 306-14.   Basil ignored Reddy's advice.  *Id*.

110.    By email to Ms. Kennedy dated August 27, 2017, Exhibit 50, Mr. Basil rejected a proposal made by Ms. Kennedy to raise funds through factoring and stated:

> I am prepared to lose everything I have put in, rather than expose myself to additional risk and expenditures. At this point my primary goal is to avoid foreclosure of my home.
>
> Any effort to encumber accounts receivable is in reality just a way to put more risk on me, as those accounts receivable are the collateral for the Noah Loan.
>
> I am sorry, but I have gone as far as I can go. There are a lot of wealthy and clever people in this group now, and they know other wealthy and clever people. The solution must come from them. . . . I cannot consent to factoring, as it is the equivalent of me writing checks.

**Response**: Not disputed that the email was sent.  Basil also stated "[t]he [Noah Bank] loan is to EKLLC, with my personal guarantee attached and support by a first mortgage on my home in Princeton.  *Id*.  Basil again referred only to his "home in Princeton" as the source of collateral for the Noah Bank loan without mention of the KENNEDY Marks as the other collateral for the loan.  *Id*.

111.    On November 10, 2017, Ms. Kennedy sent Mr. Basil an email stating "We desperately need $35K for fabric/factories today. . . Bob, would you consider fronting us the money if you are paid next week when the money hits? I'm sorry to ask, we are desperate."  Exhibit

53.

**Response**: Not disputed that the email was sent. This email was sent after Basil instructed

Kennedy and Harkness to sign the Express Trade funding documents. SF, Ex. 44 at KENNEDY

5191. Kennedy requested a short-term loan from Basil that would be paid from monies coming in

from Express Trade.

112.    On November 16, 2017, Mr. Basil sent an email to Ms. Kennedy, Exhibit 54,

stating:

> I do have confidence in the great brand you have created. I see no way to get the
> substantial financing to make the brand work under Elizabeth Kennedy LLC.
>
> I probably have more interest in saving the brand than anyone. I see no way to do
> it. . .  If I were to find the $300,000 Adam said is needed by next week (I cannot),
> it would merely put off the inevitable, unsolvable cash crunch before year end and
> beyond.
>
> I know that everyone is looking to me to save the day, which I have done several
> time before. . . .  But, after pledging my house to collateralize a $500,000 loan, and
> putting in $2 million in cash based upon broken promises and false projections, and
> facing a $150,000 payroll tax obligation, I cannot do more from a financial point
> of view.

**Response**: Not disputed that the email was sent. Disputed as to the accuracy of Basil's

statement. The statement contains material omissions, including Basil's continued reluctance in

the months prior to take meetings with potential third-party investors offered by Reddy. SF, ¶¶

310-12, 314, 317-19. The statement also omits the fact that the Noah Bank loan, while secured by

Basil's residence, was also secured by the KENNEDY Marks without Kennedy's knowledge or

consent. *Id.*, ¶¶ 239, 245, 253. In addition, Basil's statement refers to "false projections" that were

never provided to Basil by Kennedy. Finally, the statement refers to an "unsolvable cash crunch"

that was easily solvable through, *e.g.*, a factoring arrangement. *Id.*, ¶¶ 222-26, 306-7.

113.    On November 16, 2017, Ms. Kennedy advised Mr. Basil by email that if the

Company did not complete a project she referred to as "Resort", "it will be the end of the Company", Exhibit 54.

**Response**: Not disputed that the email was sent.  If the Company did not complete the Resort Collection, it would not have had enough money to complete the following season's collection.

114.    Also on November 16, 2017, Ms. Kennedy advised Mr. Basil by email that completing "Resort" would require $150,000.  Exhibit 54.

**Response**: Not disputed that the email was sent.  Kennedy advised Basil the Company would require approximately $150,000 to finish the Resort Collection.  *Id.* at KENNEDY 4663. Kennedy also advised it was her belief that if the Company completed the Resort collection, it would be able to collect $400,000 from retailers which could be used to pay off the Company's debts, including the Noah Bank loan.  *Id.*

115.    Also on November 16, 2017, in response to Mr. Basil's refusal to supply the Company with more funding, Ms. Kennedy indicated in an email to Mr. Basil that she had considered a bankruptcy filing but that after more thought and consultation with others had concluded that a "quiet shutdown" would be preferable to a bankruptcy filing.  Exhibit 54.

