USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: ___03/31/2021_____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
ELIZABETH KENNEDY,                                          :
                                                           :
                                        **Plaintiff,**      :
                                                           :          **18-cv-02501 (ALC)**
                        -against-                           :
                                                           :          <u>**OPINION & ORDER**</u>
                                                           :
ROBERT BASIL, ET AL.,                                      :
                                                           :
                                        **Defendants.**     :
                                                           :
-----------------------------------------------------------------------x
**ANDREW L. CARTER, JR., District Judge:**

       Plaintiff Elizabeth Kennedy brings this action against Defendants WFT Fashion LLC,

Robert Basil, The Basil Law Group P.C., Artifact LLC, WFT Realty LLC (collectively,

"Defendants") for violations of the Lanham Act, New York General Business Law, and New

York Civil Rights Law; and state law claims for breach of contract, breach of fiduciary duty,

malpractice, fraud, accounting, common law unfair competition, and unjust enrichment.

Defendants bring counterclaims against Plaintiff for fraud, conspiracy, breach of the operating

agreement, unjust enrichment, conversion, breach of fiduciary duty, violation of New York

Limited Liability Company Law, and fraudulent misrepresentation of trademark ownership.

Defendants Basil and Basil Law (the "Basil Defendants") also bring third-party claims against

James Caputo for contribution.

       Currently before the Court are WFT Fashion's motion for summary judgment, ECF No.

203; the remaining Defendants' motion for summary judgment, ECF No. 208; Plaintiff's cross

motion for summary judgment on her affirmative claims, ECF No. 213; and Plaintiff's motion

for summary judgment as to Defendants' counterclaims, ECF No. 215. Also before the Court is

Mr. Caputo's motion to dismiss the Basil Defendants' Amended Third-Party Complaint. ECF

No. 217. For the reasons herein, WFT Fashion's motion for summary judgment as to Plaintiff's trademark claims is **GRANTED** and Plaintiff's cross-motion for summary judgment is **DENIED**. Plaintiff's trademark claims are therefore dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over the remaining state law claims and thus these claims are dismissed without prejudice. The remaining motions by the Parties are **DENIED** as moot.

## BACKGROUND

The Court assumes the Parties' familiarity with the facts and procedural history of this case but provides a brief discussion of the background that is relevant to this Order. The following factual summary consists of only undisputed material facts unless otherwise indicated.[1] Where the facts are subject to legitimate dispute, they are constructed in favor of the non-moving party. *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005).

Ms. Kennedy is a designer in the fashion industry and she launched Elizabeth Kennedy, LLC ("EKLLC" or the "Company") in 2007.[2] UMF ¶ 161. In 2012, Ms. Kennedy partnered with Jayne Harkness and they each carried a 50% interest in EKLLC pursuant to the terms of an operating agreement ("Operating Agreement"). *Id.* at ¶ 165. Section 2.2 of the Operating Agreement provided that if Kennedy left EKLLC, EKLLC would change its name "to a name

---

[1] Multiple statements of undisputed material facts have been filed. *See* ECF No. 207, 210 (Defendants' Statements of Undisputed Material Facts submitted in connection with their respective motions for summary judgment appear to be substantially identical to each other and each note that they are identical to the previously submitted Statement of Undisputed Material Fact at ECF No. 140, with some minor additions); ECF No. 151 (Plaintiff's Statement of Undisputed Material Facts submitted in connection with her original motions for summary judgment, incorporated by reference). For ease of reference, the Court refers to ECF Nos. 140 and 151 as "UMF." Citations to the minor additions in Defendants' most recent Statements of Undisputed Material Fact will be referred to as "Supp. UMF." Exhibits attached to the Declaration of Robert Basil at ECF No. 139 will be referred to as "Basil Decl. Ex. ___" and exhibits attached to Plaintiff's Statement of Undisputed Material Facts at ECF No. 151 will be referred to as "UMF Ex. ___." Exhibits attached to the Supplemental Declaration of Robert Basil at ECF No. 186 will be referred to as "Supp. Basil Decl. Ex. ___."

[2] EKLLC subsequently changed its name to WFT Fashion LLC and is named as a Defendant in this action.

which is not confusingly similar thereto" and that upon demand from her or her representative, the Company "shall execute" documentation necessary for her or her representative to use the name "Elizabeth Kennedy, LLC." *Id.* at ¶ 165; Basil Decl. Ex. 6 ("Operating Agreement") at KENNEDY008050.[3]

In December 2014, Plaintiff, through EKLLC, applied for two trademark registrations of her name and logo of the Company (the "Trademarks"). *Id.* ¶¶ 168, 170. Plaintiff, through EKLLC, hired Archer & Greiner P.C. ("Archer Law") to register the Trademarks. *Id.* ¶¶ 30, 170.[4] On September 14, 2015, the Trademarks were registered.[5] *Id.* Each registration identified EKLLC as the owner of the Trademarks. Basil Decl. Exs. 4, 5.