**Response**:  Not disputed that the email was sent.  The "quiet shutdown" Kennedy referred to was for the Company to complete the Resort and Spring collections, deliver the product the Company already was paid for and then dissolve the Company once it completed the collection rather than shut down when the Company owed "hundreds of thousands of dollars to retailers for products that [the Company was] not shipping."  *See* Ex. 1 at 172:12-25.

116.    During the period late November 2017 to early December 2017, the Company replaced Mr. Reddy with a new financial consultant named Jeanne Hardy.  Decl. Paragraph 93.

32

**Response**: Not disputed that Jeanne Hardy ("Hardy") was retained by the Company, with Basil's approval, as a business consultant.  SF, ¶ 349.

117.    Late in the evening of December 18, 2017, Mr. Basil emailed Ms. Hardy and Ms. Kennedy to state that WFT Realty would not supply $360,000 to complete Resort and to express his view that even if that money were found and Resort completed, the Company would nevertheless be out of cash by February 2018 and would still owe payroll taxes.  Exhibit 58.

**Response**: Not disputed that the email was sent. Basil refused any factor option and stated it would better for him to finance the Company instead of a factor.  SF, ¶ 340.  In response, Hardy prepared a plan for Basil, fully expecting him to follow through on funding.  Basil Decl., Ex. 58 at KENNEDY 1383-84.  Basil did not provide any additional funding to the Company.  SF, ¶ 341.

118.    On December 19, 2017, Ms. Hardy emailed Mr. Basil to state that the amount needed was $500,000, not $360,000, Exhibit 58, and to state:

> If you are not able to fund the 500k then resort will not ship.  So we move to plan B which means closing the business.

**Response**: Not disputed that the email was sent.

119.    Also on December 19, 2017, Mr. Basil responded to Ms. Hardy's email with an email advising her and Ms. Kennedy that he could not agree to provide the requested $500,000 in funding and that "we need to go to plan B".  Exhibit 58.

**Response**: Not disputed Basil sent an email stating "[w]e need to go to Plan B if I am the only 'bridge loan' source." *Id.*  Disputed that Basil was the only source of funding.  *See, e.g.*, SF, ¶¶ 334-41 (Company obtained factor commitment from Express Trade Capital and introduced other factor options to Basil who rejected all factors).

120.    Also on December 19, 2017, Ms. Kennedy responded to Mr. Basil's email as follows: "I'm sending everyone home.  Jeanne, can you meet today so we can plan the shutdown,

what to tell vendors, etc." Exhibit 58.

**Response**: Not disputed that the email was sent.

121.    On December 21, 2017, Mr. Basil emailed Ms. Kennedy and observed that Noah Bank held a lien on all of the Company's assets and would have payment priority over vendors. In this email he observed that Noah Bank's lien covered "everything", specifying "trademark, inventory, A/R", to which Ms. Kennedy replied, "There aren't really any receivables.  We can't ship resort or spring without payment to the factories, so we can't collect on the 600 in AR that's open." Exhibit 60.

**Response**: Not disputed that the email was sent.

122.    Also on December 21, 2017, in responding to an inquiry from the Company accountant regarding $3,197.00 in unpaid Company health insurance premiums, Ms. Kennedy emailed Ms. Hardy, asking, "does the full $3197 need to be paid?  we are really short on cash.  we are trying to use every penny that is coming in to try to get resort out so that we will collect the $300K that will come in."  Exhibit 61.

**Response**: Not disputed that the email was sent.

123.    On January 3, 2018, Ms. Kennedy emailed an attorney she had retained, Benjamin Thompson, Esq., and/or Ms. Hardy, stating that she had advised Mr. Basil that she had told stores that the spring collection will be cancelled.  She added in her email to Mr. Thompson and Ms. Hardy that "We may be cancelling Fall as well – in which case I have to lay off my team this week once they finish the last resort pieces."  Exhibit 62.