In June 2015, Ms. Kennedy and Ms. Harkness met with Defendant Robert Basil for the purpose of raising funds for the Company through an investment from Defendant Artifect LLC ("Artifect"). UMF at ¶ 5. Mr. Basil wholly owns WFT Realty, LLC ("WFT") and, through WFT, owns a 20% share of Artifect. *Id.* at ¶¶ 186-87. Basil emailed a proposal for an investment by Artifect in the Company to Ms. Harkness and Ms. Kennedy, and Ms. Kennedy forwarded that proposal to Third-Party Defendant James Caputo. Mr. Caputo is Kennedy's uncle and provided

---

[3] Section 2.2 of the Operating Agreement provides:

> Name. The name of the Company is "**ELIZABETH KENNEDY, LLC.**" All business conducted in the State of New York shall be conducted under such name. All business of the Company shall be conducted under that name or under any other name, but in any case, only to the extent permitted by applicable law. The Company shall hold all of its property in the name of the Company and not in the name of any Member. If at any time **ELIZABETH KENNEDY** is no longer a Member of the Company, then, upon her demand or the demand of her estate/legal representative, the Company shall change its name from "**ELIZABETH KENNEDY, LLC**" to a name which is not confusingly similar thereto. In addition, upon her demand or the demand of her estate/legal representative, the Company shall execute any documentation necessary for **ELIZABETH KENNEDY** or her estate/legal representative to use the name "**ELIZABETH KENNEDY, LLC.**"

[4] Ms. Kennedy paid for Archer Law through EKLLC. *See* Basil Decl. Ex. 93 (showing that a check was drawn from Elizabeth Kennedy LLC account to pay Archer Law Statement of Account as of May 29, 2015); *see also* Basil Decl. Ex. 85 ("Kennedy Dep.") at 16:3-17:8 (testifying that she "paid the attorneys" because "it was [her] name and [her] trademark that [she] felt belonged to her" and that "[i]t was normal for [her] . . . [to] constantly transfer funds [from her personal account] to cover expenses."). Archer Law's statement of account reflected that the client was EKLLC. Basil Decl. Ex. 93.

[5] The Trademarks were registered under Registration Nos. 4811444 and 4811445.

her with business and legal advice, although the Parties dispute whether he acted as her attorney or whether Mr. Basil was her personal attorney. *Id*. at ¶ 12.

On July 19, 2015, Ms. Kennedy, Ms. Harkness, and Artifect entered into an agreement by amending the Company's already existing Operating Agreement ("First Amendment"). *Id*. at ¶ 13. The First Amendment provided that Artifect would give the Company a $250,000 line of credit, guaranteed personally by Basil, in exchange for an ownership stake in the Company. *Id.* at ¶¶ 14-18.

In January and February 2016, WFT provided EKLLC two lines of credit for $100,000 and $110,000, respectively. *Id.* ¶¶ 37, 40. On March 21, 2016, Mr. Basil advised Ms. Kennedy that these lines of credit had been exhausted. *Id.* ¶ 41. On March 31, 2016 Ms. Kennedy emailed Mr. Basil to let him know that EKLLC would need $500,000 in additional funding to cover operations through September 2016 and that she could "also give up equity" in exchange for funding. *Id.* ¶¶ 42- 43. She specifically stated that:

> I also can give up equity. Although originally, I wanted to maintain majority, I really don't think it matters. All I care about is being able to continue working, and to maintain 100% creative control, ownership of my name, and decision-making rights- all of which we can put in the legal operating agreement. The percentages at this point really don't matter to me so much.

*Id.* ¶ 43; *see also* Basil Decl. Ex. 17 at KENNEDY005675. She expressed to Mr. Basil that "if it is an option, I would much rather continue working as we have been, with you and [A]rtifect as the sole investors" and asked him "what total equity [he thought] was fair." UMF ¶¶ 44-45; Basil Decl. Ex. 17 at KENNEDY005676. She proposed giving Mr. Basil an additional 22% equity in EKLLC in exchange for the additional funding. UMF ¶¶ 46; Basil Decl. Ex. 17 at KENNEDY005676.

On April 2, 2016, Mr. Basil responded and "agree[d] to have WFT Realty provide the full $500,000" in exchange for WFT receiving 20% equity in EKLLC. UMF ¶¶ 47-48; Basil Decl. Ex. 17 at KENNEDY005675. He stated that Ms. Kennedy would "retain the creative control, control of the ordinary course of business for EKLLC and right to control the use of [her] own name." UMF ¶ 49; Basil Decl. Ex. 17 at KENNEDY005675. He also added that the Operating Agreement would "have to be amended to include a provision that [Ms. Kennedy would not] compete with EKLLC during [her] membership and a short tail . . . after any withdrawal by [her]." Basil Decl. Ex. 17 at KENNEDY005675. He asked her to let him know if that was "acceptable." *Id.* Separately, he noted that he had "never received anything from Greg Winski re your trademark" and that he "should have those as legal counsel for EKLLC." *Id.* Ms. Kennedy responded, "[a]ll of the below sounds good, and I will get the trademark to you next week." *Id.*

This financial arrangement was formalized in the Second Amendment of the Operating Agreement which was finalized after Ms. Kennedy sent it to Mr. Caputo for review and asked Mr. Basil some questions regarding the draft he had sent her. Basil Decl. Ex. 18 (email from Mr. Basil sending her the Second Amendment with "terms we discussed"); *id.* Ex. 19 (email from Ms. Kennedy to Mr. Basil stating that "I went over this with my lawyer and have a couple of questions . . ." ); *id.* Ex. 20 ("Second Amendment") (incorporating changes). The Second Amendment provided that WFT committed to contribute up to $500,000 to EKLLC and that the equity shares would be split up as follows: Elizabeth Kennedy, 43%; Jayne Harkness, 2%; Artifect, 35%; and WFT, 20%. Second Amendment at KENNEDY008989. It further provided that Artifect and WFT had previously provided lines of credit which were "secured solely by the assets and revenues of EKLLC . . . and there are no personal guarantees to be provided by any members." *Id.* It also provided:

(7) The management of EKLLC will continue to be the responsibility of Elizabeth Kennedy, as sole Managing Member, whose duties shall include being solely responsible for the day-to-day operation of EKLLC, including sole discretion regarding creative decisions and all other decisions in the regular course of EKLLC's business. Elizabeth will consult regularly with WFT Realty LLC and ARTiFECT and inform them of the business of EKLLC as reasonably requested.

*Id.* at KENNEDY008990.

On July 13, 2016, Ms. Kennedy inquired whether the Company might obtain a bank loan "to get us through the show, to buy us more time to seek additional investment?" UMF ¶ 62, Basil Decl. Ex. 24 at KENNEDY008304. On August 7, 2016, Mr. Basil advised Ms. Kennedy that he had obtained a bank's commitment to provide the Company with $1 million line of credit "conditioned on [his] personal guarantee of the entire amount as collateral." UMF ¶ 64, Basil Decl. Ex. 28. He also noted that "[t]he bank's right to repayment and access to all EKLLC assets would be superior to all others." UMF ¶¶ 64-65; Basil Decl. Ex. 28. On September 10, 2016, Mr. Basil emailed Ms. Kennedy and others, noting that the million-dollar loan "took much longer than anticipated largely due to the lack of EKLLC revenue history," and that Noah Bank "was very nervous about this loan even with [his] personal guarantee, because the loan did not fit a category covered by the applicable banking regulations." Basil Decl. Ex. 29. However, the "initial word" from Noah Bank was that it was willing to provide the Company with a loan in the amount of $600,000, "secured by a first mortgage on [his] house in Princeton." *Id.*

On September 12, 2016, Mr. Basil informed Ms. Kennedy and others that the loan had been secured, Basil Decl. Ex. 30, and on September 22, 2016, Mr. Basil forwarded closing instructions he had received from Noah Bank to Ms. Kennedy and others, Basil Decl. Ex. 94. The instructions required that Ms. Kennedy, Mr. Basil and Mr. Basil's wife sign the loan documents. *Id.* On September 26, 2016, Noah Bank extended a $500,000 line of credit ("Noah

Bank Line") to Mr. Basil and EKLLC as co-borrowers, Basil Decl. Ex. 95 at KENNEDY004337.

The loan was secured by Mr. Basil's home, as well as the Company's assets, including the

Trademarks. *See* Pl. Resp. 56.1 Stmt. ¶ 74. The promissory note was signed by both Ms.

Kennedy and Ms. Harkness on behalf of EKLLC. Basil Decl. Ex. 95 at KENNEDY004340.

Above their signatures, the promissory noted stated:

> **PRIOR TO SIGNING THIS NOTE, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE . . . . EACH BORROWER AGREES TO THE TERMS OF THE NOTE.**

*Id.*[6]

On October 23, 2016, the Parties entered into a Third Amendment, Basil Decl. Ex. 37

("Third Amendment"). This Amendment identified $1,910,500 in funding that had been or would

be provided to the Company by WFT (including the Noah Bank Line). *Id.* at TB000003. It

provided that WFT would waive its right to repayment of all amounts due to it other than amounts

in connection to the Noah Bank Line. *Id.* It also provided that "all repayment rights or interest

payments" due from Company equity holders other than WFT would also be waived. *Id.* It restated

the Company's ownership interests as follows: Elizabeth Kennedy, 27%; Jayne Harkness, 2%,

Artifect, 17%; and WFT, 54%. *Id.* at TB000004. The Third Amendment also made WFT the sole

managing member who was "solely responsible for the day-to-day operation of EKLLC, including

the hiring and firing of all employees, as well as the sole determiner of their compensation." *Id.*

However, the Third Amendment provided that Ms. Kennedy would retain "sole responsibility and

---

[6] While it is not disputed that Ms. Kennedy signed the promissory note on behalf of EKLLC, the circumstances surrounding her signature are disputed. Ms. Kennedy alleges that "[a]t the closing Basil told Kennedy he read the lengthy Noah Bank loan documents (85 pages of fine print) and all Kennedy had to do was sign her name as a Company member." *See* Pl. Resp. 56.1 Stmt. ¶ 75; Kennedy Decl. ¶ 37. Mr. Basil disputes that he ever made such a statement and asserts that the Noah Bank loan officer, Timothy Kim, reviewed all the documents with Ms. Kennedy before she signed them. See Def. Resp. 56.1 Stmt. ¶ 240 (citing Basil Supp. Decl. Ex L ("Kim Decl.")).

authority for creative, artistic, and design decisions for EKLLC and its products or services," and denied WFT "discretion regarding all creative decisions." *Id.*