**Response**: Not disputed that the email was sent.

124.    Also on January 3, 2018, Ms. Kennedy emailed Ms. Hardy and Mr. Thompson as follows, Exhibit 64:

Problem –

Bob/Artifect are under the impression that we aren't working.  The sewers logged
in their hours to the intuit payroll system Monday – so Bob and EJ can now see
they've been working.

**Response**: Not disputed that the email was sent.  At this time, Basil and another Artifect

member, O'Connor, were harassing and issuing threats to Kennedy on almost a daily basis.  *See*

Ex. 1 at 217:20 – 218:7.  In early January 2018, the Company's goal was to complete the Resort

Collection so it could receive funds to pay down its debts.  *Id.*

125.    In that same email exchange, Mr. Thompson asked Ms. Kennedy how she intended

to pay the sewers, and she responded, "with funds coming in from resort pre-payments." Exhibit

64.

**Response**: Not disputed that the email was sent.  In addition, Kennedy was paying

Company employees and contractors with money out of her personal funds.  Kennedy Decl., ¶ 86

(ECF Doc. 152).

126.    On January 8, 2018, in response to an email from Ms. Kennedy headed, "Re: Bob",

Mr. Thompson asked, "He will soon see the Resort revenue come in I suspect?" to which Ms.

Kenned replied, "Resort revenue is going to a bank account he doesn't have access to.  If he is

smart enough to see product in stores and realize it's resort, that's the only way he will find out."

Exhibit 65.

**Response**: Not disputed that the email was sent.  At her deposition, Kennedy explained

why the Resort Collection revenue had gone into a separate bank account:

I didn't want him [Basil] to have access to any funds that were coming in because
he would, as he typically did in the past in these situations, freeze bank accounts,
yank money out to pay himself money back, which he would have done for the
payroll tax which he had just paid, or pull out money to pay his loan to Noah Bank.
**So it was crucial for the company, it was in the best interest of the company**

**and for all of its members, to allow this money to be spent, to pay the employees and -- to get the product done so it could be shipped**.

Ex. 1 at 220:3-16 (emphasis added).

127.     On January 13, 2018, Ms. Kennedy emailed Ms. Hardy, Exhibit 66, stating:

Per Lei Resort payment came in for $38,000 on Thursday.  I wrote checks to employees and vendors with that money – all of it is to pay for resort production. . .. Just want to keep track of what I'm spending the incoming resort $$ on, to show it is all being used to pay for resort.

**Response**: Not disputed that the email was sent.

128.     By email dated December 19, 2017, Ms. Kennedy advised Mr. Basil and others that |I'm sending everyone home" and requested Jeanne Hardy's assistance in shutting down the Company, Exhibit 58 at page Kennedy 1383.

**Response**: Not disputed that the email was sent.

129.     On January 25, 2018, former Company employee Samantha Burns advised Mr. Basil by email that Ms. Kennedy had induced her to provide services to the Company during the period December 17, 2017 to December 28, 2017 by telling her that payment for those services would be made available by an investment in the Company that required only finalization.  Exhibit 67.

**Response**: Disputed.  The email does not state Kennedy "induced" Samantha Burns ("Burns") to continue providing services to the Company.  Basil Decl., Ex. 67.  When asked what Kennedy told Burns about an alleged "investment," Burns testified that she did not "remember exactly.  I think that just we would – everyone would be paid what they were owed." *See* Ex. 3 at 17:18 – 18:4.

130.     Ms. Burns testified in this action that she and others were induced to provide services to the Company by telling them that payment for those services would be made available

36

by an investment in the Company that required only finalization.  Exhibit 68 at 17:18-18:19.

    **Response**: Disputed.  Burns did not state she was "induced" by Kennedy to continue providing services to the Company.  Basil Decl., Ex. 68.

    131.    By email sent to Robert Basil and others on or about January 24, 2018, Company employee Julien Remi Nguyen advised that he and other Company employees had been working for the Company through January 24, 2018 but had received termination letters stating that their last day of employment at the Company had been December 17, 2017.  Exhibit 70, page D Supp 286.

    **Response**: Not disputed that Company employees received termination letters stating that their last day of employment at the Company had been December 17, 2017.  Basil Decl., Ex. 70. These letters were produced by Defendants and sent to Company employees as part of a backdating plan.  SF, ¶¶ 386-391.