On June 14, 2017 the Operating Agreement was amended a fourth time. UMF ¶ 101; Basil Decl. Ex. 39 ("Fourth Amendment"). The Fourth Amendment reflected that the Company members each surrendered 4% of their respective equity holdings in the Company to the Company, with the intention of having the Company sell this 4% equity to investors. *Id.*

Eventually, in December 2017, Ms. Kennedy informed Mr. Basil that, as a result of a shortage of funding, she would be shutting down the Company. UMF ¶ 120. Ms. Kennedy alleges that Defendants acted improperly and with various conflicts of interest to deprive Ms. Kennedy of substantial amounts of equity in the Company. The dissolution of the Company and paying off debts was also a lengthy, complicated process in which the Parties dispute the payment of debts and salaries for terminated employees. *Id.* ¶¶ 120-160. Ms. Kennedy also demanded that the Company change its name from "Elizabeth Kennedy, LLC" and assign the Trademarks to Ms. Kennedy. Mr. Basil changed the name of the Company to WFT Fashion LLC but refused to assign the Trademarks. *Id.* ¶ 397.

Plaintiff filed her Complaint on March 20, 2018 ECF No. 1. Defendants filed an Amended Answer on June 20, 2018 that included cross-claims against Defendant Basil and counterclaims against Plaintiff. ECF No. 18. The cross-claims were later voluntarily dismissed. ECF No. 60. In August 2019, the Parties filed several motions for summary judgment. ECF Nos 137-139 (Defendants' motion for summary judgment on Plaintiff's affirmative claims); ECF Nos. 150-154 (Plaintiff's cross-motion for summary judgment on her affirmative claims); ECF Nos. 155-157 (Plaintiff's motion for summary judgment on Defendants' counterclaims). On March 30, 2020, the

Court issued an Order (the "March Order") dismissing these motions without prejudice, pending the resolution of the Company's bankruptcy proceedings. ECF No. 198.

The Basil Defendants filed a Third-Party Complaint against Mr. Caputo on June 5, 2019, ECF No. 122, and an Amended Third-Party Complaint on August 2, 2019, ECF No. 136. Mr. Caputo filed a motion to dismiss on September 11, 2019, ECF No. 169-172, and the motion was fully briefed by the Parties, ECF Nos. 179-180, 184. The March Order also dismissed this motion without prejudice.

On April 21, 2020, the Parties informed the Court that the Company's bankruptcy proceedings had been resolved. ECF No. 199. On June 9, 2020, the Court granted the Parties leave to re-file their summary judgment motions (including granting Mr. Caputo leave to re-file his motion to dismiss). ECF No. 200. Defendants filed their motions for summary judgment on July 1, 2020. ECF Nos. 203-207 (Defendant WFT Fashion LLC's motion); ECF Nos. 208-212 (Remaining Defendants' motion). On July 3, 2020, Plaintiff filed a cross-motion for summary judgment on her affirmative claims and a motion for summary judgment on Defendants' counterclaims. ECF Nos. 213-214 (affirmative claims); ECF Nos. 215-216 (counterclaims). Mr. Caputo filed a motion to dismiss the Amended Third-Party Complaint on July 17, 2020, ECF No. 217-220. The Court deems the motions to be fully briefed.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is proper where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The moving party has the burden "to demonstrate that no genuine issue respecting any material fact exists." *Gallo v.*

*Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994) (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no issue of material fact where the facts are irrelevant to the disposition of the matter. *See Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F. Supp. 2d 756, 761 (S.D.N.Y. 2013); *see also Anderson*, 477 U.S. at 248 (holding that a fact is material if it would "affect the outcome of the suit under the governing law"). "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal citations and quotation marks omitted).

In deciding a summary judgment motion, courts must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (citing to *Anderson*, 477 U.S. at 255). Courts may not assess credibility nor may they decide between conflicting versions of events, because those matters are reserved for the jury. *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id*. (quoting *Anderson*, 477 U.S. at 252) (emphasis in original).

When considering a motion for summary judgment, a district court "must also be mindful of the underlying standards and burdens of proof . . . because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary

judgment motions." *Maco v. Baldwin Union Free Sch. Dist.*, 249 F. Supp. 3d 674, 678 (E.D.N.Y. 2017) (quoting *SEC v. Meltzer*, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006)) (internal quotation marks omitted), *aff'd*, 726 F. App'x 37 (2d Cir. 2018). "Where the non-moving party would bear the ultimate burden of proof on an issue at trial, the burden on the moving party is satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim." *Id. (*quoting *Meltzer*, 440 F. Supp. 2d at 187) (internal quotation marks omitted).

## DISCUSSION

Since eight of Plaintiff's claims (Counts Seven to Fourteen), depend on whether Plaintiff is the rightful owner of the Trademarks (hereinafter, the "Trademark Claims"), the Court considers this question before reaching the merits of these or any of the remaining claims.[7] Because the Court concludes that Ms. Kennedy will not be able to prove she owns the Trademarks or has any right to own the Trademarks, the Court dismisses Plaintiff's Trademark Claims. The Court declines to exercise supplemental jurisdiction over the remaining claims, and thus, these claims are dismissed without prejudice.