    132.    In his January 24, 2018 email, Mr. Nguyen advised that he and his colleagues were owed back pay.  Exhibit 70, page D Supp 286.

    **Response**: Not disputed that the email was sent.

    133.    By email dated January 24, 2018, Company employee Laurens Meister complained that she had received a termination letter incorrectly stating that her last day of employment with the Company had been December 17, 2017 when in fact she had worked for the Company through January 22, 2018.  Exhibit 70, page D Supp 448.

    **Response**: Not disputed that the email was sent.  In the same email, Artifect falsely claims that the December 17, 2017 termination date "came from Elizabeth."  Kennedy Decl., ¶ 104 (ECF Doc. 152).

    134.    In her January 24, 2018 email, Ms. Meister advised that she was owed back pay.

Exhibit 70, page D Supp 448.

**Response**: Not disputed that the email was sent.

135.    By email dated January 25, 2018, former Company employee Sophia Blanco advised Mr. Basil and others that she was owed back pay for the period November 20, 2017 to December 8, 2017.  Exhibit 70, page D Supp 154.

**Response**: Not disputed.  During this time period, Basil was the sole managing member of the Company responsible for operations and the "hiring and firing of all employees, as well as the sole determiner of their compensation."  SF, Ex. 19 at § 5.

136.    By email dated January 26, 2018, Company employee Jose Villalta complained that he had received a termination letter incorrectly stating that his last day of employment with the Company had been December 17, 2017 when in fact he had worked for the Company through January 19, 2018.  Exhibit 70, page D Supp 125.

**Response**: Not disputed that the email was sent.  The termination letter was sent to Jose Villalta ("Villalta") by Artifect.  Basil Decl., Ex. 70 at D Supp 125.

137.    In his January 26, 2018 email, Mr. Villalta advised that he was owed back pay. Exhibit 70, page D Supp 125.

**Response**: Not disputed that the email was sent.

138.    By email dated January 23, 2018, former Company employee Chong Kim advised Robert Basil that she was owed wages for 57 hours of work she had provided to the Company during the period November 23, 2017 to December 3, 2017.  Exhibit 70, page Kennedy 1829.

**Response**: Not disputed that the email was sent.

139.    In her January 23, 2018 email, Ms. Kim advised that the Company had posted online records indicating that Ms. Kim had been paid the monies due her less payroll taxes, but

that in fact she had received no payment.  Exhibit 70, page Kennedy 1829.

    **Response**: Not disputed that the email was sent.

140.    Ms. Kim also provided a copy of the relevant online record falsely indicating that she had been paid and that appropriate payroll taxes had been withheld from her salary. Exhibit 70, page D Supp 525.

    **Response**: Not disputed.  The online records indicating that Chong Kim ("Kim") had been paid the monies due her less payroll taxes were for the time period of 11/20/2017 – 12/03/2017 when Basil was acting managing member of the Company solely responsible for the Company's operations, including managing payroll, which Basil was doing through EJ Colville, Basil's personal accountant.  Basil Decl., Ex. 70 at D-SUPP 525; SF, Ex. 19 at § 5

141.    By email dated January 24, 2018 to Robert Basil and others, Mr. Howard Woltmann of Overton & Co. Air Services, Inc. had agreed on November 27, 2017 to forward a rush shipment to the Company without advance payment based on representations that the need for the shipment was urgent and that payment would be forthcoming, but that no payment had ever been received. Exhibit 71.

    **Response**: Not disputed that the email was sent.

142.    By emails dated February 2, 2018, Mr. Leo Tirado of Eurotextil, Inc. advised Robert Basil that Ms. Kennedy had defrauded him and others of his acquaintance in connection with materials they supplied to the Company.  Exhibit 72.

    **Response**: Not disputed that these emails were sent.  Leo Tirado ("Tirado") testified at his deposition that he had no knowledge or basis to support his claim that Kennedy lied to him other than pointing to the Company's inability to pay Eurotextil's bills:

    Q. So when she [Kennedy] tells you you're going to get paid and then you ended up not getting paid that makes her a liar?