### I.     Plaintiff Will Not Be Able To Prove She Owns or Has Any Right to Own the Trademarks

The Company asserts that Plaintiff will not be able to prove that she owns or has any right to own the Trademarks, and thus the Court should grant its summary judgment motion as to

---

[7] Each of Counts Seven through Fourteen requires proof that Plaintiff is the rightful owner of the Trademarks. Count Seven is for a declaratory judgment that Plaintiff is the rightful owner of the Trademarks; Count Eight is for trademark infringement under 15 U.S.C. §1114, *see Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, 897 F.3d 413, 417 (2d Cir. 2018); Count Nine is for unfair competition under 15 U.S.C. §1125(A), *see Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009); Count Ten is for common law unfair competition, *see Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005); Count Eleven is for unjust enrichment based on Defendants' unlawful use of the Trademarks; Count Twelve is for trademark dilution under 15 U.S.C. §1125, *see Starbucks Corp.*, 588 F.3d at 105; Count Thirteen is for deceptive acts under N.Y. Gen. Bus. L. §349, *see Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015); and Count Fourteen is for trademark dilution under N.Y. Gen. Bus. L. §360-1, *see Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 485–86 (2d Cir. 2005).

Plaintiff's Trademark Claims. First, the Company argues that Ms. Kennedy is judicially estopped from claiming that she is the rightful owner of the Trademarks. Second, the Company contends that Plaintiff abandoned whatever rights she may have once held in the Trademarks by registering them in the Company's name and not her own. Third, the Company asserts that Mr. Basil's alleged misstatements regarding the ownership of the Trademarks are irrelevant to the issue of who owned the Trademarks. Fourth, the Company argues that the Operating Agreement does not require the Company to assign the Trademarks to Ms. Kennedy. Finally, the Company asserts that Plaintiff's own conduct prevented the company from assigning the Trademarks to her. The Court concludes that Ms. Kennedy is judicially estopped from claiming that she is the rightful owner of the Trademarks. Further, the Court finds that the Operating Agreement did not require transfer of the Trademarks to Ms. Kennedy. Therefore, the Court need not reach any of the Company's remaining arguments.

### A.  Plaintiff is Judicially Estopped From Claiming That She Owned the Trademarks

The equitable doctrine of judicial estoppel provides that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)) (internal quotation marks omitted).

In deciding whether to apply the doctrine, courts must determine (1) whether the "party's later position is 'clearly inconsistent' with its earlier position;" (2) whether the "party's position has been adopted in some way by the court in the earlier proceeding;" and (3) whether "the party asserting the two positions would derive an unfair advantage against the party seeking estoppel."

*Id.* at 103. "The third requirement is sometimes couched in terms of 'unfair detriment [to] the opposing party' rather than advantage to the party to be estopped." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 696 (2d Cir. 2011). The doctrine is further limited to "situations where the risk of inconsistent results with its impact on judicial integrity is certain." *DeRosa*, 595 F.3d at 103 (quoting *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005)) (internal quotation marks omitted). "Judicial estoppel applies to sworn statements made to administrative agencies such as the Social Security Administration[,]" *De Rosa*, 595 F.3d at 103, and has been applied to representations made before the U.S. Patent and Trademark Office ("USPTO"). *See, e.g.*, *Yeda Research & Dev. Co. v. ImClone Sys.*, 443 F. Supp. 2d 570, 623-24 (S.D.N.Y. 2006), *appeal dismissed*, 267 F. App'x 939 (Fed. Cir. 2008); *Lampi Corp. v. Am. Power Prods.*, No. 93-cv-1225, 1995 WL 723764, at *4 (N.D. Ill. Dec. 5, 1995). However, the doctrine is not applied "when the first statement was the result of a good faith mistake." *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 73 (2d Cir. 1997).

The December 4, 2014 Trademark registration applications list the "owner of the mark" as "Elizabeth Kennedy, LLC." Basil Decl. Ex. Ex. 4 at ECF 4; *id.* Ex. 5 at ECF 4. The Trademark registration applications contained the following declaration:

> The signatory believes that: if the applicant is filing the application under 15 U.S.C. § 1051(a), the applicant is the owner of the trademark/service mark sought to be registered; the applicant or the applicant's related company or licensee is using the mark in commerce on or in connection with the goods/services in the application, and such use by the applicant's related company or licensee inures to the benefit of the applicant . . .

> The signatory believes that to the best of the signatory's knowledge and belief, *no other person has the right to use the mark in commerce* . . . The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such false willful statements and the like may jeopardize the validity of the application.

*Id.* Ex. 4 at ECF 6-7 (emphasis added); *see also id.* Ex. 5 at ECF 7-8. Both the application and

declaration are signed by "Elizabeth Kennedy" in her role as managing member of Elizabeth

Kennedy, LLC. *Id.* Ex. 4 at ECF 5; *see also id.* Ex. 5 at ECF 5. The Trademark Registrations

themselves also contain a statement by the USPTO that "[t]he name 'Elizabeth Kennedy'

identifies a living individual whose consent is of record." *Id.* Ex. 4 at ECF 2; *see also id.* Ex. 5 at

ECF 2.