A. Well, she lied to me there. She was telling me I was going to get paid, yes, yes, yes.

Q. A lie is making a statement knowing that it's wrong

A. Yes, she lied.

Q. So she made statements to you that she knew at the time were false?

A. Yes.

Q. And you base this on the fact that you were never paid and she kept ordering?

A. Well, it's obvious, right?

Q. It's not obvious to me; tell me how it's obvious?

A. Well, in light of what had happened and we never got paid she knew. I think back then she knew she was not able to pay us.

Q. Do you think or you know?

A. She never paid us. She never paid, she didn't pay the old bills due and she didn't pay the new bills. She didn't pay anything.

Ex. 4 at 84:5 - 85:5.

143.    Mr. Tirado testified in this action that Ms. Kennedy had lied to him by leading him to believe that she would pay for materials she had ordered when in fact she knew that no payment would be made.  Exhibit 73.

**Response**: Not disputed.  *See supra* at Response No. 142.

144.    Starting in January 2018, Ms. Kennedy and her lawyer Benjamin S. Thompson, Esq. advised Company creditors that demands for payment directed to Ms. Kennedy personally "are not appropriate and are misdirected" and instructed them to contact Mr. Basil and/or Brian O'Connor instead.  Exhibits 72 and 80.

**Response**: Not disputed.   Thompson also advised certain vendors that "controlling

financial members of the Company forced [Kennedy] out and have assumed all responsibilities and obligations of the Company."  Basil Decl., Ex. 72 at D 520.  Kennedy advised vendors that she would "help in any way I can to ensure you are paid."  *Id.*, Ex. 80 at KENNEDY 834.

145.    No later than July 17, 2015, Ms. Kennedy had advised Mr. Basil that she had her own attorney, who was also her uncle, to whom she sent certain documents for review.  Exhibit 8.

**Response**: Disputed.  *See supra* at Response No. 12.

146.    Thereafter, Ms. Kennedy periodically indicated to Mr. Basil that she consulted with her lawyer/uncle in regard to matters relating to her membership in the Company.  Exhibits 19, 40 and 84.

**Response**: Disputed.  *See supra* at Response No. 12.

147.    Plaintiff at her deposition in this matter identified James Caputo as her uncle and as the attorney she represented to Mr. Basil as being her attorney.  Exhibit 85 at 62:15-24.

**Response**: Disputed.  *See supra* at Response No. 12.

148.    Plaintiff testified at deposition that she had access to Mr. Caputo, was able to consult with him and periodically did so throughout the entire period commencing no later than July 17, 2015 and continuing to the date of her deposition, January 9, 2019, and periodically did so.  Exhibit 85 at 27:8-21, 30:10-15, 31:14-32:5, 33:12-35:22, 62:12-63:8, 107:11-20, 165:25-66:4.

**Response**: Disputed.  *See supra* at Response No. 12.

149.    Plaintiff's current litigation counsel considered communications between Ms. Kennedy and James Caputo regarding her membership in the Company and the various amendments to its Operating Agreement to be communications protected by the attorney-client communication privilege and/or the attorney work-product privilege, refused to disclose them in

response to a demand for documents and identified them on a privilege log produced to the defendants in this action.  Exhibit 86.

**Response**: Not disputed that Plaintiff's counsel initially labeled communications between Caputo and Kennedy as privileged.  However, on January 28, 2019, Plaintiff's counsel provided Defendants with all responsive communications between Caputo and Kennedy previously withheld on privilege grounds, stating "Ms. Kennedy is not claiming Mr. Caputo was her attorney. Caputo is Kennedy's uncle who provided her with general business advice during the relevant time period. That was made clear at Kennedy's deposition. Accordingly, see attached for previously redacted email exchanges between Kennedy and Caputo."  *See* Ex. 8.

150.    Plaintiff correctly testified in her deposition in this action that she never retained Mr. Basil as her attorney, never paid him or his firm any money, never signed any agreement with him or his firm pursuant to which either he or his firm was to act as her attorney, never sent him any documents to review and does not know whether he believed himself to be her attorney. Exhibit 85 at 28:3-29:20.