      Here, it is undisputed that Plaintiff took a prior inconsistent position before the USPTO in

signing the Trademark applications which contained the assertion that only the Company held

rights to the Trademarks. Further, it is undisputed that the USPTO adopted this position, as the

USPTO would not have otherwise granted the Company trademark registrations for trademarks

that constituted Plaintiff's name. *See DeRosa*, 595 F.3d at 103 (statement adopted where party

applied for benefits and received them). 15 U.S.C. § 1051(a) ("The *owner* of a trademark used in

commerce may request registration of its trademark on the principal register . . . by paying the

prescribed fee and filing in the Patent and Trademark Office an application and a verified

statement . . . The statement shall be verified by the applicant and specify that . . . (A) the person

making the verification believes that he or she . . . to be the owner of the mark sought to be

registered; (B) to the best of the verifier's knowledge and belief, the facts recited in the

application are accurate; . . . (D) to the best of the verifier's knowledge and belief, no other

person has the right to use such mark in commerce); *see also id.*§ 1052(c) ("No trademark by

which the goods of the applicant may be distinguished from the goods of others shall be refused

registration on the principal register on account of its nature unless it . . . [c]onsists of or

comprises of a name . . . identifying a particular living individual except by his written

consent."). It is also undisputed that the Company would suffer an "unfair detriment" if judicial

estoppel were not applied as the Company has already taken actions in reliance of ownership of the Trademarks, specifically seeking and obtaining financing based at least in part on the assets of the Company, which included the Trademarks. Forcing the Company to further litigate this issue would also unfairly prejudice the Company, especially in light of their insolvency.

Plaintiff makes several arguments as to why judicial estoppel should not be imposed: (1) the PTSO application was done *ex parte* and therefore, she is not prevented from taking a different position; (2) "no tribunal, including the PTO, has adopted the proposition that the Company is the owner of the [Trademarks] or that Kennedy is not the senior user of the [Trademarks]; (3) even assuming that her statements were adopted by the USPTO, "Defendants have suffered no prejudice." Pl. Mot. at 4-5. More specifically on the third argument, she appears to argue that because the Company "was not a party to the USPTO proceeding and thus never acquiesced in the position formerly taken by the trademark owner," then the Company could not show that they were unfairly prejudiced. Pl. Opp. at 8 (citing *BeautyBank, Inc. v. Harvey Prince LLP*, 811 F. Supp. 2d 949, 958 (S.D.N.Y. 2011)). Lastly, she asserts that judicial estoppel should not apply because her representation to the USPTO was an "unintentional error" that was not made in bad faith or with intent to mislead the Court. She contends that she relied on the law firm she hired to fill out and file the necessary paperwork with the USPTO and that "[a]s a nonlawyer, with no legal training, [she] believed she was the owner of the [Trademarks] at the time she registered the [Trademarks]." Pl. Opp. at 10.

It is true that "in general, courts do not bind parties to their statements made or positions taken in *ex parte* application proceedings in front of the PTO." *See, e.g.*, *Perfect Pearl Co., Inc. v. Majestic Pearl & Stone*, 887 F. Supp. 2d 519, 534 (S.D.N.Y. 2012) ("[C]laim by the defendant in an infringement action that a mark is merely descriptive when it had previously argued to the

PTO that the mark was suggestive does not, in the ordinary course, carry much weight with a court." (citation omitted)); *Polo Fashions, Inc. v. Extra Special Prods., Inc.*, 451 F. Supp. 555, 561 (S.D.N.Y. 1978) ("Statements made during an ex parte prosecution before the [USPTO] seeking registration of a trademark do not circumscribe for all time the rights *the registrant may acquire* thereafter through extensive use." (emphasis added)); *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 348 (S.D.N.Y. 2014) (judicial estoppel did not apply where plaintiff had not explicitly taken a different position before the USPTO that they had not started to use the mark at issue; even if they had, no estoppel applied because no records showed that the position had been adopted by the USPTO). However, this is not the ordinary case—none of the cases cited by Plaintiff involved a party who filed a trademark application on behalf of a company she owned 50% of (and was sole managing member of) and later tried to claim that they owned the trademark and not the company. Further, those cases are distinguishable because they involved implicit positions on whether a mark was suggestive or as to the likelihood of confusion. The position taken by Plaintiff was not an implicit one—she declared that the Company and no one else owned the Trademarks and the USPTO adopted this view by granting the Company the Trademarks.

The Court considers Plaintiff's argument that the Company "was not a party to the USPTO proceeding and thus never acquiesced in the position formerly taken by the trademark owner," and hence cannot prove it has been unfairly prejudiced, to be without merit. As the owner of the Trademark registration, it is undisputed that the Company was a party to the USPTO proceeding and acquiesced in the position that they owned the Trademarks.

Plaintiff's argument that her previous statement was an "unintentional error" that was not made with an intention to mislead the USPTO has no basis in the record. It is undisputed that

Ms. Kennedy hired Archer Law on behalf of EKLLC to register the Trademarks and that they did so. *See* Kennedy Dep. at 15:22-16:4; Basil Decl. Ex. 4 at ECF 4-5; *id.* Ex. 5 at ECF 5. Ms. Kennedy has presented no evidence that Archer Law, a firm experienced in representing clients in the apparel and textile industries, somehow made a mistake in registering the Trademarks in the Company's name. Her assertion that she relied on Archer Law to fill out and file the necessary paperwork with the USPTO and that "[a]s a nonlawyer, with no legal training, [she] believed she was the owner of the [Trademarks] at the time she registered the [Trademarks]" is also without merit. Her reliance on her attorneys does not excuse Plaintiff. *See Prate v. Freedman*, 583 F.2d 42, 48 (2d Cir. 1978) ("In our legal system, an attorney is his client's agent and representative; the client retains ultimate authority over the conduct of litigation."). While it is true that "[i]n certain areas of legal representation not affecting the merits of the case or substantially prejudicing the rights of a client, a lawyer is entitled to make decisions on his own," *Prate*, 583 F.2d at 48 (quoting ABA Code of Professional Responsibility EC 7-7)), this is not one of those circumstances. The decision of who the Trademarks should be registered to was solely that of Ms. Kennedy, as sole managing member of EKLLC, and not an area where EKLLC's attorneys could exercise discretion. "Like any other principal, a client may be bound by the act of his agent, acting within the scope of his authority." *Prate*, 583 F.2d at 48.