**Response**: Not disputed Plaintiff did not enter into a written agreement with Basil for legal services and did not pay Basil's law firm money.  Disputed as to the other statements.  Basil and his law firm (the "Basil Defendants") routinely provided legal services to Kennedy and repeatedly gave Kennedy assurances of care and loyalty to her.  SF ¶¶ 183-84.  Kennedy believed the Basil Defendants were her attorney and relied on them to advise her of her rights and obligations to the Company, and explicitly said so to Basil on multiple occasions.  *Id*., ¶ 184, 214.  The Basil Defendants (i) advised Kennedy of her legal rights and interests in executing the amendments to the Operating Agreement which, unknown to Kennedy, were used to drastically and disproportionately reduce Kennedy's ownership in the Company, among other things (SF, ¶¶ 179,

205, 207, 248, 250 286); (ii) advised Kennedy of her ownership rights to her name and the KENNEDY Marks (*id.*, ¶¶ 214-16); (iii) advised Kennedy of her personal liability to the Company (*id.*, ¶ 348); (iv) advised Kennedy of her legal rights relating to the restrictive covenants imposed upon her (*id.*, ¶¶ 211-213, 254); and (v) advised Kennedy in connection with the Noah Bank transaction with the intent to mislead her (*id.*, ¶¶ 236-37, 240-41).

151.   The firm of Mark S. Gottlieb, C.P.A., P.C. ("Gottlieb") provided plaintiff's counsel with a report dated February 27, 2019 entitled "Business Valuation Report/Elizabeth Kennedy LLC" (herein, the "Report", Exhibit 89).

**Response**: Not disputed that Mark S. Gottlieb, C.P.A., P.C. ("Gottlieb") provided plaintiff's counsel with a report dated February 27, 2019 entitled "Business Valuation Report/Elizabeth Kennedy LLC" (the "Report"). Disputed that the entire Report is represented as Exhibit 89 to Basil's Declaration. A full copy of the Report is attached as Exhibit A to the Declaration of Matthew Crane ("Crane"). *See* Crane Decl., Ex. A (ECF Doc. 153-1).

152.   Gottlieb in its Report made no attempt to value any of the damages claimed by the plaintiff under any of the causes of action contained in her Complaint. Exhibit 90 at 10:8-12:7.

**Response**: Disputed. The purpose of the Report is to provide the fair value of the Company as of December 31, 2017. ECF Doc. 153-1 at page 4 of 92. The Company's valuation at the time of Plaintiff's withdrawal is the basis for some of her requested monetary relief in this action. *See, e.g.*, Compl. ¶¶ 104-114.

153.   Gottlieb in its Report contended that as of December 31, 2017, if certain hypothetical assumptions were employed (herein, the "Hypotheticals"), the Company's value might be calculated to equal $6,273,365 and the value of Ms. Kennedy's pro rata share of Company ownership might be calculated to equal approximately $1,690,000 (these valuations are

referred to herein as the "Valuations").  Exhibit 89, at its Exhibit 12.

   **Response**: Disputed.  The Report employs the income approach and use of hypothetical

assumptions and conditions defined by the American Society of Appraiser's ("ASA") and the

Uniform Standards of Professional Appraisal Practice ("USPAP").  ECF Doc. 153-1 at 1, 18, 21-

22.  Using these methodologies, the Report concludes the Company's value was $6,273,365 as of

December 31, 2017.  *Id.*, Ex. 11.

   154.   Gottlieb's designated witness Matthew Crane testified at deposition in this action

that Gottlieb offered no opinions other than the Valuations.  Exhibit 90 at 7:22-8:20.

   **Response**: Disputed.  Defendants' defined term "Valuations" (Statement No. 153) and

their attempt to characterize the Report as what "might be" the valuation of the Company is

incorrect.  The Report concludes in unambiguous terms that the "value of [the] entire business

based on operating assets upon the methodologies selected" was $6,273,365.  ECF Doc. 153-1,

Ex. 12.  Kennedy's interest at the time of her withdrawal from the Company, assuming a 27%

stake, was $1,690,000.  *Id.*

   155.   Mr. Crane testified that Gottlieb made no attempt to determine the value of the

damages plaintiff claims under any of the causes of action appearing in the Complaint.  Exhibit 90

at 9:20-12:7.