For these reasons, Ms. Kennedy is judicially estopped from claiming she owned the Trademarks.

## B. The Operating Agreement is Unambiguous and Did Not Require the Trademarks Be Assigned to Plaintiff

Even though Plaintiff is estopped from asserting that she owns the Trademarks, the Court must still determine whether the Operating Agreement required the Company to assign them to her upon her withdrawal from the Company and subsequent demand. In resolving a motion for

summary judgment involving contract interpretation, "a court should accord [the contract] language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (quoting *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)). Summary judgment is appropriate in a contract interpretation dispute when either "the language of the contract provision is wholly unambiguous" or "the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157-158 (2d Cir. 2000) (citations omitted). Additionally, summary judgment is appropriate "regarding the interpretation of ambiguous language if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Id.* (citing *Mellon Bank v. United Bank Corp.*, 31 F.3d 113, 116 (2d Cir. 1994)).

Under New York law[8], the question of whether a written contract is ambiguous is a question of law for the court. *See, e.g. Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.3d 425, 429 (2d Cir. 1992). "Ambiguity is determined by looking within the four corners of the document, not to outside sources . . . ." *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998) (citation omitted). No ambiguity exists when contract language has "definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978) (citations omitted); *see also Seiden*, 959 F.2d at 428.

---

[8] The Operating Agreement provides that "[t]he laws of the State of New York (without reference to its choice of law principles) shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members." Operating Agreement at KENNEDY008064. Neither party contests that New York law applies.

"Although the parties dispute the meaning of specific contract clauses, our task is to determine whether such clauses are ambiguous when 'read in the context of the entire agreement.'" *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting *WWW. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989). Instead, "[a]mbiguous language is language that is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (quoting *Seiden*, 959 F.2d at 428) (internal quotation marks omitted); *see also Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996) ("contract is ambiguous where reasonable minds could differ on what a term means").

Where a contract is unambiguous, its meaning is a question of law for the court to decide. *See, e.g.*, *Revson*, 221 F.3d at 66; *K. Bell & Assocs. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996). Under these circumstances, the court is to consider its "particular words . . . in light of the obligation as a whole and the intention of the parties as manifested thereby," *Kass*, 91 N.E. 2d at 180-81, but the court is not to consider any extrinsic evidence as to the parties' intentions, *see, e.g.*, *Seiden*, 959 F.2d at 428; *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). However, where a contract is deemed to be ambiguous, extrinsic evidence as to the parties' intent may properly be considered. *See, e.g.*, *Seiden*, 959 F.2d at 426.

Looking at the Operating Agreement as a whole, the Court finds that Section 2.2 is unambiguous and thus, its meaning is a question of law for the Court to decide. Section 2.2 of the Operating Agreement states:

> Name. The name of the Company is "**ELIZABETH KENNEDY, LLC.**" All business conducted in the State of New York shall be conducted under such name. All business of the Company shall be conducted under that name or under any other name, but in any case, only to the extent permitted by applicable law. The Company shall hold all of its property in the name of the Company and not in the name of any Member. If at any time **ELIZABETH KENNEDY** is no longer a Member of the Company, then, upon her demand or the demand of her estate/legal representative, the Company shall change its name from "**ELIZABETH KENNEDY, LLC**" to a name which is not confusingly similar thereto. In addition, upon her demand or the demand of her estate/legal representative, the Company shall execute any documentation necessary for **ELIZABETH KENNEDY** or her estate/legal representative to use the name "**ELIZABETH KENNEDY, LLC.**"

Ms. Kennedy contends that because the contract provides that "upon her demand or the demand of her estate/legal representative, the Company shall execute any documentation necessary for **ELIZABETH KENNEDY** or her estate/legal representative to use the name '**ELIZABETH KENNEDY, LLC.,**'" the Company was obligated to assign the Trademarks to her when she withdrew from the Company and counsel demanded that the Company assign the Trademarks to Ms. Kennedy on January 24, 2018. Compl. ¶ 98, Basil Decl. Ex. 81. According to Ms. Kennedy, "[a]lthough the Operating Agreement does not explicitly reference the [Trademarks], it is clearly implied from the language and purpose of the entire Operating Agreement that the parties intended to protect Kennedy's right to use her name, which obviously included the [Trademarks] bearing her name." Pl. Opp. at 14-15.

The Company asserts that this provision does not mean that the Company must assign its Trademarks to Ms. Kennedy, given that there is no reference to any Trademarks. Company Mot. at 14. Rather, Section 2.2 solely requires the Company to "perform the ministerial act of executing documentation upon the plaintiff's appropriate demand." Company Mot. at 14.