   **Response**: Disputed.  Defendants rely on excerpted deposition testimony of Crane based

on a line of questions by Defendant's counsel that sought legal conclusions which were timely

objected to by Plaintiff's counsel.  Basil Decl., Ex. 90.  Only the Court, not an expert, may instruct

the jury as to the applicable law.  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

In any event, as stated *supra* at Response No. 152, the purpose of the Report is to provide the fair

value of the Company as of December 31, 2017.  ECF Doc. 153-1 at page 4 of 92.  The Company's

valuation at the time of Plaintiff's withdrawal is the basis for some of her requested monetary relief. *See, e.g.*, Compl. ¶¶ 104-114.

156.    Gottlieb concluded that in the absence of the Hypotheticals, the Company would have only liquidation value and could not be considered a going concern. Exhibit 89 at 18.

**Response**: Disputed. Defendants' defined term "Hypotheticals" (Statement No. 153) does not identify any specific hypothetical assumption in the Report in order to give an informed response to this statement. Notwithstanding, the Report addresses liquidation as follows:

> As of December 31, 2017, EK's bank account was overdrawn, had negative working capital, and its members' capital account was expressed as a deficit. The financial position indicated that without future funding, the Company would remain insolvent and would be most likely liquidated. This circumstance generally precludes the use of a premise of going concern, because a liquidation is considered imminent, unless future funding and/or a recapitalization of existing debt is expected. Through discussions with Plaintiff's counsel we were instructed that there were other avenues for funding, which were prevented by Mr. Robert Basil. We were further instructed that Mr. Basil reneged on funding previously arranged. Subsequently, this led to Elizabeth Kennedy's insolvency and withdrawal from her company and an involuntary bankruptcy filing by the Company. These facts were known at the valuation date…As indicated, the facts at the valuation date would normally require a premise of value based upon liquidation. However, given Plaintiff's assertion that Mr. Basil's actions resulted in the subsequent dissolution, a premise of going concern has been used in this report. As such, the assumption of going concern considers the appropriate premise of value as a hypothetical condition.

Crane Decl., Ex. A at 18.

157.    Gottlieb used the Hypotheticals to achieve the Valuations at the direction of plaintiff's counsel. Exhibit 89 at 18.

**Response**: Disputed. As stated *supra* at Response No. 156, Plaintiff objects to Defendants' defined terms "Hypotheticals" and "Valuations."

158.    Gottlieb used the Hypotheticals to be able to value the Company as a "going concern" even though Gottlieb knew that the actual facts showed that the Company was not a

"going concern".  Exhibit 90 at 14:21-24.

**Response**: Disputed.  Crane's testimony and the Report both confirm that the Company's valuation was based on a hypothetical condition that the Company was a going concern, (*i.e.*, the Company would continue to function without a liquidation for the foreseeable future) because of other funding sources that were available as of the valuation date.  Crane Decl., Ex. A at 18.

159.    Gottlieb used the Hypotheticals even though Gottlieb knew that the Hypotheticals were untrue.  Exhibit 90 at 103:2-15.

**Response**: Disputed.  As stated *supra*, Plaintiff objects to Defendants' defined term "Hypotheticals."  In addition, the statement that a hypothetical condition is "untrue" is nonsensical since a hypothetical condition, as defined by the ASA and USPAP, is a condition "which is contrary to what exists but is supposed for the purpose of analysis."  ECF Doc. 153-1 at 18.

160.    Gottlieb based its Valuations not only on the Hypotheticals it knew to be untrue, but also on projected sales figures it believed were neither "reasonably accurate" nor "reliable".  Exhibit 90 at 69:25-70:6, 78:12-79:5.

**Response**: Disputed for the same reasons stated above in Response No. 159.  In addition, the excerpted testimony does not state the "Hypotheticals" were "untrue" or characterize any projections are unreasonable.  Basil Decl., Ex. 90.  In fact, Crane testified that financial projections prepared by Reddy and cited in the Report were "reasonable."  *Id.*, at 69:25 – 70:10.

Dated: New York, New York
      October 10, 2019               THOMPSON LLP

                                        By: /s/ Andrew R. Goldenberg
                                        Andrew R. Goldenberg, Of Counsel (AG 8213)
                                        Benjamin S. Thompson (BT2176)
                                        75 Broad Street, Suite 2120
                                        New York, New York 10004
                                        Telephone: (212) 920-6050
                                        Facsimile: (646) 924-3040

*Attorneys for Plaintiff*