Plaintiff contends that "executing documentation" only refers to signing documents that Plaintiff has prepared. *Id.*

The Court declines to take Ms. Kennedy's view that Trademarks are "clearly implied from the language and purpose of the entire Operating Agreement." Ms. Kennedy cites to no contractual language besides the provision at issue that "clearly implie[s]" that the Company must assign the Trademarks to her upon her withdrawal from the Company and subsequent demand or which signals the overall purpose of the Operating Agreement. Instead, she attempts to rely on extrinsic evidence such as the fact that she "hired an attorney to draft the Operating Agreement and instructed the attorney to include this provision so that Kennedy could continue to use her name in the event that she was no longer a member of the Company." Pl. Opp. at 14. However, because the Court concludes that the provision was unambiguous, the Court cannot consider extrinsic evidence in construing the meaning of the provision at issue.

Contrary to Plaintiff's assertion that the provision at issue "clearly implie[s]" that the Company must assign her the Trademarks upon her withdrawal from the Company and subsequent demand, the provision at issue nowhere mentions any Trademark. In making this argument, Plaintiff seems to assume that the word "name" and "trademark" are generally understood to mean the same thing. She has provided no evidence supporting the proposition that a "reasonably intelligent person . . . who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business" and "has examined the context of the entire integrated agreement" would understand that to be the case. In fact, the USPTO has recognized that "[u]se of a business name does not necessarily qualify as trademark use, though other use of a business name as the source of goods or services may qualify it as both a business name and a trademark." U.S. Patent & Trademark Office, Trademark, Patent, or

Copyright?, USPTO (last modified Jan. 17, 2021),

https://www.uspto.gov/trademarks/basics/trademark-patent-or-copyright. While this suggests

that a business name may qualify as a trademark, looking at the contract as a whole does not

support the conclusion that the parties intended that "use [of] the name ELIZABETH

KENNEDY" include use of the name as a *trademark*, as opposed to solely as a business name.

*See 242-44 E. 77th St., LLC v. Greater N.Y. Mut. Ins. Co.*, 31 A.D. 3d 100, 103-104 (1st Dep't

2006) ("Under the principles of ejusdem generis, a rule of construction, the meaning of a word in

a series of words is determined 'by the company it keeps.'" (citation omitted)). Specifically, the

section that this particular provision is included in relates to the *name* of the business, and

specifies that the "business of the Company shall be conducted under that name," that "[t]he

Company shall hold all of its property in the name of the Company" and that "[i]f at any time

ELIZABETH KENNEDY is no longer a Member of the Company, then, upon her demand or the

demand of her estate/legal representative, *the Company shall change its name* from

'ELIZABETH KENNEDY' to a name which is not confusingly similar thereto." Section 2.2

(emphasis added).[9]

***

Because Ms. Kennedy will not be able to prove that she owns the Trademarks, the

Company's motion for summary judgment is GRANTED as to Plaintiff's Trademark Claims.

Plaintiff's summary judgment motion as to these same claims is DENIED. The Trademark

Claims are therefore dismissed with prejudice.

---

[9] Though we decline to consider extrinsic evidence, the Court notes that Plaintiff's assertion that the Parties intended that the provision include the Trademarks cannot be reconciled with her testimony that she believed she was the owner of the Trademarks when she applied for the Trademark registrations in 2014. Kennedy Dep. at 16:12-16:15. If she genuinely believed that she owned the Trademarks, there would have been no need for inclusion of a provision that the Company assign the Trademarks to her if she withdrew from the Company.

## II.     The Court Declines to Exercise Supplemental Jurisdiction Over the Remaining State Law Claims

Under 28 U.S.C. § 1367(c)(3), the Court may exercise supplemental jurisdiction over Ms. Kennedy's remaining state law claims after dismissing "all claims over which it has original jurisdiction." However, the Second Circuit encourages courts to avoid exercising supplemental jurisdiction. "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004) (quoting *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991)).

Having dismissed all of Plaintiff's Trademark Claims, and there being no other basis for federal jurisdiction over this case, the Court elects to not exercise its supplemental jurisdiction over Plaintiff's state law claims. *See* 28 U.S.C. § 1367(c)(3); *Boustany v. Xylem Inc.*, 235 F. Supp. 3d 486, 496–97 (S.D.N.Y. 2017). Accordingly, those claims are dismissed without prejudice. For the same reasons, the Court declines to exercise supplemental jurisdiction over Defendants' counterclaims and the Basil Defendants' claims against Third-Party Defendant Caputo.

## CONCLUSION

For the reasons herein, Plaintiff's motion for summary judgment as to her Trademark Claims is **DENIED**. Defendant WFT Fashion's motion for summary judgment is **GRANTED** as to the Trademark Claims, which are hereby dismissed with prejudice. As the Court declines to exercise supplemental jurisdiction over the remaining state law claims, these claims are dismissed without prejudice. The remaining motions pending before the Court are **DENIED** as moot. The Clerk of Court is respectfully directed to terminate ECF Nos. 203, 208, 213, 215 and 217 and close this case.

**SO ORDERED.**

**Dated: March 31, 2021**
    **New York, New York**

_____
    **ANDREW L. CARTER, JR.**
    **United States District Judge**